1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DAVID ANTHONY SILVA,                )   1:10-CV-00409 LJO MJS HC
                                    )
                    Petitioner,     )   FINDINGS AND RECOMMENDATION
                                    )   REGARDING PETITION FOR WRIT OF
          v.                        )   HABEAS CORPUS
                                    )
P.D. BRAZELTON, Warden,             )
                                    )
                    Respondent.     )
_____)

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus (Pet., ECF No. 1) pursuant to 28 U.S.C. § 2254. Respondent, P.D. Brazelton, warden of Pleasant Valley State Prison is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

**I.    BACKGROUND**[1]

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving a determinate sentence "exceeding 100 years in length plus multiple consecutive life terms" pursuant to a judgment of the Superior Court of California, County of Stanislaus on numerous counts related to a series of home invasion robberies conducted by Petitioner and two co-defendants while armed with firearms. (Lodged Doc. 1 at 2-4; People v. Morrison, 2009

---

[1]This information is derived from the state court records lodged by Respondent with his response and is not disputed by the parties.

1  Cal. App. Unpub. LEXIS 3856 (Cal. App. 5th Dist. May 15, 2009)[2]).

2  Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth

3  Appellate District (the "5th DCA"), which, on May 15, 2009, affirmed the judgment of

4  conviction, struck three of Petitioner's enhancement convictions, and stayed the sentence as

5  to counts 14 and 35. (Lodged Doc. 1 at 161.) Petitioner filed a petition for review in the

6  California Supreme Court, which, on August 26, 2009, denied the petition. (Lodged Doc. 6.)

7  On March 8, 2010, Petitioner filed the instant federal petition for writ of habeas corpus.

8  Petitioner raises the following six claims for relief: (1) he was denied an impartial jury based

9  on the prejudicial effect of questions regarding criminal street gangs in the jury questionnaire;

10  (2) he was denied an impartial jury based on extrinsic evidence that a juror discussed with the

11  jury regarding how she felt threatened due an incident outside of trial; (3) insufficient evidence

12  supported the conviction; (4) the trial court should have suppressed wiretap evidence; (5) the

13  trial court should have suppressed voice identification evidence; and (6) the court imposed

14  improper sentencing enhancements. On October 29, 2010, Respondent filed an answer to the

15  petition. Petitioner did not respond to the answer and the matter stands ready for adjudication.

16  **II.    STATEMENT OF THE FACTS**[3]

17  <u>Count 1-May 25, 2003</u>

18  Shortly after midnight on May 25, 2003, Keyes resident Jimmy Lasater
   awoke to discover two men standing inside his house, about four feet from him,
19  with guns pointed at his head. One gun looked like a chrome or light-colored
   snub-nose .38 revolver. The men were wearing ski masks, dark jackets, and
20  what appeared to be leather gloves. They threw Lasater's pajama bottoms at
   him and told him to put them over his face, then pushed him to the floor and tied
21  his hands behind his back with a rope that had been in one of the bedrooms.
   The pair then took everything out of Lasater's pockets and began ransacking the
22  house. While this was going on, Lasater could hear two male voices. There was
   also a third robber in his bedroom, but, because this person whispered, Lasater
23  could not determine whether the individual was male or female.

24  The robbers asked Lasater where his guns were, and one wanted to
   know which key went to the safe in Lasater's bedroom. They took the cash from

---

26  [2] Petitioner's state appeal was consolidated with that of co-defendants David Wayne Morrison and
27  Anthony Lawrence Martinez.

28  [3] The Fifth DCA's summary of the facts in its May 15, 2009 opinion is presumed correct. 28 U.S.C. §
   2254(e)(1).

Lasater's wallet, $6,000 to $10,000 from the safe, all of Lasater's approximately 10 firearms, and various the person who asked about the key to the safe later asked about the keys to Lasater's Camaro, the vehicle was not taken. At some point, the robbers called Lasater by his first name, and said they were not going to bother his cars, because he was cooperating and they knew he was going to hand them on down to his grandchildren.[4]

Lasater estimated the intruders were in his house about an hour and a half to two hours. He did not recognize them or anything about their voices, except that they sounded Hispanic to him. Authorities recovered one of his guns, a Browning nine-millimeter semiautomatic, following the arrests in this case.

<u>Counts 2-4-June 26, 2003</u>

In June 2003, P.S. and his wife, Jane Doe One, owned two businesses in Turlock. At approximately 12:30 a.m. on June 26, the two were asleep in their Turlock residence when they were awakened by a loud noise and the sound of glass. Upon getting out of bed, Jane Doe One discovered that the living room door was broken in two, and there were footsteps and four or five flashlight beams coming toward her. She and P.S. tried to close and lock the bedroom door, but the intruders broke through. All were dressed in ski masks, dark clothing and gloves. One's gun was touching Jane Doe One's forehead. She believed there were four or five intruders, all with guns and flashlights; P.S. believed there were two hands and two guns, one of which was silver-colored and did not have a cylinder.

Two people came into the bedroom. One briefly shined the flashlight in Jane Doe One's eyes, blinding her, and told her to look away. She complied, and was told to get down on the floor. When she did so, one of the intruders tied her hands with cords cut from electrical appliances in the bedroom, while another intruder tied her legs at the ankles. At one point, she was touched on her side with a sharp object. The first intruder took her diamond wedding ring from her finger.

P.S. was also told to get down on the ground, which he did. Electrical cords were used to tie his hands behind his back and bind his legs near the ankles. One of the intruders said, "'You know why we're here.'" The voices were male, but P.S. could not see anyone because a blanket was thrown over his upper body. He could hear things being taken out of the dressers, as well as people going in and out of the room. Although he never actually saw anyone, he heard two male voices in the bedroom, as well as footsteps elsewhere in the house. He did not notice anything unusual about the voices, but Jane Doe One believed the intruders possibly were African-American. She based this on their accents and voices, as she saw no skin.

After perhaps 10 or 15 minutes, someone pressed down on P.S. with a knee and showed him a bank deposit bag for one of the businesses, wanting to know what it was. Shortly after, something was pushed down against P.S.'s cheek, causing him to scream in pain. He was then asked where the receipts and valuables were. P.S. answered, but the intruder kept pressing the object against his left eye area and causing him to scream. When the man asked why he should stop doing what he was doing, P.S. insisted he had told the

---

[4] Lasater, who was retired but built hot rods for himself, had a number of his hot rods parked outside his house.

truth about all the places he had money.

After some time passed during which the intruder apparently moved away from P.S., one of the assailants returned and pulled down the boxer shorts P.S. was wearing. Someone grabbed his penis, held the sharp object against it, and threatened to cut it off. When P.S. screamed, he was told to be quiet or the children would wake up. Then the person stopped and said, "'Your wife is so beautiful. Let me see how much you love your wife.'"

Jane Doe One, who had had her head covered with a towel or other heavy material, could hear the exchange between the intruder and her husband. The intruder then came to her, pulled off her pajamas, and began touching her hips. She struggled; he held her down with his leg and penetrated her vagina twice with his finger. After he stopped touching her, he said she was beautiful. He then returned to P.S. and again demanded money. While this was going on, Jane Doe One could hear another person in the room, taking things from the closet. All told, the intruders were in the home approximately an hour to an hour and a half. They ransacked the house, cutting open furniture and pulling up part of the rug. They took jewelry, identification, credit cards, a digital camcorder, approximately $2,000 in cash, and one of the couple's cars. They cut the home telephone line and took the couple's cell phones.

Authorities found footprints in the orchard across the street from the residence, and tire marks going eastbound. The couple's vehicle was found later that morning about a quarter to a half mile east of the residence. The couple's camcorder was recovered from Silva's residence after the arrests in this case, and he was shown on the videotape it contained.

<u>Counts 5-9-July 15, 2003</u>

At approximately 4:30 a.m. on July 15, 2003, four intruders, each with a flashlight and two with guns, broke through the front door of the Modesto residence shared by Ramon Mechuca, Francisco Hernandez, and Jose Hernandez. One of the guns was pointed toward Mechuca's forehead; it was black and the front part was "kind of squarish." Francisco Hernandez tried to escape through a window, but one of them grabbed him and threatened to kill him if he did not get down on the floor and pay attention. Mechuca, who was facedown on an air mattress, had his wrists and ankles bound almost immediately with black plastic ties. A blanket was pulled over his head. Francisco Hernandez was also tied up and placed next to Mechuca, and his head was covered with the same blanket.

One of the intruders, who spoke broken Spanish to Mechuca and the Hernandezes, demanded to know where the money and drugs were. When Mechuca said they had no drugs, the intruder threatened to start cutting them and then said some things in English, which Mechuca did not understand, to another person. Mechuca told them where his wallet was; they took the approximately $38 it contained and a silver ring Mechuca was wearing, and broke the men's cell phone. They also beat Francisco Hernandez, causing the blanket to come off Mechuca's head and allowing him to see Morrison's now-uncovered face.[5] Morrison said, "'He saw my face,'" and "'Let's kill him.'"

---

[5] When the intruders first entered the home, they had their faces covered with dark handkerchiefs. Morrison's was now down around his neck.

The blanket was placed over Mechuca again, and he was hit in the head and kicked in the ribs. He pretended to be unconscious so the intruders would not strike him anymore. Mechuca suffered injuries to his left ear. Francisco Hernandez was beaten with a frying pan and sustained facial injuries. The intruders overturned the couch onto Mechuca's and Francisco Hernandez's backs and jumped up and down on it while laughing. After the intruders removed the couch from the men, they left with Jose Hernandez, and Mechuca could hear shouts as they beat him.

The intruders remained in the house for about an hour to an hour and 45 minutes. After they left, Mechuca dragged himself to Jose Hernandez's room. Jose Hernandez, whose hands and feet were bound, was covered with a bloody pillowcase and said he was choking. Mechuca, who was still bound hand and foot, used his mouth to remove the covering. He then saw that Jose Hernandez was "full of blood" and bleeding from his head. An ambulance subsequently took Jose Hernandez to the hospital.

<u>Counts 10-11-July 21, 2003</u>

Around 7:00 a.m. on July 21, 2003, Christine Baker and her husband, Richard, were working in the walnut orchard surrounding their house in Delhi when they saw a small, magenta-colored car go up and down the road two or three times. When the Bakers reentered the house at 8:00 a.m., two men, each with a gun, told them to get on the floor. When they complied, kitchen aprons were put over their heads, and their wrists and ankles were bound with black plastic straps.

The intruders were dressed all in black and were wearing black ski masks. At least one was wearing what appeared to be unscuffed, black lace-up boots with ridged soles. The intruders said that if the Bakers cooperated and stayed quiet, they would not be hurt. Although their tone was polite, they constantly demanded the location of the Bakers' money, safe (which the Bakers did not have), and other valuables.

The intruders remained in the house for 45 minutes to an hour after the Bakers returned from the orchard. They ransacked the premises, cut the telephone lines, took slightly more than $1,000 in cash, as well as jewelry and coins, and also took the couple's car. After they left, the Bakers discovered that one of their bedroom windows was open wider than it had been when they went to the orchard that morning, and the screen was on the bed.

Later that day, the Bakers' car was found in an orchard about three miles from their house. Other vehicle tracks less than 10 feet away ran along a canal bank on the edge of the orchard and appeared  to go northbound. Authorities recovered some of the couple's belongings following the arrests in this case.

<u>Counts 12-14-July 24, 2003</u>

A little before 2:00 a.m. on July 24, 2003, Cynthia and William Gibbs were in the master bedroom of their Turlock home when they heard a loud crash and breaking glass. As the couple exited the room, they were confronted by at least two people who shined flashlights in their eyes, said they were the Turlock police, and ordered them to the ground. It appeared to Ms. Gibbs that they were wearing dark clothing. At some point during the incident, she saw a black boot that looked like a motorcycle or heavy work boot.

When Ms. Gibbs said they were not the police and told them to get out of her house, the intruders pushed the couple to the floor. At that point, someone was sitting on Ms. Gibbs's head and her chin was on the floor. Someone turned on the lights, and she saw a dark handgun with no cylinder lying near her face.

As Ms. Gibbs lay facedown, a person bound her hands behind her back with a black zip tie that was pulled extremely tight. When he moved off her head and went to bind her feet, she called out to her children to call 911. The person then punched her and knocked her head to the ground. A gun was put to Gibbs's temple, and he was told that if his wife did not get quiet, things could get really, really bad. The hand holding the gun was wearing what looked like a gray garden glove; the gun had a dark barrel and looked like an automatic. Gibbs also saw a gray shoe, with the material of the upper portion in a cross-weave pattern. Ms. Gibbs did not say anything else, and the person finished binding her ankles and put a house dress over her head. Gibbs was also bound at the wrists and ankles with zip ties, and a towel was placed over his head.

During the incident, Ms. Gibbs heard three voices, all of which she believed were male.[6] Sometimes the intruders referred to one another by a racially derogatory term. Despite the use of the epithet, the intruders did not sound African-American to Ms. Gibbs. Because of how they sounded and the racial slur, however, Gibbs thought at least some of them might be. He heard three different male voices. One seemed to be the leader, one seemed to be in charge of enforcement, and the third kept lookout. One was very polite when addressing him.

The Gibbses ran a business from an office on their property, and the intruders wanted to know where Gibbs kept the money he paid his employees. The leader used a knife to unbind him, and he was escorted out to the office, which was off of the garage. His head remained covered. Once inside the office, he was placed in front of the safe and told to open it, which he did. A coin collection and .25-caliber Derringer were taken from the safe. Gibbs was then escorted back to his previous location in the house, but this time, his hands and feet were bound with duct tape. When Gibbs could not figure out how to put his hands, the intruder he believed to be the leader told him to put them together like he was praying.

At some point, one of the intruders entered the room of the Gibbses' daughter. This person shined a flashlight in her face and demanded to know who lived in the house and whether she had a cell phone. He had a gun that was a dark grayish color, with an overall length of six to eight inches. She thought it may have been a revolver. He pointed it directly at her head. Later, she was able to see that he was wearing a black ski mask, black jeans with a silver clip on the right front pocket, a long-sleeved black shirt, and black combat-style boots.

The Gibbses' daughter was restrained by the use of black zip ties around her wrists and ankles. One person took her by the arm and walked her to her brother's bedroom and put a blanket over her and her brother's heads. Her brother, who was also bound with zip ties, saw that the person who restrained him had a clip for a knife in his right pocket. The young man heard three male

---

[6] One was just mumbling, but was a low enough voice for her to believe it was male.

voices that sounded African-American. He had the impression that one, who spoke in more of a whisper, was the leader.

The intruders remained in the home for at least two to two and a half hours. Before they left, they put socks in the Gibbses' mouths and wrapped duct tape around their heads. They also disabled the telephones. They ransacked the place and took jewelry, a gun, other items, and the family's car. It was recovered later that day a short distance away. Three distinct shoe print patterns were found in the dirt by the car, one coming from the driver's side and two coming from the passenger side. The length of the strides was consistent with someone running. The shoe impressions appeared to be fresh, and led along a house to where it appeared, from tire tracks, that another vehicle had parked. Similar shoe impressions were found in front of the Gibbs residence. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions, and most likely were the source of one of the impressions.

Ms. Gibbs sustained a cut mouth and bruises from being punched. In addition, she had ligature marks on her wrists and ankles, numbness in her hands that lasted about six weeks, and numbness in her legs that did not last as long. Authorities recovered some of the family's belongings following the arrests in this case.

<u>Count 15-August 4, 2003</u>

In August 2003, F.G. resided in Merced with her husband, Z.M., and son. She had a small business selling jewelry to people in their homes. She kept the jewelry in a safe in her kitchen. In late July, Morrison had twice come to the house to ask about a car F.G. had for sale.

Around 3:30 a.m. on August 4, F.G. and her visiting sister were asleep in the master bedroom when someone entered through the bedroom window. F.G., who saw only one person, screamed for her husband, who was sleeping in the living room. The intruder, who had a gun pointed at her face, told her in English to lie on the floor. The women obeyed and the intruder bound them at the wrists with black plastic.

When Z.M. heard his wife scream, he ran toward the bedroom. He saw two subjects, both of whom were armed and carrying flashlights. One had a black semiautomatic; the other, a chrome revolver with a long barrel. The one with the semiautomatic pointed it at Z.M., causing him to back out of the bedroom. The intruder followed him out and told him to get on the ground. This man was wearing some type of black sweater, a ski mask with holes for the eyes but not the mouth, and what looked like work boots or hiking boots with soles that were not very thick. A short time later, the other man also came out of the bedroom and pointed his gun at Z.M. This man was wearing a ski mask and black clothing. One of the intruders told Z.M., in English, that if the police arrived, the intruders would kill everyone.

The intruders placed Z.M. facedown and bound his wrists and ankles with black plastic bands. At some point, a small bed sheet was thrown over his head. One of the intruders took a gold ring off Z.M.'s finger. One of them placed his knee on Z.M.'s back, pressed a knife blade to the back of his neck, and demanded money. Z.M. responded that they had no money  in the house because they had been burglarized three months earlier. The intruder began cutting Z.M.'s neck and threatened to kill him.

At some point, a third intruder with a gun entered the house. F.G. saw that the shoes of one intruder had a black, U-shaped design on top, toward the toe. She and Z.M. both heard at least one use a racial slur when talking to another. Based on the eye color and skin tones Z.M. had been able to see, as well as the one's terminology, Z.M. formed the opinion that two of the intruders were Hispanic and one was African-American. The African-American was the one with the silver revolver. F.G. heard one of the intruders talking on what she believed was a cell phone. The man asked, in broken Spanish, which one was the woman who was going to open the safe. F.G. recognized the voice that replied on the cell phone and described her as being that of a former boyfriend who knew where she lived and about her jewelry business. A short time later, she was taken to the kitchen and struck in the face, whereupon she opened the safe. Her face was then covered with a towel. After the intruders went through the safe, F.G. ended up in the living room, where her breasts and vagina were touched over her clothing. Someone tried to rip off her shorts, but desisted when she struggled and yelled.

The intruders were in the house for about 30 minutes. They ransacked it, cut the telephone lines, and took everything of value, including the jewelry F.G. had had in the safe, which was worth $80,000 to $100,000. Authorities recovered some of the jewelry following the arrests in this case. Also recovered was some of the jewelry that had been taken in the earlier burglary, which had occurred when no one was home.

<u>Counts 16-17-August 7, 2003</u>

In August 2003, Renae Frye and William Cozine lived in Turlock. They sold small statuary and yard ornaments, some of which were kept in their front yard.

Around 12:45 a.m. on August 7, three men, wearing ski masks with openings for the eyes and lips, dark clothes, gloves, and black footwear, walked through the open front door with guns drawn and ordered the couple to the floor.[7] When they complied, Frye was told to put her hands behind her like she was praying. The intruders tied their wrists and ankles with large black zip ties, and covered Frye's face with a towel she had had on her hair and Cozine's head with a blanket that had been on the couch. They pepper-sprayed Frye's small dog when it became aggressive, and demanded to know where the drugs were. The couple, who had no drugs, told the intruders they were at the wrong house. The men then started asking for "big money."[8] After Cozine replied that it was in the bank, one of the intruders had Frye open the safe.

Frye neither heard a car arrive at the residence before the robbery nor leave the residence afterward. The only voices she heard during the incident were male. Although she was so frightened that she could not tell whether any of the voices had what might be termed an ethnic accent, for some reasons she thought the intruders were Spanish. The intruders were polite when addressing her and Cozine, but called each other slang and racially derogatory names.

---

[7] All the intruders had guns. The one pointed at Frye was eight to 10 inches long, black, and probably a pistol. Frye saw one pair of boots and one pair of shoes. Both were black.

[8] When Frye was interviewed by Detective Campbell later the same day, she related that one of the intruders asked where the $ 30,000 was.

1    The intruders were in the house for 45 minutes to an hour, during which
2    time they ransacked the premises and cut the main telephone line. They took
jewelry, $8,000 to $12,000 in cash that was kept in various locations throughout
3    the house, and the couple's cell phones.[9] Authorities recovered the cell phones
following the arrests in this case.

4

### Counts 18-20-August 11, 2003

5    In August 2003, Vicki and Kenneth Myers resided in Delhi. Although the
couple owned a Laundromat and a ministorage facility in town, neither was
6    operated out of their home.

7    At around 3:00 a.m. on August 11, at least three men broke open the
front door to the house. At least two had guns; all were wearing dark clothing
8    and had their heads covered. Two shined flashlights in the couple's faces, and
one put a gun to Myers's face.

9

10    The intruders immediately told Ms. Myers to put her hands behind her
back like she was praying. When one of her small dogs became aggressive, the
intruders sprayed something at it and it fled. The intruders then covered Ms.
11    Myers's head with her bedspread and used black zip ties to bind her wrists and
ankles. Two of the intruders took hold of Myers and told him to turn over on his
12    stomach and put his hands behind his back like he was praying. One struck him
in the back of the head a couple of times with what felt like a fist, while the other
13    restrained his wrists and ankles with black zip ties. His head was then covered
with his blankets. Myers was able to see that at least one of the intruders was
14    wearing black lace-up boots, while one had a black and green camouflage scarf
wrapped around his face and a black baseball-type cap with the bill facing
15    backwards. At some point, Myers observed that another was wearing a white
tennis shoe with a black stripe and a red stripe running horizontally the length
16    of the side of the shoe.

17    The intruders asked where the jewelry, money, and valuables were. They
also wanted information about the couple's businesses, and threatened to hurt
18    the Myerses' daughter, whom they knew lived at the ministorage facility. They
also appeared to know the receipts for the ministorage were deposited on
19    Mondays.

20    At one point, one of the intruders cut Ms. Myers's finger to the bone,
apparently accidentally, when repositioning her bound hands. One of the
21    intruders threw the blanket off of her body, leaving her head covered, then
jerked her panties as if he was going to pull them down. He stopped, however,
22    and covered her back up.

23    Myers could hear the intruders ransacking the bedroom. When they found
the safe in the closet, they put Myers on his knees, put a gun to the back of his
24    head, and clicked the gun twice. He told his wife that they were going to kill him
and that he loved her; she begged them not to do it. They then forced Myers to
25    open the safe, after which one of them kicked Myers in the back a few times with
what felt like a boot. The man kicking Myers told him, "'Just remember that all
26    black people aren't bad.'" Although the intruders referred to one by a racial slur
when addressing each other, they did not sound African-American to the couple.

27

28    [9] Ironically, there was $ 30,000 more in the house that the intruders did not find.

The intruders remained in the house for approximately 45 minutes. They cut the telephone lines to the residence, and took jewelry, money, a rifle and a side-by-side Browning 12-gauge shotgun, and a cell phone. It was subsequently discovered that someone apparently had parked in the orchard beyond the fence near the southwest corner of the property. There were a number of shoe prints in the area. Very shortly after the incident ended, Myers saw a car driving across the back of the property on the frontage road. Because it was still dark out, he could not ascertain its color or identify it in any way.

The following day, Ms. Myers saw a newspaper article about another home invasion. Anyone with information was asked to call Detective Campbell of the Stanislaus County Sheriff's Department. Ms. Myers called the number given to inform Campbell that such things were also occurring in Merced County. Authorities recovered some of the Myerses' belongings following the arrests in this case.

<u>Counts 21-23-August 11, 2003</u>

In August 2003, Steve Christy resided in Hughson. He managed Modesto Farmers Market and 16 acres of grapes adjacent to his property. His house had an alarm system, but it was not connected to the sheriff's department or other agency.

At approximately 4:30 a.m. on August 11, he was awakened by what sounded like an explosion and the alarm going off. As he ran toward the front door, he saw three people who had broken down the door and were entering the house. The intruders each shined a flashlight in his eyes and pointed a gun at his head and told him to turn off the alarm. The intruders all wore dark or black coveralls, dark masks with holes for the eyes and mouths, and plain dark gloves. One was wearing white tennis shoes with a little bit of blue on them.

Once Christy turned off the alarm, the three ordered him back into the bedroom, told him to put his palms together, restrained his wrists with a plastic zip tie so tightly that his hands began to swell, and placed him facedown on the floor next to the bed. A towel was placed over his head.

Christy did not hear the intruders talk to each other. Instead, one particular intruder did all the talking to Christy. This man spoke politely in a low tone of voice, and asked where the money was. When Christy told him, he asked for the safe. When Christy truthfully responded several times that he did not have one, a foot or a hand was placed on the back of his neck, something was pointed at the back of his head, and the intruder again asked where the safe was and said he would "'blow [Christy's] brains out.'" Christy heard a click from the gun behind his head, then the intruder who was talking to him told him to get up. They then went out to Christy's shop, which was about 100 feet from the main house.

Once inside the shop, the one intruder again asked the location of the safe. Someone started looking through the shop, while another intruder struck

Christy near his right kidney with what felt like a fist, knocking him unconscious. When he regained his senses, one of the intruders helped him back into the house.

All told, the intruders were at the house around an hour to an hour and a half. They ransacked the premises, cut the telephone line to the house, and took jewelry belonging to Christy's late wife, about $300 from his wallet and $990 in cash that had come from the farmers market, a Browning 12-gauge shotgun and a .38-caliber revolver, and some other items.

Boots seized from Silva could not be excluded as the source of a shoe print found on the dirt road leading from the house next to the Christy residence. Authorities recovered Christy's shotgun and some of his other belongings following the arrests in this case.

<u>Counts 24-29-August 12-13, 2003</u>

In August 2003, Jane Doe Two, her husband M.J., and their two children, T. and M., both of whom were young adults, resided Ceres.[10] The family owned two businesses, one in Oakdale and the other a limousine service that they ran from an office situated between their house and shop.

At approximately 3:30 a.m. on August 12 or 13,[11] M. was in the family room, awake, when he heard the outside door in his bedroom open, then saw some flashlights and three people. He pretended to be asleep, but one of the intruders came over to him, said he had been watching and knew he was not asleep, and told him to get up. M. was then struck on the back of his head with something hard and went to the floor.

Another intruder, who had a gun and was dressed all in black, went to the master bedroom, where Jane Doe Two and M.J. were sleeping. Jane Doe Two, who was dressed in her bra and underwear, was awakened by the intruder shining a flashlight in her eyes and telling the couple to get out of bed. When M.J. turned, the man hit him over the head with a gun, drawing blood, and then put the weapon to M.J.'s head. Towels were placed over the couple's heads, and they were led to the room where M. was. As she passed the room of T., who was seven and a half months pregnant, Jane Doe Two looked in and saw another intruder, also dressed completely in black, getting the young woman out of bed. This person had a flashlight and a gun. All told, there were three intruders in the home; all wore black boots and full masks over their heads. The

---

[10] Jane Does One and Two were given those appellations because they requested nondisclosure of their names pursuant to section 293. At sentencing, the trial court was informed that Jane Doe Two henceforth wished to be known by her true name. Given this court's policy of protective nondisclosure and the fact she is referred to as "Jane Doe Two" throughout the trial, we continue to use that designation for her.

[11] The exact date of the incident is not clear from the record.

masks had eye holes.[12] Jane Doe Two heard only male voices.

Once in the living room, Jane Doe Two sat down on the floor. Her son was going to the floor as a man hit him on the head with a handgun. The intruders then threw a blanket over him.

M.J. was also in the living room, and then T. was brought in. T. lay on the floor as she was told, then a gun was placed to her temple and she was told that if she moved, the intruder-who used a racial slur in referring to her-would shoot her.[13] A blanket was placed over her head and her wrists and ankles were bound with phone cord wire. M. was also bound with some sort of wire at the ankles and wrists. During the incident, T. saw two guns, both handguns. M. also saw two guns, at least one of which was a handgun.

Jane Doe Two was situated facedown on the living room floor. She was bound at the wrists and ankles with telephone cords and her head was covered. Someone ripped two rings from her fingers. Although Jane Doe Two was unsure whether this person was wearing gloves, she believed, based on his accent, that the man who was with her most of the night was Hispanic. One of the intruders, who was wearing gloves, took M.J.'s wedding ring.

M.J. was facedown on the floor. His wrists were bound with electrical cords from appliances in the house and his head was covered with something. One of the intruders wanted to know the location of the money and valuables. Someone held a gun to M.J.'s head and said they would blow it off if he did not tell them where everything was. M.J. heard the gun click several times while it was held to the back of his head. M.J. took them to the bedroom and showed them where the jewelry and guns were. The intruder then returned M.J. to the other room and laid him back down. At some point, one of the intruders said the family did not grow up like he did and were not raised on chitlings. M.J. also heard what sounded to him like gang talk. When the intruders walked past him, they kicked him in the head three times and once in the side. At least one was wearing black boots.

The Hispanic-sounding man told Jane Doe Two that her story about where the money was at had better match her husband's. He untied her and took her to open the safe, which was in the weight room. He then took her to the office, where a money box was kept. At some point, another intruder joined them. Jane Doe Two opened the money box, which contained $34, whereupon the intruder she believed was Hispanic cut off her underwear and undid her bra. She fell to the floor and he started asking her questions about whether she had ever cheated on her husband and how old her children were. Hoping they would leave, she told them that she had a limousine driver who was due. She could

---

[12] According to T., the subject who awakened her was wearing all dark clothing, a mask, and a black bandanna with white designs covering his face.

[13] Because of the use of the racial epithet and the way some of the intruders talked, T. formed the opinion they were African-American or Hispanic.

tell, from the tones of voice, that they were angry she had no money. Although she no longer had a towel over her head, she did not look at the intruders because she was afraid if she did so, they would kill her.

The intruders took Jane Doe Two back into the living room. The Hispanic one started rubbing her breasts and asking if they were real. Next, he tied her back up, facedown, although he did not retie her feet. He then stuck the gun in her vagina and told her husband he would "'blow her up'" if M.J. did not tell him where the money was. Jane Doe Two screamed, and the intruder removed the gun from her vagina and put it toward her posterior, although the gun did not actually penetrate her anus. He then untied her again and stood her up. He told M.J. that he was going to take her with him, and he put her over his shoulders and carried her outside.

The Hispanic intruder took Jane Doe Two to the deck, where there was a hot tub. From things he said to her, such as accusing her of being prejudiced, she believed he was trying to make her think he was African-American. He wanted to know where the money was and twice stuck her head underwater in the hot tub.

While this was going on, M.J. was brought out to the hot tub. He had been kicked in the head a few times and was bleeding.[14] The intruders demanded to know where more money was at, but there was no more money. One intruder held him by the back of his neck and tried to dunk him, but M.J. resisted. He then let his head be dunked in order to avoid a beating. M.J. managed to free his hands and straighten up, but one of the intruders punched him in the side of the face and the intruder who was with Jane Doe Two pointed what looked like it might be a black nine-millimeter semiautomatic at M.J.'s face. M.J. capitulated and his hands were retied. At one point, an intruder grabbed M.J.'s head, which was bleeding, and asked Jane Doe Two, " 'Is this your husband?'" She was screaming and crying and said yes. An intruder dunked Jane Doe Two's head one more time, then the couple was taken back into the house.

Jane Doe Two was not retied. Her head was shoved down into the love seat so that her naked posterior stuck up in the air. Every time she tried to sit down, an intruder would put her back up. At one point, two of the intruders were laughing and one of them pantomimed having intercourse with her. A dildo was thrown at her, and the Hispanic intruder told her to use it. When she did not want to touch it, the two intruders moved her into T.'s room, where they placed her on the bed, face up. One of them put a pillow over her face. They

---

[14] The lights by the hot tub were motion detectors. They were off that night, as someone had unscrewed the bulbs from their sockets. Only the motion detectors in the back of the house had had the bulbs removed. Those at the front of the house were untouched.

A canal ran along the left side of the home, near the hot tub area. Thorny weeds known as goat heads grew along the canal bank. After the intruders left, M.J. saw goat heads in the family room that were not there prior to the robbery.

encouraged her to use the dildo on herself, then one of them inserted it into her vagina himself and moved it in and out. At the same time, the first one fondled her genitals with his hand. She was crying hysterically; when the intruders told her to shut up, she told them that she could not breathe. When the intruder placed the dildo against her posterior, she said that there was something wrong with her. They stopped at that point and tied her up in the living room again.

At some point after the hot tub incident, one of the intruders received what sounded like a call on a cell phone. He spoke to someone, but Jane Doe Two could not tell what he said because she was crying. When the intruders left, they used the back door, which was in M's room. All told, they were in the house some 45 minutes to an hour, during which time they ransacked the family's belongings. They disabled the telephones and took jewelry, $34 in cash, a shotgun, a .22-caliber rifle, two handguns, and a knife. Authorities recovered some of these items following the arrests in this case.

The family subsequently received medical treatment for their injuries. Jane Doe Two was somewhat disoriented and sustained bruises on her arms, legs, and ankles. She also experienced some vaginal bleeding. T.'s wrists were injured by the cords being wrapped around them. M. suffered a minor concussion and received either staples or stitches to close his head wound. M.J. sustained injuries to his face and head that required stitches and left a permanent scar.

Several sets of footprints were found along the canal bank. Boots seized from Silva could not be excluded as the source of some of the prints. Boots seized from Martinez could not be excluded as the source of another of the prints. In addition, one print appeared to be of a tennis shoe type, with a heel that appeared to be split, somewhat like a horseshoe.

<u>Counts 30-31-August 14, 2003</u>

At approximately 1:20 a.m. on August 15, 2003, Marcos Renteria was asleep in his Ceres residence when he was awakened by a loud noise coming from the attached garage. Renteria arose and managed to partially dial 911 on his cell phone, but before he could complete the call, someone kicked down the door to the bedroom. Renteria saw two intruders, both with guns drawn on him and with flashlights. One gun was shiny, probably chrome, and square. Renteria did not think it was a revolver. The intruders were wearing dark clothing, black combat boots, and had handkerchiefs covering the lower halves of their faces.

When the intruders entered, they turned on the bedroom light and started yelling at Renteria in English to get down. Both voices were male. One of them demanded to know who he was calling, then grabbed the phone and threw it on the ground. When Renteria said they could have anything, one of them said, "'Anything?'" One then hit him over the head with a metal flashlight and both began punching him. A burning liquid was sprayed at his face, and he was struck with a flashlight more than once. One of the intruders put the square gun to his head, and Renteria grabbed it and tried to wrest it from the man's hand. He almost succeeded, as the intruder was wearing gloves that were a little too

big for him. At some point, one intruder's mask came off or Renteria pulled it off. It was Martinez. The other intruder said, "'Shoot him, Bro.'"

Although bleeding heavily, Renteria fled to the garage. He pushed the button to raise the car door and managed to lift it a bit, but the intruders caught up to him and started punching him again. The intruders pushed Renteria back inside the house, but he managed to evade them and dive underneath the garage door. He then started running to his shop, which was 150 to 200 feet away. Renteria could tell the intruders were following him, then he heard shooting. Several shots struck him, then some of his workers came to his aid. Renteria saw some lights moving away from the house, toward the canal. It appeared the intruders were running with their flashlights. Renteria estimated they had been on the premises about an hour. To his knowledge, nothing was taken from the house.

Renteria was shot four times. His injuries required prompt medical attention and surgical repair to prevent loss of limb or death. Subsequent DNA testing showed his blood on Silva's boots. In addition, Silva's boots could not be excluded as the source of a shoe print found at the scene.

### Counts 32-35-September 10, 2003

In September 2003, Homer Garza, Sr., resided in Denair, with his wife Virginia, 14-year-old daughter Melissa, and 23-year-old son Homero, Jr.[15] Garza, a farm manager, had an office at his residence, as well as one at his work site. An alarm system that was connected to a security company and the sheriff's department had been installed at the house on September 9.

At approximately 2:20 a.m. on September 10, Garza got up to see his wife off to work and to check on some water he had running in his orchard. Everything seemed fine. Around 3:30 a.m., he was asleep when the house's alarm went off. Thinking there was a problem with the installation, he was hurrying to turn off the alarm, the control panel for which was by the front door, when three men entered the house by breaking open the dead-bolted front door. One held a shotgun to Garza's head and said that if he did not quickly turn off the alarm, the intruder would "'blow [his] brains out.'" The intruder repeated this and banged Garza's head with the butt of the shotgun multiple times. Garza was able to tell the intruders were wearing masks, but could not make out what kind because the individual with the shotgun also was shining a flashlight in his face.

Garza managed to turn off the alarm. The intruder, who was wearing gloves that felt like latex, grabbed him, took him into the living room, and told him to drop to the floor and put his hands together behind his back, as if he was praying. Garza's hands and ankles were restrained with black plastic ties and his head was covered with one of his wife's shirts.

---

[15] For the sake of clarity, we will refer to the Garza children as Melissa and Homero. No disrespect is intended.

As one of the intruders ran down the hallway toward the children's rooms, another one put his foot to Garza's neck, applied pressure, and asked him where the money was. The shoe felt heavy. The intruder told Garza that his son was in blood, and that if he loved his son, he would tell where the money was. Garza said there was money in his wallet in the laundry room. The intruder then asked where the "clavo" was. In the Spanish culture, "clavo" is a slang term that means "stash."[16] Garza understood it to mean money or jewelry, and he told the intruder that he did not know what he was talking about. The intruder then got angry and kicked Garza in the side of the face.

Meanwhile, Homero was awakened when his locked bedroom door was kicked in. What appeared to be a shotgun and a flashlight were pointed at him by a person wearing what looked like black military boots and black pants with pockets on the side. He could hear the alarm in the background. It went off after 15 to 25 seconds. Homero was told to lie facedown on his stomach and put his hands behind his back in a praying position. He complied, but, due to his size, the intruder had trouble holding his hands together, so another person came and helped. Homero's wrists and ankles were restrained with black zip ties and a blanket was thrown over him. He could hear three male voices. The intruders spoke in English, except that Homero, who understood Spanish, heard the Spanish slang term "ese" four or five times when one intruder addressed another. The two intruders in his room used the term and seemed to have Hispanic accents.

Homero heard one of the intruders tell his sister to get up and then to get on the ground. He then heard what sounded like someone being struck. Although he did not hear his sister make any sound, he yelled out not to hurt her, that she was only 14.[17] The intruders repeatedly asked Homero where the money was; when he insisted there was no cash in the house, he was kicked a few times in the back of his head with something that felt sturdy, like a boot. The intruders said that if he was lying, his father was going to get hurt worse, and that Homero should look at him, that he was bleeding all over. Homero knew they were lying, because he could hear his father and had not heard him being struck or asking not to be hit.

Eventually, one of the intruders asked Garza how to turn off the front lights. Garza told him the location of the switch, then heard a car nearby that sounded like its muffler was torn up. The car was leaving. The incident lasted 30 to 50 minutes, during which the house was ransacked and the telephones disabled. The intruders took a number of items, including jewelry, CD's, money, and a video camera. Authorities recovered some of the items following the arrests in this case.

---

[16] Although English was Garza's native language, he was fluent in Spanish. Except for the word "clavo," the intruders spoke English.

[17] Melissa was left on the floor with a blanket covering her head and with her wrists and ankles restrained with zip ties.

1   Garza suffered cuts and bruises to his head and face from being kicked
2   and struck with the gun butt. He also had bloody marks on his ankles from
    having his feet tightly bound. Melissa sustained a facial abrasion and marks on
3   her wrists and ankles. Homero had marks on his wrists and ankles that were
    visible for about a month. None of the family sought medical attention.

4       Shoe prints were found between the residence and the road. Boots
5   subsequently seized from Silva could not be excluded as the source of some of
    the impressions. Boots subsequently seized from Martinez could not be
6   excluded as the source of other of the impressions. There were tire tracks in the
    orchard near the house that appeared to go from Swanson Road, into the
7   orchard, and then out onto the road again. The shoe prints led toward the area
    where the tire prints were found.

8                         Counts 36-37-September 10, 2003

9       Early on the morning of September 10, 2003, Stanislaus County Sheriff's
    Detective Nuno was assigned to be part of the arrest team, if residential robbery
10  suspects, who were under surveillance, committed a robbery. Sergeant Allen,
    who was the team supervisor, was with Nuno in one vehicle, while the rest of the
11  SWAT team and a couple of other detectives were in other vehicles. Nuno and
12  Allen were in an unmarked car that was equipped with lights and a siren. Nuno
    was driving.

13      At approximately 4:30 a.m., Nuno and Allen were at the staging area in
14  Hughson, when they received information that the individuals were believed to
    have committed a residential robbery in the area.[18] The surveillance team
15  reported the suspects' location; Nuno had previously been informed that the
    suspect vehicle was brownish or golden and had the words "Cold Pimp'n" on the
16  back.

17      Nuno and Allen, who were in the lead vehicle, and the rest of the arrest
    team moved to intercept the suspects. Once the team was in position, Nuno
18  activated his lights and siren. The suspect vehicle slowed down as if it was going
    to stop, but then accelerated. A pursuit ensued that covered seven to 10 miles
19  and lasted approximately 10 minutes.

20      Nuno followed the vehicle from a rural area into a residential
    neighborhood in Turlock. There, the car slowed down and began making turns.
21  The rear doors opened a couple of times, then, in the vicinity of 550 Angelus,
    near Angelus and Spruce, the vehicle slowed almost to a stop. Nuno slowed
22  down as well, and pulled toward the driver's side passenger area of the vehicle.
    The right rear door opened completely, and Martinez got out. He was wearing
23  black clothing, a black beanie-type hat, black boots, and a bandolier, and had
    a shotgun in his hand. As he turned toward Nuno and Allen, the shotgun also
    turned in their direction. Allen opened his door, stepped half out of the car, which
24

25      [18] Because the telephones were missing or disabled, Homero Garza had activated the panic button on
26  the alarm to summon help.

27

28

was still moving, and fired several shots at him. Because Allen was behind the door of the car and the window was not rolled down, he fired through the window, which shattered. The shots also damaged the vehicle's outside mirror. The Cold Pimp'n vehicle was about 10 to 15 feet in front and to the right of his and Nuno's position at that point. As Martinez ran toward a residence on the south side of Angelus, Allen reacquired the target, stood up, and fired again. He was standing behind the door of his and Nuno's car, which was now slightly rolling away from him.

Immediately after Allen fired the second time, he and Nuno heard loud booms, which Allen believed to be gunfire. They were coming from the suspect vehicle, toward Allen. Allen had stepped out of the car in which he had been riding, and was standing right next to it. He was still somewhat in the doorway, with the car moving away from him. When he first heard the gunshots, Nuno's car had not completely cleared his position. The suspect vehicle was still in front of Nuno's car, approximately four to five car lengths away. The lower driver's side portion of Nuno's windshield broke, and he realized he was being shot at. Glass from the windshield cut his left cheek, and the bullet, which struck the driver's side door frame, was probably inches from his face. Nuno heard several booms. Allen heard two or three shots. Nuno was not sure which shot hit the windshield, but it was neither the first nor the last.

As this was going on, the suspect vehicle started to move. Nuno accelerated to catch up to it, and Allen followed Martinez.[19] At the intersection of Angelus and Spruce, approximately 100 yards from where Martinez had exited the vehicle, the two passenger side doors opened. As the car was either completely stopped or moving slowly, Morrison got out of the rear passenger side. Nuno did not see anything in his hands. Silva got out of the front passenger side. He was dressed in dark clothing and holding a chrome-colored handgun.

Because Silva was holding a firearm, Nuno positioned his car at an angle and began to shoot at him through the broken-out passenger window. He could not tell whether any of his shots struck Silva, who disappeared into the darkness, as did Morrison. Having lost sight of them, Nuno came around the driver's side of the suspect vehicle, at which point he saw the driver exit. It was Fouse. Nuno gave chase as she ran into a yard across the street, then took her into custody without further resistance.

Fouse was taken into custody around 4:45 a.m. A subsequent search of the vehicle revealed a number of items that the Garzas later identified as belonging to them, as well as a black baseball cap and black ski mask. The ski mask had two eyeholes, and a mouth opening that had been closed by some means. A camouflage hood was found on the rear floorboard. A shotgun was

---

[19] Stanislaus County Sheriff's Deputy Ward, who was also a member of the arrest team, was running toward the area to assist. Ward estimated that seven to 10 shots were fired from the area of the suspect vehicle. At the time Ward heard them, Nuno had already dropped Allen off and driven after the other vehicle. Allen was running after the suspect who had left the vehicle.

found in the front yard of the residence at 550 Angelus, where Martinez had jumped the fence into the backyard and fled from Allen. In the backyard was a bandolier with shotgun shells in it.

After receiving information concerning Silva's whereabouts, Ward assisted in taking him into custody about 5:30 or 6:00 a.m. Silva was hiding in the carport of the residence at 733 South Orange Street. When apprehended, he had a cell phone in his hand. Eight black plastic zip ties, each individually secured in a loop, were found underneath the vehicle where Silva had been hiding. Although Silva only had a pocketknife on his person, two black nine-millimeter magazines for a semiautomatic weapon were found in the backyard of the residence, about 15 to 20 feet from the carport. One contained 10 rounds and the other contained nine. A black Browning High-Power semiautomatic handgun with a magazine in it was subsequently located in the backyard of the neighboring residence at 720 Spruce. The two backyards were separated by a fence with a gap in it, and the two magazines were some six to 10 feet from the black handgun.

Although the black handgun was photographed where found and Deputy Luck, then a Stanislaus County Sheriff's Department trainee, was assigned to watch the evidence in the area, the gun was no longer there a couple of hours later when sheriff's personnel returned to collect it, and Luck was no longer in the immediate area. A resident of the house agreed to assist Deputy Reed, Luck's field training officer, in trying to recover the handgun. The following day, this person directed Reed to an apartment complex in Turlock and retrieved what appeared to be the gun. A check of the weapon's serial number revealed it had been taken in the Lasater robbery. Subsequent comparison revealed that one of the unfired cartridges in the magazines found in the backyard at 733 South Orange most likely was cycled through this gun.

A silver-colored Smith and Wesson .357-caliber revolver was found in an adjacent backyard at 717 South Orange.[20] The revolver, which was capable of holding six rounds, contained six empty shell casings.

Nuno assisted in capturing David Michael Silva, who was hiding in a duplex laundry room on Spruce, near Angelus. David Michael Silva was taken into custody between 6:00 and 7:00 a.m.

Just before 8:00 a.m., Stanislaus County Sheriff's Detective Cook found Martinez hiding in the backyard of the residence at 364 South Avenue, at the corner of South Avenue and South Orange Street. A black zip tie and a loaded Mossberg 12-gauge shotgun (also known as a Moss) were recovered from the area in front of the residence at 550 Angelus.[21] A black strap containing 12-gauge shotgun rounds was found in the backyard of the residence.

Around 1:30 p.m., the SWAT team was directed to 653 South Avenue. Morrison was inside the residence with several other individuals and was taken into custody.

---

[20] The three parcels were contiguous; 720 Spruce and 733 South Orange were back to back, and 717 South Orange ran along both of them. The break was in the fence between 720 Spruce and 733 South Orange.

[21] The shotgun later was identified as belonging to M.J. and Jane Doe Two.

Additional Evidence[22]

Detective Campbell, who became the lead investigator on the day of the Gibbs case, began to focus on Morrison, Silva, and Martinez as potential suspects shortly after the robbery of M.J. and Jane Doe Two. On about August 13, members of the Stanislaus County narcotics task forces were asked by the Stanislaus County Sheriff's Department to assist in surveillance of suspects in a series of residential robberies.[23]

Richard Balentine, an investigator for the Stanislaus County District Attorney's Office, was part of the surveillance team for approximately 22 out of the 27 days the surveillance lasted, and also spent three days monitoring intercepted conversations in the so-called wire room. Martinez, Silva, and Morrison were three of the individuals targeted for surveillance, and were seen together on a number of occasions. During the surveillance period, certain homes and vehicles came to be recognized as being associated with them. Silva was associated with two residences, one at 20077 First Street, Hilmar, and the other at 3512 Woodglen Court, Modesto. He was seen driving a 1984 Buick Park Avenue, variously described as silver or brown, with large white letters spelling "Cold Pimp'n" in the back window. He was also seen driving a white 1999 Mitsubishi Eclipse convertible. On a few occasions, Virginia Ellsworth was seen in Silva's company, and also in his vehicle at his residence. Martinez was seen coming from, going to, and staying the night at 733 South Orange in Turlock, and he was occasionally seen on Davis Court in Delhi, the same address on Woodglen in Modesto as Silva, and, near the end of the investigation, on South Carpenter Road. Martinez was associated with a green 1997 Dodge pickup. Morrison was seen going to, coming from, and staying the night at 16347 Davis Court, Delhi, the same address at which Martinez occasionally was seen. Morrison was associated with a gold Chrysler Intrepid. Morrison was often seen associating with Patricia Ramos.

Fouse was also under surveillance. Balentine twice saw her at the Woodglen address. On one of those occasions, August 30, she drove up and walked into the house, then came back outside with Silva and two other males. All four got into the Cold Pimp'n vehicle, which was not the car in which Fouse had arrived. Fouse got into the left rear of the vehicle; a Hispanic male got into the right rear; a white male who was carrying an object that Balentine believed was a shotgun or rifle got into the right front; and the car, which was driven by Silva, left the residence. On one occasion, Balentine saw her driving the Cold Pimp'n vehicle.

Early on the morning of August 15, the date of the Renteria incident, Agent Vieira of CalMMET was surveilling the First Street residence when, at 2:11 a.m., he saw the Cold Pimp'n Buick drive up and park in front of the house. A male dressed in dark clothing exited the driver's side of the vehicle and walked toward the front door of the residence. A minute later, a male wearing a gray shirt exited the residence and walked toward the front driver's door of the Cold

---

[22] We do not separately set out evidence presented with respect to count 38, the conspiracy charge, as much of it comprises the evidence presented with respect to one or more of the incident-specific counts.

[23] There were three such task forces. The local task force was Stanislaus County Drug Enforcement Agency (SDEA); the state task force was California Methamphetamine Enforcement (CalMMET); and the federal task force was High Intensity Drug Trafficking Area (HIDTA). The three were run as one large unit, with combined resources and personnel.

Pimp'n car. He pulled what appeared to be a heavy black bag out of the right rear passenger side of the vehicle and carried it into the house. At approximately 2:14 a.m., the gold Intrepid pulled up and parked just in front of the Buick. A male, dressed all in black, exited the front passenger side door and walked up toward the front of the residence. Although Vieira could not tell if this man knocked or simply let himself in, he entered the residence. He returned to the gold Intrepid about a minute later and drove away. Another male came out of the residence and drove off in the Cold Pimp'n vehicle. Vieira could not tell whether this was either of the two men who previously had interacted with the Cold Pimp'n car. The vehicle left at approximately 2:15 a.m.

At approximately 9:50 p.m. on August 15, Balentine and one of the surveillance teams were southbound on 99 when Balentine saw Silva driving the white Eclipse convertible southbound into Merced. Morrison and Martinez were passengers in the vehicle. The three attended a party in Merced. At approximately 11:55 p.m., SDEA Agent Hoek and other officers were conducting surveillance at a residence in the southern Merced area when they saw the white Eclipse convertible leave. Silva was driving and had two passengers. The car went to the residence on Davis Court in Delhi. Two people got out. The vehicle, now containing only the driver, left after about two minutes.

At approximately 8:53 p.m. on August 18, Modesto Police Sergeant Van Diemen of the SDEA drove by the home at 733 South Orange, Turlock, and saw Martinez and Morrison in the front yard. He was aware the two were cousins.

At 11:59 p.m. on August 25, SDEA Agent Tovar was surveilling the Woodglen address in Modesto. As he drove by the residence, he saw Silva and Morrison standing in the driveway, talking to each other.

As a result of the surveillance, information was developed that caused Campbell and Hoek to obtain authorization for and initiate wiretap surveillance with respect to (209) 505-9835, for which Patricia Ramos was the subscriber but which Morrison used, and (209) 614-7098, for which Silva was the subscriber. Wiretapping was conducted from August 29 until September 10, with surveillance teams concentrating on the hours of 6:00 p.m. to 6:00 a.m. During a number of the intercepted conversations, the males referred to each other by a racially derogatory term or shortened variation thereof. Fouse became a target of the investigation when her name came up in the wiretaps.

At 6:46 p.m. on September 1, a conversation between Silva and Morrison was intercepted in which a reference was made to Silva having "that black bag" on him because his "old lady" wanted it and was supposed to show somebody in Turlock. Later in the conversation, Silva said they could just "get in the tinted windows" and "do [their] thing."

Later that evening, at 8:45 p.m., the Cold Pimp'n vehicle was followed to a Taco Bell in Turlock. At 8:48 p.m., a conversation between Silva and his mother, Terry Silva, was intercepted. There was a reference to Silva and Fouse being together at a Taco Bell, and Fouse mentioned that Silva's girlfriend was her roommate. During the course of the conversation, Terry Silva said that someone had told her there had been a lot of things in the paper about home invasions. Silva replied that there had been, which was why he had stopped for a while. Terry Silva then told him that she wanted him to take anything he had out of her house and put it in his cars or something.

At 2:47 p.m. on September 2, a conversation between Silva and Morrison

was intercepted. Morrison said that he wanted to pick up the jewelry and take it, because someone wanted to check it out. About half an hour later, the gold Intrepid arrived at the Woodglen residence. Approximately two minutes later, the white Mitsubishi Eclipse arrived. At 5:17 p.m., Agent Pettit, who was conducting aerial surveillance, saw the gold Intrepid meet up with a burgundy-colored car on Carlos Court. Pettit followed the Intrepid to Atlantic Street, where it met someone out front. A short time later, Pettit saw a male take a black bag out of the trunk. At 6:30 p.m., Pettit observed a male in a white shirt at the trunk of the Intrepid. Two minutes later, the Intrepid left with a green Dodge Neon. Both vehicles went to Sam's Food Lot on Carver, and someone from the Dodge got out and talked to the driver of the Intrepid.

At 6:41 p.m., a conversation in which Morrison contacted Martinez was intercepted. In it, Morrison said he needed money to make a car payment, and so gave "Mike" a good deal. Morrison spoke of how much he received per gram, and said he gave "Mike" a lot of rings and things that weighed about 10 to 15 grams apiece. When Martinez asked whether "Mike" paid 650 for what Morrison gave him, Morrison responded affirmatively and said he got two for Martinez, two for Silva (to whom he referred by a nickname), and two for himself, and would get 50 the next day. Martinez said that sounded good. Immediately after, Morrison telephoned Silva, informed him of the deal, and said that if Silva wanted $200, to come to Turlock and get it. Silva said he would. Morrison also informed Silva that he had instructed "Mike" to say they only sold stuff to him one time. At approximately 7:00 p.m., Pettit saw the Intrepid go to an apartment complex in the 500 block of Angelus Street in Turlock, where it remained for about 12 minutes.

Surveillance of the Woodglen residence showed Morrison and Martinez leaving in a green truck at 2:50 a.m. on September 3. Martinez was driving. At 9:46 p.m. the next night, a conversation between Morrison and Martinez was intercepted in which Morrison told Martinez that he had sold some pieces of jewelry for "three," and that, if Martinez wanted $100, he should come and get it.

At 3:34 p.m. on September 8, a conversation between Silva and Morrison was intercepted in which Silva said he was trying to get some stuff moved because he had to be out of his location by 6:00 the next morning. Silva said he was trying to find a storage facility, but that "they" called him earlier and had some people who wanted to look at the jewelry. When Morrison asked whether Silva's "old lady" or Shady told Silva that, Silva replied that it was his "old lady."[24] Morrison asked whether Silva wanted him to go over there. When Silva said yes, Morrison said he was already on his way and had everything with him. In another conversation at 10:19 that night, Martinez and Morrison discussed the price per gram, and that if "they" only wanted a few small items, then the cost would be "half price the tags."

At 10:32 p.m. on September 9, a conversation between Silva and Morrison was intercepted in which Morrison informed Silva that he and "Anthony" wanted to "do some money making." Morrison asked if Silva wanted to go out with them. When Silva said he did not want to go out and "window shop," Morrison again asked if he wanted to go. Silva responded, "Geared up?" Morrison answered affirmatively, and Silva agreed. Morrison said they were

---

[24] Silva and Fouse had been friends for approximately 15 years. Fouse had been known by the nickname "Shady" since childhood.

getting on the freeway in Merced, then were going to stop by Morrison's house and then go to Anthony's. He said he would call Silva when they got to Modesto. A few minutes later, at 10:36 p.m., Silva telephoned Fouse and said he might need a driver that night. He said he had called her because "David" had called him. Fouse asked whether David had sold all the gold; Silva responded that he did not think "they" sold it all, but "they" sold some of it the day before. Silva and Fouse then discussed when Silva would be there, and Fouse asked whether it was the same as last time, dropping him off and then coming back and getting him. He answered affirmatively and said she would not be used for anything else, as far as going with them. Fouse said she was moving slowly right then, but she could drive.[25] She said it would be kind of fun, and that she needed something interesting in her life right then. When she asked what car she would be driving, Silva said he would find out and see if they needed a driver, and would call her back. Silva then telephoned Morrison and asked if they were going to need a driver. When Morrison said yes, Silva said he would get Shady. Discussion then turned to what car they were going to use. Morrison responded that his mother had his Intrepid, his Thunderbird was "all primered up," and they would not all fit in Anthony's truck. Silva agreed and said his "nightmare" was full of his belongings, but he could unload it at his house. They then discussed where they would meet. It was agreed they would meet at Silva's home, and that Morrison would grab his things and get ready at Anthony's, and then he and Anthony would go to Hilmar. Silva called Fouse back at 10:47 p.m. and told her they would be needing a driver. Two minutes later, there was a conversation between Morrison and Silva in which Morrison asked whether Silva had "the Moss" at his house. When Silva said he had both of them right there, Morison said he wanted to use "the big one with the belt."

At 11:33 that night, a conversation between Silva and Fouse was intercepted in which Fouse said she saw "all them cops" and asked where Silva was. When Silva said the police were at a particular store, Fouse said now that they knew where all the police were, they should "do something" in Turlock "really fast." When she asked if Silva was at home, he replied that he was on Lander, not far from "you guys." Agent Pettit, who was conducting aerial surveillance, saw the Mitsubishi arrive at the First Street residence at 11:37 p.m. At 11:40 p.m., the Cold Pimp'n Buick arrived. At 11:48 p.m., the officer surveilling the residence on First Street, which was a short distance west of Lander Avenue, saw a female and a male standing by the Cold Pimp'n vehicle. The man was dressed in black. At 11:58 p.m., a telephone conversation was intercepted in which Silva asked Morrison where he was. Morrison replied that they were already dressed and leaving Anthony's house. Silva said he had to unpack his car.

Surveillance on Martinez's new residence on Carpenter Road in Modesto showed that the green Dodge pickup associated with Martinez was parked out front at 11:30 p.m. Martinez and Morrison were seen taking items from the residence to the vehicle at least twice, then they left in the truck just prior to midnight. Both were dressed in dark clothing, and it appeared they had placed something dark, like a duffel bag, in the cab of the truck. Agent Pettit began aerial surveillance of the vehicle at approximately 12:06 a.m., and followed it to the First Street residence in Hilmar.

At 12:04 a.m. on September 10, Vieira saw the female back the Cold Pimp'n Buick, which was parked on the street, into the driveway, underneath the

---

[25] Fouse related that she had undergone a medical procedure that day.

carport. At 1:05 a.m., a female and a male dressed in black got into the car. The female got into the driver's side front door, and the male got into the passenger side front door. Because the vehicle was in the carport, Vieira could not tell whether anyone got in through the rear passenger doors. The vehicle then left the location. This was sometime after the green pickup arrived.

From the First Street residence, the vehicle went to an AM/PM store in Turlock, where a female got out and appeared to put gas in the car. The tinting on the vehicle's windows made it difficult for the surveilling officer to see inside the back.

The car was followed from the Turlock area to an area out in the country near Snelling, where it parked with its lights off, in an orchard across the street from a residence from 1:34 a.m. to approximately 2:27 a.m. It then left and was followed to the Hughson area.

At 3:15 a.m., Agent Pettit, who was conducting aerial surveillance, observed the Buick driving down Swanson "blacked out," i.e., with its lights turned off. It pulled into an orchard in the vicinity of a residence. Because of the trees, Pettit was unable to see whether anyone got out. Officer Myers saw the vehicle at the Swanson Road location at 3:50 a.m. The car was on the east side of the roadway, facing north, and was 10 to 15 feet off of the pavement. No exterior or interior lights were on, and the area was quite dark. Myers drove southbound on Swanson. As he passed the car, he activated his high beams. It appeared there was nobody in the front seat. He was unable to see in the back.

The Buick began moving again at approximately 4:30 a.m. Myers fell in behind the car as it headed westbound. At approximately 4:38 a.m., he became aware of a panic alarm from a home in the area in which the Buick had been parked. A pursuit of the Buick ensued.[26]

At 4:52 a.m. on September 10, a telephone conversation between Silva and his girlfriend, Virginia "Ginger" Ellsworth, was intercepted. In it, Silva revealed that he was running from the police and was hiding on Orange, in Turlock. When Ellsworth offered to come and get him, Silva told her that he was in the backyard of his "homeboy" Anthony's house at Angelus and Orange, but that the police were all around. Silva stated that he had shot at them and asked her to hurry. At 5:26 a.m., another conversation between Silva and Ellsworth was intercepted, with Ellsworth confirming that Silva was in Anthony's backyard and telling him that the house was surrounded and the area blocked off, and she could not get to him. When she told Silva not to move and to cover himself up, he replied that he did not have anything to cover himself with, but was hiding behind the Blazer in the driveway between Anthony's and the neighbor's houses. When the girlfriend asked if Silva had a gun on him, he replied no, that he had

---

[26] There was never a plan to allow a residential robbery to occur in order to catch the perpetrators red-handed. Sergeant Van Diemen, who was acting in a supervisory capacity this evening, was aware both times the Cold Pimp'n car pulled into an orchard. He did not call for an arrest either time, however, because the information he personally had received over the radio was that when the vehicle left the Hilmar residence and headed toward Snelling, only two people -- a male and a female -- were observed getting into the car. This indicated to Van Diemen that the full crew was not in the vehicle, and so he did not believe that a residential robbery was going to occur at that point. It was his belief that the two individuals in the car were conducting scouting missions and looking for potential victim locations. It was the panic alarm call from the Garza residence that triggered the arrest.

thrown it, but did not know where. The information on Silva's hiding place was passed from the monitor in the wire room to officers on the scene.

On September 10, search warrants were executed at the residences associated with the male defendants. M.J. and Jane Doe Two, Vicki and Kenneth Myers, Adriana F.G. and Z.M., and William Gibbs subsequently identified a number of items found at the Davis Court residence and in the gold Intrepid in the driveway as belonging to them.

F.G. and Z.M., Steve Christy, and M.J. identified items found at the Carpenter Road residence in   [*60] Modesto as belonging to them. Cash; nine-millimeter, .38-caliber, and .357-caliber ammunition; shotgun shells; a black Mag-light flashlight; knives; a camouflage mask type of head covering, similar to what a hunter would wear; a pair of blue jeans containing a wallet with Morrison's driver's license; and a significant amount of jewelry were found in the bedroom determined to belong to Martinez. A Winchester .22-caliber rifle and a few items of jewelry were found in the other bedroom, as was a black ski cap. Also seized from that bedroom were a black pair of K-Swiss tennis shoes, a black pair of FILA tennis shoes, a pair of K-Swiss shoes that were white with red trim, and a pair of K-Swiss tennis shoes that were white with a blue stripe.

At the First Street residence, officers found Christy's Browning shotgun, as well as other items belonging to him, M.J. and Jane Doe Two, the Bakers, the Myerses, Cozine and Frye, F.G. and Z.M., the Gibbses, and Jane Doe One. A pair of K-Swiss tennis shoes, white with red markings, and a pair of white FILA shoes, with a split-heel sole, were found in a bedroom. Also found were a sawed-off Mossberg shotgun with pistol grips; scanners tuned to Stanislaus County Sheriff's Department frequencies; the main section of the Modesto Bee, dated August 16, 2003, which contained an article about residential robberies and referred in detail to the Renteria robbery; a red suitcase containing jewelry and other items; two video camcorders; two-way radios; cell phones; gun cases and holsters; a Mag-lite metal five-cell flashlight; a can of pepper spray; a headband with a battery-operated light on the front; a black magazine containing 34 rounds of nine-millimeter ammunition; a black nylon hood cap with no visible eye or mouth holes; ammunition of various calibers; a pair of black gloves; six bandannas, two of which (including one that was black with white designs) were folded in a triangular shape with two of the corners tied in the back; and a pair of black pants, a black shirt, black shoes, and black socks in a pile on the floor of the bedroom in which paperwork bearing Silva's name was found. Also found in the house were approximately 20 large-style black plastic zip ties in a clear bag.

After the arrests, Detective Campbell requested that the jail intercept defendants' jail visits. During a visit Silva had on September 25, 2003, Silva stated that a lot of items belonging to him and his mother had been taken for people to claim, as "they" thought it was all stolen. He also said that "they" had his boots and that the boots had blood on them, which happened during the attempted murder of a farmer who was shot four times. Silva further related that a "cop" was saying he saw Silva shoot at him when Silva jumped out of the car, although Silva believed that could be contested. He related that there were also sexual penetration charges, but opined that the only way those could be linked to "us" was if "they" could place "us" in the house or at the robbery. Silva conceded a lot of items were found in his house, but asserted that, as far as he was concerned, it was only receiving stolen property.

(Lodged Doc. 1 at 5-42.)

1    III.    **DISCUSSION**

2         A.    **Jurisdiction**

3         Relief by way of a petition for writ of habeas corpus extends to a person in custody

4    pursuant to the judgment of a state court if the custody is in violation of the Constitution or

5    laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams

6    v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner's claims involve those guaranteed by the

7    U.S. Constitution and arise from the Stanislaus County Superior Court of California, which is

8    located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly, the

9    Court has jurisdiction over the action.

10        B.    **Legal Standard of Review**

11        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

12   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

13   enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484,

14   1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus,

15   it is governed by its provisions.

16        Under AEDPA, an application for a writ of habeas corpus by a person in custody under

17   a judgment of a state court may be granted only for violations of the Constitution or laws of the

18   United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal

19   habeas corpus relief is available for any claim decided on the merits in state court proceedings

20   if the state court's adjudication of the claim:

21            (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established federal law, as
22            determined by the Supreme Court of the United States; or

23            (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
24            State court proceeding.

25   28 U.S.C. § 2254(d).

26   ///

27            1.    Contrary to or an Unreasonable Application of Federal Law

28        A state court decision is "contrary to" federal law if it "applies a rule that contradicts

governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405 06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70 71 (2003). A state court decision will involve an "unreasonable application of "federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409 10); Woodford v. Visciotti, 537 U.S. 19, 24 25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an incorrect application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case by case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quoting Richter, 131 S. Ct. at 786).

///

### 2.   Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later

unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Johnson v. Williams, No 11-465, 2013 U.S. LEXIS 1610, 14 n.1 (U.S. Feb. 20, 2013); Cannedy v. Adams, 2013 U.S. App. LEXIS 2646, 23 (9th Cir. Cal. Feb. 7, 2013) ("[I]t is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is "contrary to" or "an unreasonable application of" clearly established federal law."). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784 85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786 87. The Court then explains the rationale for this rule, i.e., "that state courts are the

1  principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It

2  follows from this consideration that § 2254(d) "complements the exhaustion requirement and

3  the doctrine of procedural bar to ensure that state proceedings are the central process, not

4  just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes,

5  433 U.S. 72, 90 (1977)).

                        3.    Prejudicial Impact of Constitutional Error

7        The prejudicial impact of any constitutional error is assessed by asking whether the

8  error had "a substantial and injurious effect or influence in determining the jury's verdict."

9  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22

10  (2007) (holding that the Brecht standard applies whether or not the state court recognized the

11  error and reviewed it for harmlessness).  Some constitutional errors, however, do not require

12  that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310

13  (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas

14  petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v.

15  Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do

16  not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d

17  911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

18  **IV.**    **REVIEW OF PETITION**

19      **A.**    **Claim One: Lack of Impartial Jury Panel Due to Introduction of Criminal Street Gang Questions During Selection**

20

21        In his first claim, Petitioner renews his state court argument regarding allegations his

22  jury was not impartial. Specifically, Petitioner contends that questionnaires presented to

23  prospective jurors injected the possibility of prejudicial gang evidence which was later ruled

24  inadmissible and despite there being no evidence of gang conduct in the charges presented.

25  Petitioner asserts the introduction of the questions relating to criminal street gangs irreparably

26  prejudiced the jury. (See Pet. at 4-10.) Petitioner presented this argument to the 5th DCA on

27  direct appeal. (Lodged Docs. 1 pp. 70-80, 2 pp. 34-55.) The 5th DCA denied the claim in a

28  reasoned decision. (Id.) Petitioner also presented this claim to the California Supreme Court,

which denied review. (Lodged Docs. 5, 6.)

1    Because the California Supreme Court's opinion is summary in nature, this Court "looks

2    through" that decision and presumes it adopted the reasoning of the California Court of

3    Appeal, the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501

4    U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption

5    that higher court agrees with lower court's reasoning where former affirms latter without

6    discussion); see also Cannedy v. Adams, 2013 U.S. App. LEXIS 2646 at 23.

7           1.    State Court Review

8    In denying Petitioner's claim, the appellate court stated as follows:

9    III. DISCLOSURE OF GANG ALLEGATIONS

10   A. Background

11            As previously described, the amended indictment alleged that the three
     male defendants committed the majority of the charged offenses for the benefit
12   of or in association with a criminal street gang, in violation of section 186.22,
     subdivision (b)(1). At the outset of trial, Martinez moved to "bifurcate the gang
13   evidence." It was agreed that that motion, in which all defendants subsequently
     joined, would be heard in conjunction with Morrison's motion to strike the gang
14   allegations (§ 995).

15            Also at the outset of trial, all parties agreed on a 19-page questionnaire
     to be filled out by prospective jurors who were not excused for hardship. The
16   document included questions about where the prospective juror lived; his or her
     family and members of the household; education; employment; hobbies and
17   activities; television programs watched; Internet access and use; newspaper
     reading habits; gun ownership; military service; law enforcement and judicial
18   contacts; opinion about the criminal justice system, including opinions about
     prosecutors and defense attorneys and level of agreement or disagreement with
19   things such as the presumption of innocence, whether someone must be guilty
     if he or she was arrested, whether a defendant should testify, and whether
20   police officers are more likely to tell the truth than other witnesses; the
     prospective juror's ability to keep an open mind until he or she heard all the
21   evidence; ability to separately evaluate the evidence regarding each count and
     each defendant; prior jury service; feelings about the crime of conspiracy, law
22   enforcement techniques such as wiretapping and surveillance, and DNA; effect
     of the fact the defendants were in jail on the ability to be fair and impartial; and
23   whether the prospective juror had formed an opinion about the case as a result
     of having been asked to fill out the questionnaire.

24
           The questionnaire also contained a section titled "PUBLICITY," the
25   introductory paragraphs of which stated:

26            "Between the months of May and September, 2003, a
     series of residential robberies occurred in Stanislaus and Merced
27   Counties. On September 10, 2003, law enforcement officers
     pursued a vehicle into the city of Turlock, where there were
28   gunshots and suspects fled from the vehicle. [P] … [P]

"ANTHONY LAWRENCE MARTINEZ, DAVID WAYNE MORRISON AND DAVID ANTHONY SILVA have been arrested and charged with several residential robberies, attempted murder of a citizen and two peace officers, sexual assault crimes, assault with a deadly weapon, kidnapping, conspiracy to commit robbery, with gang and firearm enhancements. DARLENE RENEE FOUSE has been arrested and charged with residential robberies, assault with a deadly weapon, conspiracy to commit robbery and attempted murder of peace officers."

The section's questions dealt generally with exposure to, and the effects of, pretrial publicity. Question 83 read, "There has been a great deal of publicity over street gang activity, including a public access channel program put on by the county sheriff's office called Guns Gangs and Violence," then asked whether the prospective juror had seen or heard about this program; if so, when; and whether the prospective juror had watched it more than once. Question 86 stated, "The jurors who sit on this case will be expected to base their decision entirely on the evidence produced in court. If you have already formed opinions about this case, can you set them aside and base your decision entirely on the evidence presented in this courtroom?"

In the portion of the questionnaire titled "MISCELLANEOUS," question 92 asked whether the prospective juror believed certain ethnic or racial groups were more likely to commit crimes and, if so, to explain. Question 93 asked whether the prospective juror believed certain ethnic or racial groups were more likely to be gang members and, if so, to explain. Question 94 asked whether the prospective juror had strong attitudes about gang violence; if so, to explain; and, if so, whether that would affect his or her ability to be fair and impartial. Question 95 asked whether the prospective juror had seen signs of gang activity in his or her community; if so, to explain; and, if so, whether that would affect his or her ability to be fair and impartial.

Jury selection commenced on October 24, and a number of prospective jurors filled out the questionnaire. The motion to bifurcate was pending; it was argued and taken under submission on October 26, and granted on November 3. In part, the court stated that, having reviewed the grand jury testimony of the People's two gang experts, "I did not see anything in there that put a gang mark on this particular crime other than the overall picture of … prior conduct involving Mr. Morrison, Martinez and Silva. And reviewing the -- I've reviewed the jury questionnaires through the letter D, as in David. And it seems to me that the most -- I don't know how to describe this, but the greatest, the more serious reaction comes from the gang issue than the crimes themself [sic], in terms of you may have more than are concerned with the type of crime and whether they can be fair in a case like that, but the more vociferous opposition is to the gang issue …." The court also expressed concern that gang issues involving the male defendants might "bleed over" to Fouse, as she was not charged with any gang enhancements.

In discussing the logistics of bifurcation, Silva expressed a preference that prospective jurors not be told there would be two separate phases of trial, but instead that there be no mention about gangs at all. When the possibility was raised that the parties might waive jury trial on the gang enhancement allegations, the court noted that a jury trial waiver would eliminate the need to examine for cause prospective jurors, "some [of whom] have some very vehement opposition to the mention of the word gangs, … and we're going to get a lot of cause disqualifications because of that issue …."

The next day court was in session, November 7, was the first day of challenges for cause. At the beginning of the court session, Silva moved for an order quashing the jury panel. Spokes argued that, as a result of his having been "thrown into this trial with little or no time to prepare" due to his other case, "there were a number of issues in motions in limine that were not heard prior to the final approval of the jury questionnaire." Consequently, all prospective jurors who had not been excused, had filled out the questionnaire prior to the court's ruling on the bifurcation motion, so that gang information of little probative value as to the male defendants and no probative value as to Fouse, and which the court had already ruled was too inflammatory for the jury to consider, was now before the prospective jurors. Spokes argued that the prejudice was clearly demonstrated by the answers to the gang-related questions in the questionnaire.

The other defendants joined the motion to quash. After further argument, in which the prosecution offered to waive its right to a jury trial on the enhancement allegations so that the court could instruct prospective jurors that they would not be hearing evidence concerning gang allegations, the court denied the motion. It noted that it had read all of the available questionnaires, which contained 107 total questions, some with subparts. When considering all the questions that were asked, it did not believe the statement describing the crimes and gang enhancement allegations were sufficient to taint the jury. It did say, however, that it would give a curative admonition if it determined, at some point, that it was required.

Defendants now contend the trial court abused its discretion by denying the motion to quash the jury panel. They say that, by asking about attitudes toward gangs and gang violence, the jury questionnaire infused the trial with irrelevant, inflammatory, and highly prejudicial innuendo, so as to deny their rights to a fair and impartial jury and render the trial fundamentally unfair. We conclude the trial court did not err.

B. Analysis[27]

"Due process means a jury capable and willing to decide the case solely on the evidence before it …." (Smith v. Phillips (1982) 455 U.S. 209, 217.) "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. [Citations.]" (Irvin v. Dowd (1961) 366 U.S. 717, 722.)

Evidence of gang membership has a "highly inflammatory impact" (People v. Cox (1991) 53 Cal.3d 618, 660, disapproved on other grounds in People v. Doolin, supra, 45 Cal.4th at p. 421, fn. 2) and "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged" (People v. Carter (2003) 30 Cal.4th 1166, 1194). The same is true of gang-related evidence, particularly regarding criminal activities. (People v. Bojorquez (2002) 104 Cal.App.4th 335, 345.) Thus, when, as here, evidence relevant to the gang enhancement has little or no probative value with respect to guilt, bifurcation of trial on the gang enhancement

---

[27] Since the People do not claim the issue was forfeited by defendants' initial approval of the questionnaires, their failure to have the bifurcation motion determined before the questionnaires were distributed, their failure to exhaust their peremptory challenges, or their acceptance of the jury, we need not address defendants' related claims of ineffective assistance of counsel.

1    allegation(s) is appropriate. (People v. Hernandez (2004) 33 Cal.4th 1040,
     1049.)

2
          The fact the trial court in this case determined the jury should hear no
3    gang evidence in the guilt phase of trial does not mean, however, that
     information that several defendants were charged with gang enhancements,
4    coupled with limited questioning of some prospective jurors on their attitudes
     toward gangs, tainted the jury beyond repair. As the California Supreme Court
5    has stated, "We believe the trial court possesses broad discretion to determine
     whether or not possible bias or prejudice against the defendant has
6    contaminated the entire venire to such an extreme that its discharge is required.
     Defendants cite no case, and we have found none, indicating that such a drastic
7    remedy is appropriate as a matter of course merely because a few prospective
     jurors have made inflammatory remarks. Unquestionably, further investigation
8    and more probing voir dire examination may be called for in such situations, but
     discharging the entire venire is a remedy that should be reserved for the most
9    serious occasions of demonstrated bias or prejudice, where interrogation and
     removal of the offending venirepersons would be insufficient protection for the
10   defendant." (People v. Medina (1990) 51 Cal.3d 870, 889, affd. sub nom.
     Medina v. California (1992) 505 U.S. 437.) In determining whether the panel as
11   a whole could not be fair and impartial, we consider the totality of the
     circumstances surrounding jury selection, keeping in mind that the conclusion
12   of the trial court with respect to claims both of individual juror bias and group
     bias is entitled to great deference. (People v. Martinez (1991) 228 Cal.App.3d
13   1456, 1465, 1466-1467.)

14        We conclude the trial court here did not err in declining to discharge the
     entire panel. That a number of prospective jurors had strongly held, harsh
15   attitudes towards gangs and gang violence is not surprising, but defendants fail
     to persuade us that these individuals could not be, and were not, weeded out
16   through the normal course of jury selection. This is so even though, with the
     exception of one prospective juror, no voir dire was conducted specifically with
17   respect to the gang-related questions.[28] Instead, the court questioned
     prospective jurors in general terms about their attitudes concerning certain types
18   of offenses and whether the prospective juror could assure the court that he or
     she would base his or her decisions solely on the evidence presented
19
     _____

20        [28] The trial court asked the one juror, "And you also indicated that you had a strong attitude about gang
     violence, question number 94. And the question after that would be whether that would affect your ability to be fair
21   and impartial. [P] Would you explain that to me, sir?" The prospective juror replied, "Too much damage going
     around with these youngsters. I don't understand it. I was raised to be respectful to others, and I see too many
22   youngsters that are gang bangers. And it works the same even if you're not a gang banger, and they do damage
     and not belonging in a gang." The trial court then informed the prospective juror that he may hear evidence about
23   gang issues in this case, and asked if he would be able to set aside his feelings and base his decision solely on
     the evidence presented at trial. Defendants subsequently objected to the court conducting voir dire on the gang
24   questions despite the fact that, as of that point, the People had not agreed to waive a jury trial on the gang
     allegations. After extensive discussion on how to handle the situation, during which all defense counsel stated they
25   would not be asking any follow-up questions with respect to the gang issues in the questionnaire, it was decided
     that the parties could challenge for cause by referring to the number of the particular question, the answer to
26   which, in their view, established cause for excusal. The court also determined that if, based on the written
     responses, it found cause to challenge, it would excuse the prospective juror on its own motion. The method was
27   used on more than one occasion. In addition, the trial court permitted the parties to question potential jurors on
     gang issues outside the presence of the other members of the panel if necessary to avoid any taint. Thus, there
28   was no lack of opportunity or means to delve beyond the answers in the questionnaire. (Cf. People v. Chapman
     (1993) 15 Cal.App.4th 136, 140-141.)

1    throughout the trial and not on any beliefs or prejudices he or she might have.

2        People v. Ayala (2000) 24 Cal.4th 243 is instructive. In that case, the
     defendant's brother, Ronaldo Ayala, was tried for, and sentenced to death on,
3    crimes arising from the same events for which the defendant was on trial.
     Because of the news coverage of Ronaldo Ayala's case, the defendant moved
4    to dismiss the jury panel or, alternatively, to continue trial. The motions were
     denied. (Id. at p. 270.) In finding no error, the California Supreme Court stated:
5    "[W]e observe that there was no need to discharge the jury panel unless, after
     the jury was selected, jurors were sworn who, because of their knowledge of the
6    trial or sentence, or both, of Ronaldo Ayala, could not be fair in defendant's
     case…. The parties agree that defendant challenged 36 panelists for cause on
7    the basis of their knowledge of the Ronaldo Ayala case, and that of those, 13
     were excused, leaving 23. Defendant acknowledges that those 23 prospective
8    jurors agreed that their knowledge of the Ronaldo Ayala case would not affect
     their ability to try his fairly. He claims, however, that the opposite must be true
9    because Ronaldo Ayala's death sentence was reported on television and in the
     newspapers, and the prospective jurors were exposed to the information. [P]
10   That, however, is not enough. Defendant's claim is purely speculative. He
     acknowledges that the panelists testified that they would not be improperly
11   affected by their knowledge of the sentence in Ronaldo Ayala's case. He
     produces no evidence to support his claim that the jury panel was irremediably
12   tainted by exposure to Ronaldo Ayala's case and should have been excused."
     (Id. at p. 271.)

13

14       Here, the questionnaires revealed that only one juror (Juror No. 5) had
     ever seen the program on gangs (question 83). All jurors said they could base
15   a decision entirely on the evidence presented in court (question 86), and could
     be fair to both sides despite anything they may have heard or read about the
16   case (question 87). Only Juror Nos. 6, 9, and 10 believed certain ethnic or racial
     groups were more likely to commit crimes (question 92) or be gang members
17   (question 93). As an explanation, Juror No. 6 wrote, "I think [H]ispanics have
     more gangs." Juror No. 9 wrote, "Because environment raised in does not
18   provide enough opportunities as in [sic] does in some other areas/races." On
     voir dire, the juror explained, "I'm not sure if statistics prove it, but I think they do.
19   If the education systems in certain neighborhoods aren't as good as other
     neighborhoods, and there's more gangs, et cetera, in certain neighborhoods, so
20   if they're in that area, they're more likely to fall into whatever the patterns of that
     area are." The juror stated that his or her feelings or attitudes would not carry
21   over into judging the case if he or she heard from witnesses of a certain racial
     group or if any of the defendants belonged to a particular racial group. In
22   response to question 92, Juror No. 10 wrote, "Gangs seem to be more ethnic --
     mainly Spanish, etc." In response to question 93, this juror wrote, "Poverty and
23   low income, etc. have alot [sic] to do with it." On voir dire, the juror said he or
     she would be able to set personal feelings aside and judge the evidence fairly
24   regardless of the race or ethnicity of any of the defendants, because "everyone
     is individual."

25       Juror Nos. 2, 7, 10, and 11 did not have strong attitudes about gang
     violence (question 94). The rest of the jurors answered question 94 affirmatively.
26   When asked to explain, Juror No. 1 wrote, "I don't like it and wish it would stop,"
     but also that it would not affect the juror's ability to be fair and impartial. On voir
27   dire, the juror reiterated that he or she would base a decision solely on the
     evidence and not on any prejudice or fears about certain issues in the case.
28   Juror No. 3 wrote, "I don't like it." Juror No. 4 wrote, "I don't like it! It is sooo
     wrong." During voir dire, the juror reiterated that he or she would base a decision

solely on the evidence presented at trial and not on any stereotypes or beliefs about the particular crimes. Juror No. 4 further expressed agreement with the presumption of innocence. Juror No. 5 wrote, "There's a big problem in Modesto," but it would not affect the ability to be fair and impartial. Juror No. 6 wrote, "I think all violence is unacceptable," but this would not affect the ability to be fair and impartial. Juror No. 8 wrote, "They can be very violent and can cause big problems," but this would not affect the ability to be fair and impartial. Juror No. 9 wrote, "Don't like it," but that this would not affect the ability to be fair and impartial. Juror No. 12 wrote, "I am against it."

With the exception of Juror No. 10, jurors either had seen no signs of gang activity in their communities, or had only seen graffiti (question 95). Juror No. 9, who had not seen signs of gang activity in the community, nevertheless wrote, "But schools are very strict b/c of it. Colors, uniform codes, etc." Juror No. 10, who had seen signs of gang activity, did not specify what kind, but wrote, "Lately it's more in the papers."

None of the alternate jurors had viewed the program on gangs (question 83), and all could base a decision entirely on the evidence presented in court (question 86), and could be fair to both sides despite anything he or she may have heard or read about the case (question 87). None of them believed certain ethnic or racial groups were more likely to commit crimes (question 92) or be gang members (question 93); in response to question 93, Alternate Juror No. 5 wrote, "More about economic backgrounds in my opinion." Alternate Juror Nos. 3, 4, 5, and 6 did not have strong attitudes about gang violence (question 94). Asked to explain an affirmative answer to question 94, Alternate Juror No. 1 wrote, "I would like to see gang violence off our streets and that are [sic] young people become useful in the community," but it would not affect the ability to be fair and impartial. Alternate Juror No. 2 wrote, "It's wrong," but this would not affect the ability to be fair and impartial. Alternate Juror No. 7 write, "I think it is the no. 1 cause of street crime," but this would not affect the ability to be fair and impartial. On voir dire, the alternate juror assured the court that he or she would base a decision in the case solely on the evidence and instructions, and not on any preconceived notions or prejudices. Alternate Juror No. 8 wrote, "I think gang violence is always too extreme their choice of violence is extreme." As to whether this would affect the ability to be fair and impartial, he or she wrote, "Unknown it depends on circumstances -- no."

Alternate Juror No. 1 had not seen signs of gang activity in the community (question 95), but wrote, "I've not seen it personally but certainly I'm aware of this problem." Alternate Juror Nos. 3, 5, and 6 had not seen signs of gang activity in the community. Alternate Juror No. 2 wrote, "I live next to park & I see graffiti on the fences & colors people are wearing[.]" Alternate Juror No. 4 wrote, "I am always respectful/they are always respectful in return./I teach kids (some are involved in gangs)," but this would not affect his or her ability to be fair and impartial. Alternate Juror No. 7 had seen graffiti and groups of people wearing certain colors. Alternate Juror No. 8 wrote, "I see a lot of young kids trying to be gang members they dress and act like them." When asked if this would affect his or her ability to be fair and impartial, the alternate juror wrote, "No -- a lot of gang members are usually not members just acquaintances."

Reviewing the foregoing responses to the questionnaires and on voir dire, and considering the totality of the circumstances surrounding jury selection (People v. Martinez, supra, 228 Cal.App.3d at p. 1465), we conclude defendants' claim of irreparable taint lacks support in the record (see People v. Ayala, supra, 24 Cal.4th at p. 271). Significantly, prospective jurors' views on,

1   and attitudes toward, gangs were not disseminated to other prospective jurors.
2   (Cf. Mach v. Stewart (9th Cir. 1997) 137 F.3d 630, 631-634; Paschal v. United
    States (5th Cir. 1962) 306 F.2d 398, 399-401.) The sole exception, described
3   in footnote 40, ante, involved general views that were not suggestive of any kind
    of special expertise or knowledge or predetermination of guilt, and were not
4   likely to have any effect on other prospective jurors. The questionnaire
    responses of the trial jurors and alternates themselves were mild and not
5   particularly inflammatory, and did not indicate bias that could not be set aside
    in favor of a verdict based solely on the evidence produced at trial.

6        "To hold that the mere existence of any preconceived notion as to the
    guilt or innocence of an accused, without more, is sufficient to rebut the
7   presumption of a prospective juror's impartiality would be to establish an
    impossible standard. It is sufficient if the juror can lay aside his impression or
8   opinion and render a verdict based on the evidence presented in court.
    [Citations.]" (Irvin v. Dowd, supra, 366 U.S. at p. 723.) Under the circumstances
9   of this case, the trial court did not abuse its discretion in concluding that
    discharge of the entire panel was not necessary to ensure rendition of a verdict
10  based solely on the evidence. (See People v. Medina, supra, 51 Cal.3d at p.
    889.)

11
12       In so holding, we reject any claim that the trial was infused with highly
    inflammatory suggestions about defendants' criminal propensity and that jurors
13  likely considered the gang issue in the course of their deliberative processes. It
    is belied by the record. The gang issue simply did not permeate the trial. The
14  court instructed the trial jurors and alternates, immediately before opening
    statements, that they "must determine the facts from the evidence received in
15  the trial and not from my [sic] other source" and that the fact a defendant had
    been charged with a crime was not evidence of guilt. When evidence was
16  presented, jurors were informed to which count(s) it pertained, and the court
    read the charges to them. In so doing, it did not read the gang enhancement
17  allegations. No evidence pertaining to gangs or gang activity was presented at
    trial, with the exception that, when Rozelle asked M.J. whether there was any
18  kind of talk that to him sounded ethnic, M.J. replied, "It sound -- it sounded like
    -- like gang talk." At the conclusion of evidence, the trial court instructed jurors,
19  inter alia, that the instructions previously given continued to apply, and that they
    must decide all questions of fact in the case from the evidence received in the
20  trial and not from any other source. Jurors were further instructed that evidence
    consisted "of the testimony of witnesses, writings, material objects or anything
21  presented to the senses and *offered to prove the existence or nonexistence of
    a fact.*" (Italics added.) We presume jurors understood and followed these
    instructions. (People v. Holt (1997) 15 Cal.4th 619, 662.)

22
23  (Lodged Doc. 1 at 70-80.)

        2.    Analysis
24
25      Petitioner's first claim for relief alleges that he was deprived of his constitutional rights

26  to due process of the law and an impartial jury by the trial court's denial of defendants' motion

27  challenging the jury panel. All defendants joined in a motion to quash the jury panel, arguing

    that the panel was tainted by questionnaires that the court had directed prospective jurors to
28
    fill out. The questionnaire included questions relating to gang activity, specifically asking the

1    prospective jurors whether they had strong attitudes regarding gang violence, whether they

2    had seen signs of gang activity in their community, and whether they believed certain ethnic

3    or racial groups were more likely to be gang members.

4         The Fourteenth Amendment of the United States Constitution safeguards a criminal

5    defendant's Sixth Amendment right to be tried by a panel of impartial and indifferent jurors.

6    See Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); see also Hayes

7    v. Ayers, 632 F.3d 500, 507 (9th Cir. 2011) (quoting Irvin, 366 U.S. at 722) ("The Sixth

8    Amendment right to a jury trial 'guarantees to the criminally accused a fair trial by a panel of

9    impartial, indifferent jurors.'") "It is not required, however, that the jurors be totally ignorant of

10   the facts and issues involved." Irvin, 366 U.S. at 722-23 (finding that mere existence of

11   preconceived notion of guilt or innocence of accused is insufficient by itself to rebut the

12   presumption that a prospective juror is impartial). Rather, due process requires that a

13   defendant be tried by "a jury capable and willing to decide the case solely on the evidence

14   before it." Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); see

15   also Fields v. Brown, 503 F.3d 755, 766 (9th Cir 2007). Jurors are objectionable if they have

16   formed such strong and deep impressions that their minds are closed against conflicting

17   testimony. See Irvin, 366 U.S. at 722 n.3. The presence of even one biased juror deprives a

18   defendant of the right to an impartial jury. Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).

19        Here, the California Court of Appeal found that there was no support in the record for

20   Petitioner's claim that the jury panel had been tainted. The state appellate court conducted an

21   exhaustive examination of the juror's responses to the questionnaires for possible bias. Those

22   jurors that expressed a strong attitude regarding gang violence also answered that this attitude

23   would not affect their ability to be fair and impartial jurors. The voir dire responses of the jurors

24   indicated that they would reach a decision based solely on the evidence rather than any fears

25   or prejudice; thereby indicating a lack of actual bias.

26        Petitioner has not presented any evidence to rebut the presumption of correctness

27   attached to the appellate court's finding that there was no jury bias. The Court does not find

28   that the state court's decision, that Petitioner's constitutional right to an impartial jury was not

1  violated by the trial court's refusal to discharge the jury panel, to be "contrary to, or involved

2  an unreasonable application of, clearly established Federal law, as determined by the

3  Supreme Court of the United States; or resulted in a decision that was based on an

4  unreasonable determination of the facts in light of the evidence presented in the State court

5  proceeding." 28 U.S.C. § 2254(d).  For these reasons, it is recommended that the claim be

6  denied.

7       **B.     Claim Two: Juror Misconduct**

8       Petitioner argues that his Fifth and Sixth Amendment rights were violated when the trial

9  judge refused to discharge some or all of the jurors during deliberations after one of the jurors

10  found a black zip tie in her mailbox and shared that fact with other jurors.[29] (Pet. at 3, 11-16.)

11  This contention is without merit.

12       1.     State Court Review

13       The last reasoned state court adjudication of this issue was in the unpublished opinion

14  of the 5th DCA, which rejected Petitioner's claim. The court provided the factual and

15  procedural background regarding the relevant incident before addressing the merits of the

16  claim:

17           Jury deliberations began on March 24, 2006. On April 3, the sixth day of
18       actual deliberations, court convened outside of the presence of the jury and the
         defendants. The court ordered the transcript of the proceedings to remain
19       sealed pending further court order, and asked counsel not to discuss the matter
         with anyone until the court and counsel had discussed it further. The court then
20       advised counsel that Juror No. 10 had informed the bailiff that she had found a
         black zip tie in her mailbox that morning, and that, as she was waiting to be
21       brought in, she discussed it with the other jurors. The bailiff had advised the
         court that the jurors did not feel they could continue to deliberate that day, but
22       instead wanted to go home and be with their families. The court proposed
         questioning Juror No. 10 and the foreperson, then deciding with counsel what
23       to do next.

24           Juror No. 10 was then brought into the courtroom and related that her
         house was equipped with a mailbox and place to put the newspaper. Both were
25       located outside the house's electric gate. As she was driving through her gate
         onto the street about 8:30 that morning, on her way to court, she saw a black zip
26       tie hanging out of the newspaper box. It was between 12 and 15 inches long,
         zipped in a loop, and similar in type to the heavy-duty ones she had been seeing

27  _____

28  [29] During trial, evidence was presented that, during the series of home invasions, the perpetrators
     frequently bound the hands and legs of the victims with black zip ties. Also, when Petitioner and his co-defendant
     Martinez were finally apprehended, quantities of black zip ties were found in the vicinity of the two men.

in court. She knew it had not been there the day before and did not think it was something someone would do as a prank, because she did not think her son or his friends knew about the zip ties. When asked how it had affected her, Juror No. 10 explained that it shook her up, because to her, it was like a message. That was her first thought. She admitted telling the other jurors about it in the jury deliberation room, and suggested that one of the other jurors needed to tell the court about a situation that had happened earlier.

After assuring Juror No. 10 that juror information was confidential, the court observed that she looked like she was shaken up, and asked how this event had affected her ability to sit as a juror in this case. Juror No. 10 responded, "Well, I have to say today is very awkward. You know, it's just kind of mind-boggling right now, because I think, you know, the shock of it all I think too. I'm a very honest person, and I don't think that sways me in any way. I mean, I don't feel like because of that it's going to make me change my mind or make me feel any different than how we're going about it right now and being objective and being honest with what's going on and with everything." She did agree with the court's assessment that the day would not be a very productive one for deliberations, at least for her. When asked her "take" on how other jurors felt, she said they were "pretty much shook up too," and that they all felt it was "kind of hard to go into that today."

Counsel were permitted to question the juror. When Spokes noted the juror had indicated she thought it could be a message and asked whether she had formed an opinion as to whom the message may have been from, Juror No. 10 responded, "I just feel like someone who's friends with the defendants, somebody that just-I don't know." When asked if she had thought it could be a friend of the victims, the juror responded that she did not look at it that way. Spokes informed her, and the prosecutor confirmed, that the jury questionnaire did not bear the juror's address, and that the defendants did not get to look at any of the questionnaires. He asked whether the juror ever suspected she was being followed; she responded no, and that she used a post office box number, not her street address, on everything.

The trial court directed Juror No. 10 not to discuss the questions she had been asked with the other jurors, then had Juror No. 8 brought in. She related an incident about which she had not thought until Juror No. 10 said what had happened to her. When she got home from court on Thursday and pulled into her driveway, a car stopped in the middle of the road. In it were two Hispanic males, ages 25 to 29, with dark hair and fair skin. The car was dark blue. When her son asked if he could help them, one of them said they were looking for a particular street. When her son said he did not know where it was, they left. There was no street by that name in the neighborhood. Juror No. 8 did not recognize them and had not seen them sitting inside the courtroom. She would have thought nothing of what happened absent the new information, and her learning the new information from Juror No. 10 would not affect her ability to serve as a juror in this case. Juror No. 8 believed the day would be a productive day of deliberations for her personally, but could not speak for others.

Juror No. 12, the foreperson, was then brought in. When asked how the information disclosed by Juror No. 10 would affect Juror No. 12's ability to deliberate in this case, she responded that it did not affect her personally. She stated, "I find it alarming, and I find it very frightening, but it doesn't change the direction I'm headed." She subsequently clarified that her emotions "[a]bsolutely" would not cause her to be less than fair and impartial, and that part of her emotion had been feeling badly that Juror No. 10 was so upset. She agreed with

the court's statement that nobody knew who did it; when Spokes interjected that they certainly knew the defendants did not do it, Juror No. 12 responded, "We know that too." The prosecutor pointed out, and the court confirmed, that the press had reported zip ties being found at numerous residences involved in the case. When asked whether it would be a productive day to deliberate, Juror No. 12 related that Juror No. 10 had been very upset by the time she reached the deliberation room, and that she told the other jurors before they even got behind closed doors. As soon as they were let in, they immediately told the bailiff. They did not deliberate after finding out the information, as Juror No. 10 was obviously shaken and, while not crying, was tearful. They also did not sit around and try to say who was responsible or how the zip tie got there, although they obviously knew nobody in the courtroom did it. Everybody was a little shocked, but Juror No. 12 personally felt more settled than when she first heard the news, as people had been just sitting there, chitchatting. Juror No. 12 felt that the rest of the jurors would probably be okay to continue, but that it should be Juror No. 10's decision, because she was the most nervous about it. Aside from Juror No. 10 being upset, Juror No. 12 did not notice anyone having a particularly adverse reaction to the news.

The jurors were given the day off and asked to return the next day.[30] They were ordered not to discuss the matter with anyone else or to have further discussions among themselves.

The next day, the court allowed counsel to suggest areas of inquiry, and it then questioned each juror individually.[30] Juror No. 10 was first. The court stated its understanding that she had contacted the bailiff the day before about additional zip ties being found at her home. Juror No. 10 related that her husband had, and that the Turlock Police Department had responded. She did not think finding the zip ties would have any additional impact on her, because she believed they may have come from a basketball hoop her son had installed the prior September.[31] The juror agreed with the court's statement that there was no evidence or information as to the source of the first zip tie. When asked about her initial reaction that the defendants may have somehow been responsible, Juror No. 10 stated, "I have done a lot of thinking and stuff, and I don't know to be honest. I don't know. That's still in the back of my mind, you know, that it might be a statement. I don't know from someone." She agreed that she did not know who it might be, and that it could have been anyone. The court reminded her that the defendants were in jail, which had been known since jury selection, and that her juror information was not public. It then noted that she had been upset the day before, and asked whether that had changed in the last 24 hours. She said yes, that she felt better, and that she thought it was just the initial shock of everything-wondering what it was and whether it meant something, or whether somebody had followed her home. When the court asked whether the incident would affect her ability to serve as a juror, she replied that she did not think so, and that she believed she would be able to set it aside and make her decision in the case based solely from the evidence she had heard in the trial. When pressed, she clarified that she would not favor either side, and

---

[30] Juror No. 10 was informed, outside the presence of the other jurors, that an investigator would collect the zip tie.

[30] During the course of this questioning, the court informed all of the jurors, except, inadvertently, Juror Nos. 2 and 3, that all juror information was confidential.

[31] She did not share the information about the additional zip ties with the other jurors.

that it would not influence her. Although it scared her, she would not speculate as to the source in terms of letting it enter into her deliberations.

Juror No. 1 was next. She admitted speculating about the source of the zip tie, and being very scared. She stated: "I took it as a warning like, oh, you know, we know where you live." The court reminded Juror No. 1, who, it stated for the record, cried when responding about people possibly knowing her address, that all juror information was confidential, and that her address had not been disclosed and was not on the jury questionnaire. Juror No. 1 responded that she understood that; she also agreed with the court's statement that there was no evidence as to the source of the zip tie. She stated that, although she had a hard time thinking it was random or a coincidence, she also thought it could have come from a victim's family, as there were some unhappy victims, or the defendants probably had some family members in court who could have followed one of the jurors. Juror No. 1 stated that she could see both sides, and that it scared her to think that someone possibly followed a juror home. When asked whether she could make her decision in the case based solely on the evidence she had heard in the trial and ignoring the zip tie, she stated she thought she could and had all along. She stated that she thought she had kept an open kind and been able just to look at the evidence, but she admitted that she was scared and a little nervous. She believed she could look at the evidence, because she did not know who did it and never would. Being scared would not affect how she decided. When asked whether her reaction had changed in the last 24 hours, she said no, that she was still nervous, and was more aware when she went home. When asked again whether her deliberations would be affected by the information in any way, she responded, "No, I don't think it will be affected. I don't know who did it. It could have been a victim. It could have been a friend of a defendant. It could have been a victim, friend of a victim, so I cannot sit here and say yes, it was the defendants' family or friends that did it. I don't feel that way. I just feel that it was a sick thing to do, and it just makes me nervous. I feel like I'm in a movie, The Juror. I don't know."[32] When asked if she felt she could continue to deliberate, the juror stated, "As long as nothing else happens like this, because I feel like if I find a zip tie, I will not go on. [¶] ... [¶] "[T]his in itself I don't feel like I have a problem going on, but I do feel like it is in my mind, and I don't think I'm going to-I've gone this far keeping an open mind, looking at the evidence. This does not-it's not going to make me go, okay, I'm going to sway one way or the other. I haven't been doing that the whole time. This is not going to make me do it, but am I nervous for my family that something stupid might happen? Yes. By who? I don't know. So I'm-I don't know. That's just how I feel. I don't know if I'm contradicting myself, but I don't know."

Next, the court questioned Juror No. 2. This juror felt badly for Juror No.

---

[32] Silva requests that we taken judicial notice of this film, a copy of which he has lodged as an exhibit. Pursuant to Evidence Code section 452, subdivision (h), we take judicial notice of the existence of the film The Juror (Columbia Pictures 1996). We decline, however, to notice its contents. (Fremont Indem. Co. v. Fremont General Corp. (2007) 148 Cal.App.4th 97, 113; People v. Manson (1976) 61 Cal.App.3d 102, 163; see Weitzenkorn v. Lesser (1953) 40 Cal.2d 778, 787-788.) We are not being asked to take judicial notice of, for instance, the existence of certain statements or dialogue in the film (cf. Keimer v. Buena Vista Books, Inc. (1999) 75 Cal.App.4th 1220, 1224-1225 & fn. 4); Ferlauto v. Hamsher (1999) 74 Cal.App.4th 1394, 1397-1398) or even of a mere plot synopsis. Instead, we are being asked to judicially notice the film "in order to bring context to the juror's expressions of her feelings, and to evaluate the trial court's ruling on the motion to excuse the juror for cause." This is not a proper subject for judicial notice. (Fremont Indem. Co. v. Fremont General Corp., supra, 148 Cal.App.4th at p. 113; see Keimer v. Buena Vista Books, Inc., supra, 75 Cal.App.4th at p. 1224, fn. 4.)

10, because she was visibly upset, but "it did nothing for [Juror No. 2] one way or the other." Juror No. 2, who would have had no problem deliberating the day before, did not speculate concerning who might be responsible for the zip tie, "because it could be any number of things." Learning the information would not cause Juror No. 2 to favor or be against either side, and the juror would be able to make a decision solely based on the evidence.

Upon hearing what happened, Juror No. 3 was worried for Juror No. 10, but not for him- or herself. When asked about speculating as to who might have been responsible, the juror replied, "I think we all did to a certain extent. I know that I thought about it, but what good is that going to do? You can sit there and speculate all day long, and it's still your speculation. There's no hard evidence to point to any one particular person so why do that?" Juror No. 3 did not speculate as to one side, because it could have been someone who knew Juror No. 10 was on jury duty, a friend of her son who was trying to do something silly, an associate of a defendant or Juror No. 10's children, or anybody-not necessarily somebody intending harm. Juror No. 3 would "[a]bsolutely" be able to refrain from speculating as to who might have been responsible. As far as any change in reaction, initially Juror No. 10 was frightened, so Juror No. 3 was concerned for her. Now that Juror No. 10 was calm and fine, Juror No. 3 was fine. Juror No. 3's concern was for Juror No. 10's emotional well-being, not for what could potentially happen. What happened was "unrelated to the trial in [Juror No. 3's] mind." It would not affect deliberations.

Juror No. 4 felt bad for Juror No. 10. At most, the information might have impacted Juror No. 4 a little bit, but the juror was aware there was no evidence about the source, and Juror No. 4 did not want to blame the defendants or victims or anyone for doing this. Juror No. 4 would be able to make a decision solely based on the evidence, and would not speculate as to how the zip tie got in the mailbox.

Juror No. 5 related that, when he arrived the day before, Juror No. 10 was upset. He asked what was wrong, and she said she had found a black zip tie in her newspaper box. He was concerned about her because she was very upset. Although he found it odd, it did not cause him personal concern. He did not speculate on who might be responsible, and had no thoughts about that. As far as affecting his deliberations, he planned to continue as he had "been going so far." It would not affect his deliberations in any way, and he would not favor either side as a result of learning the information.

Juror No. 6 related being told the information by Juror No. 10 while waiting in the hallway for the door to be opened. Juror No. 10 was tearing up and looked scared. Everyone was surprised. Juror No. 6 was stunned and scared for Juror No. 10. Juror No. 6's reaction had not changed in 24 hours-it was still a feeling of concern, but not fear. As to who was responsible, Juror No. 6 probably speculated a little bit and thought it was someone one of the defendants knew. Juror No. 6 had no knowledge of who did it, but thought it had something to do with the case-not that the defendants had a part in it, but that it was somebody who was concerned about them. Neither her speculation nor the information received from Juror No. 10 would enter Juror No. 6's deliberations or be held against either side.

Juror No. 7 related being in the hallway when Juror No. 10 entered, looking upset. When the other jurors asked what was wrong, she told them. They tried to console her and discussed whether it could be coincidental. They thought it probably was not. Juror No. 7 personally was shocked and upset, as

she wondered who put the zip tie there and how they knew where Juror No. 10 lived. She was no longer as upset as she had been; she thought more possibly it was a coincidence and might not be related to the case. She initially thought that if someone did put it there on purpose, it might be a friend of the defendants. Juror No. 7 would be able not to speculate about the source in deliberating and to base her decision solely on the evidence.

Juror No. 8 heard the information in the hallway, felt badly for Juror No. 10 because she was scared, and gave her a hug. Juror No. 8 personally did not feel afraid or speculate as to who might have done it, as anyone could have been responsible. Juror No. 8 would disregard the information and make a decision based solely on the evidence.

Juror No. 9's reaction, upon hearing the information, was mostly one of disbelief. Although who might have done this crossed his mind and he thought perhaps it might be a friend of someone, he had no idea. He felt nervous, but less so after 24 hours. He understood no one knew who put the zip tie there, and he could stop speculating and not let it enter his deliberations. As far as he was concerned, this would not be any different than any other information the court told jurors to disregard, and he thought jurors thus far had been doing a very good job of sticking to the facts they had been given.

Juror No. 11 related that she learned about the zip tie inside the jury room, when Juror No. 10 stated it to all of them. Some may have found out before that. Although it did not change the way she viewed the evidence and how she felt about everything, she was definitely frightened. She did not have any children, but her husband came home late and left early, and she was a little afraid to be by herself. Nevertheless, she would be fair; she definitely did not feel the defendants did this. She did not think it was possible for them to do it, although the situation "definitely jumped [her] nerves." She did not speculate who might have done it; she had no idea, and it seemed a little coincidental. When asked whether she would be able not to speculate, Juror No. 11, who began tearing up as she was answering, said she was not really sure. She explained that her parents lived a few blocks from Juror No. 10, and she sometimes left court and went straight there. She assumed, since no one knew juror information, they could possibly have been followed. She did not know by whom, but it made her nervous. Her reaction had not changed in the last 24 hours; she was still "just kind of afraid." She stated, "I don't feel my decisions are any different. It could have nothing to do with this. I'm just a little bit afraid." When asked whether she would be able to disregard the information in terms of her deliberations, she responded, "Yes, it really doesn't affect-it's just my own personal safety that it affected, but it doesn't affect it at all. I've separated the two. I know that sounds really confusing." Juror No. 11 reiterated that the information she received from Juror No. 10 would not have any impact on her decisionmaking process in this case and would not affect her deliberations in any way. When asked specifically about whether the fear she was feeling would affect her deliberations, Juror No. 11 said no, that it would just affect her when she was going home and coming back. She did not feel in fear being in court.

Juror No. 12 was the next person questioned. She related that when she heard the information from Juror No. 10, her reaction was one of surprise, as she had never heard of black zip ties before this trial. It bothered her that Juror No. 10 was upset and tearful. The reaction Juror No. 12 felt upon hearing this and seeing Juror No. 10 was upset lessened over time, as she was rational enough to think that she did not need to be that concerned about it. She was not afraid at all for her personal safety, and did not speculate as to who might have

been responsible. It was obviously not one of the defendants, and it never would have occurred to her to think it was. She did not know Juror No. 10 personally and did not know anything about her home. Juror No. 12 left court the day before feeling totally normal and had a normal evening and night. Her reaction this day was the same; she thought they would probably just continue deliberating. When asked whether she would be able to ignore the information in her deliberations, Juror No. 12 replied, "Absolutely. I don't have a fright over that, and I haven't picked up any vibes this morning around me that anyone else does, but that's just my speculation." The information would not affect her deliberations in any way.

After concluding the questioning of the other jurors, the court had Juror No. 10 brought back into the courtroom for follow-up questions about the incident's effect on her. Juror No. 10 said that the fact the zip tie was found in her mailbox would not affect her deliberations in any way, and she would be able to set it aside just like anything else the court had instructed jurors to set aside. She did not have any doubt about that.

Defendants subsequently challenged the entire panel based on the likelihood the issue would affect jurors' decision-making processes in the case, and, alternatively, the responses and emotional states of Juror Nos. 1, 10, and 11, and the fact there were not enough alternate jurors to replace those three. The court denied the challenge to the entire panel, but invited counsel to address the jurors individually. After argument with respect to Juror No. 1, the trial court stated: "It's obvious that Juror Number 1 was upset. She was tearing and used Kleenex during the questioning, but I will note that she was probably the most tearful of all the jurors throughout the trial.... I have noticed her tearing during various testimony throughout this trial, so I'm not going to place a lot of credence in that. She's obviously upset, but she did state that the information that she had seemed to have equal potential blame for either the victims and/or the defendants, indicated it could be either side, and that she would not be swayed, and based on her statements to the Court, I will deny the challenge to Juror Number 1. I find her statements to be credible."

There were no challenges to Juror Nos. 2 through 9. After argument with respect to Juror No. 10, the trial court ruled: "It's obvious to me that Juror 10 was visibly upset yesterday. I think she has been among the most stoic of the jurors throughout the trial, pretty much expressionless throughout the trial. I did notice what appeared to me her being upset yesterday.... She did request that we not deliberate yesterday because she was still upset .[¶] She certainly looked more like her normal self today when she came back, indicated herself that she was feeling better today, and she is of the opinion that the zip ties could have been anyone. Within the realm of possibilities could include, I suppose, the defendants, could include the victims, a message that maybe this is taking too long, could have just been chance. [¶] And she did stated that ... this would not influence her decision, and she indicated that she would be true to herself and would not speculate as to the source of this, and I find that her statements-she appeared to be credible to me and did express her true feelings. And even yesterday said, I have to be completely honest, and I believe that she was, so the challenge the Juror Number 10 is denied."

Counsel then argued with respect to Juror No. 11. The court stated: "As I recall she stated that she does not feel that the defendants were responsible for this. [¶] ... [¶] And not in fear being here. And, frankly, I think listening to this trial we probably are a little bit more cautious about things that could happen to us. And, frankly, I did not notice whether she cried during the trial or not.... [¶] ...

[¶] She did today, but during the trial. I don't know if that's an unusual situation for her or not.... [¶] But early into the questioning today she pretty much volunteered on her own that this would not change her deliberation, and based on that I will deny the challenge of Juror Number 11."

There was no formal challenge to Juror No. 12. Nevertheless, the court stated: "She indicated as of today she was not afraid, and, frankly, I think that we all had a very similar reaction when we found out the news about what had happened, and we're all human, including the jurors, and I don't think that there's a substantial likelihood that they would be influenced by this. And what I will do before the jury starts deliberating once again, I'm going to give them an admonition...."

After the lunch recess, the jurors were returned to the courtroom. The court admonished them not to speculate as to the cause of the zip tie being found in Juror No. 10's mailbox, to disregard it completely, not to allow it to enter into their deliberations in any way, and to pretend it never happened. They then resumed deliberations, and continued to deliberate for all of April 5, 6, 7, and 10. On April 11, they returned their verdicts.

...

2. Refusal to discharge jurors

As a preliminary matter, we reject any notion defendants should be barred from complaining due to their own misconduct. (See, e.g., People v. Hines, supra, 15 Cal.4th at pp. 1053-1054; People v. Hannon (1977) 19 Cal.3d 588, 599; People v. Terry (1962) 57 Cal.2d 538, 566.) As the People concede, the origin of the zip tie found by Juror No. 10 was unclear. Indeed, the prosecutor at trial expressly stated no one was saying the defendants were responsible. There is simply not enough information for us to conclude defendants or someone acting in their behalf deliberately sought to influence the jury. (See In re Hamilton (1999) 20 Cal.4th 273, 305.) Under the circumstances, a determination defendants forfeited the issue by their own wrongdoing could only be based on the rankest speculation, in which we will not engage. Accordingly, we turn to the merits.

"If at any time, whether before or after the final submission of the case to the jury, a juror … upon … good cause shown to the court is found to be unable to perform his or her duty, … the court may order the juror to be discharged ...." (§ 1089.)[33] "A trial court's ruling whether to discharge a juror for good cause under section 1089 is reviewed for abuse of discretion. [Citations.]" (People v. Guerra, supra, 37 Cal.4th at p. 1158.) A trial court's discretion to investigate and remove a juror in the midst of trial is broad (People v. Boyette (2002) 29 Cal.4th 381, 462, fn. 19); however, "[t]he juror's inability to perform the functions of a juror must appear in the record as a 'demonstrable reality' and will not be presumed. [Citation.]" (People v. Guerra, supra, 37 Cal.4th at p. 1158.) "This is a 'heightened standard' [citation] and requires a 'stronger evidentiary showing than mere substantial evidence' [citation]." (People v. Wilson, supra, 44 Cal.4th at p. 840.) The decision whether to retain or discharge a juror "rests within the sound discretion of the trial court" and, "[i]f any substantial evidence exists to support the trial court's exercise of its discretion, the court's action will be upheld

_____

[33] Some of the older cases and one brief also rely on former section 1123. That statute has long been repealed. (Stats. 1988, ch. 1245, § 42; see now Code Civ. Proc., §§ 233, 234.)

on appeal. [Citation.]" (People v. Maury (2003) 30 Cal.4th 342, 434; see also People v. Earp (1999) 20 Cal.4th 826, 892 [decision to retain or discharge juror upheld unless it falls outside the bounds of reason].) These standards apply even where the asserted ground for discharge is jury misconduct. (See People v. Miranda (1987) 44 Cal.3d 57, 117 [applying abuse of discretion standard to denial of motion for new trial based on jury misconduct], disapproved on other grounds in People v. Marshall (1990) 50 Cal.3d 907, 933, fn. 4.)

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (In re Hamilton, supra, 20 Cal.4th at pp. 293-294; Smith v. Phillips, supra, 455 U.S. at p. 217; see also Ristaino v. Ross (1976) 424 U.S. 589, 595, fn. 6 [extending rights to criminal defendants in state courts].) "A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (Harris, supra, 43 Cal.4th at p. 1303.)

"[W]here a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other sense' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias.[34] [¶] When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. [Citations.] A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]" (In re Hamilton, supra, 20 Cal.4th at pp. 294-295, fn. omitted.) Misconduct can be good cause for discharge of a juror under section 1089 (People v. Ledesma (2006) 39 Cal.4th 641, 743) even if it is "neutral" in the sense that it does not suggest bias toward either side (People v. Daniels (1991) 52 Cal.3d 815, 863-864), but removal is not necessarily the remedy required in every case (see People v. Guzman (1977) 66 Cal.App.3d 549, 559).

In determining whether discharge is required in a particular case, it must be remembered that "[m]isconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (In re Hamilton, supra, 20 Cal.4th at p. 295; Remmer v. United States (1954) 347 U.S. 227, 229; People v. Guzman, supra, 66 Cal.App.3d at p. 559.)[35] It must also be remembered, however, that "'"[i] is an impossible standard to require … [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.] Moreover, under that "standard" few verdicts would be proof against challenge.' [Citation.] 'The

---

[34] "[A]ctual bias supporting an attack on the verdict is similar to actual bias warranting a juror's disqualification. [Citations.]" (People v. Nesler (1997) 16 Cal.4th 561, 581 (lead opn. of George, C.J.).)

[35] A trial court need not expressly declare its awareness of this presumption; it does so implicitly where, as here, it "hold[s] a prompt hearing to explore the circumstances of the threat and the possibility of bias …." (Harris, supra, 43 Cal.4th at p. 1304.)

safeguards of juror impartiality … are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.]" (<u>People v. Danks</u> (2004) 32 Cal.4th 269, 302-303.)

In the present case, for the sake of argument, we will assume misconduct occurred, even though, for the most part, jurors did nothing improper. Since the origin of the zip tie in Juror No. 10's newspaper box is unknown, we have no way of determining whether it was indeed a communication related to this case. "'[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. [Citations.]' [Citations.]" (<u>In re Hamilton</u>, supra, 20 Cal.4th at pp. 305-306; <u>People v. Federico</u> (1981) 127 Cal.App.3d 20, 38.) Here, several jurors perceived, at least initially, that a message was being sent about the case. Thus, regardless of whether there was an actual communication, jurors received extraneous information, which several of them believed related to the case, that was not part of the evidence received at trial. Accordingly, we will assume that jurors' involuntary exposure to the event, which was outside the trial evidence, requires an examination for probable prejudice, regardless of the extent to which no blameworthy conduct occurred. (<u>People v. Ramos</u> (2004) 34 Cal.4th 494, 519; <u>In re Hamilton</u>, supra, 20 Cal.4th at pp. 294-295; <u>but see</u> <u>People v. Farnam</u> (2002) 28 Cal.4th 107, 139, 141, fn. 13 [rejecting suggestion juror misconduct might be established where, while in presence of three jurors, fourth juror was robbed].) In addition, despite the fact jurors were instructed to "promptly report to the court any incident … involving an attempt by any person either to improperly influence any member of this jury or tell a juror his or her view of the evidence in this case," Juror No. 10 -- however understandably -- first related the incident to the other jurors. Although a report apparently was made immediately to the bailiff, there also appears to have been at least a modicum of discussion -- again understandably -- among the jurors. Jurors had also been instructed: "You must not converse among yourselves … on any subject connected with the trial. You must discuss this case only when all the following conditions exist: [P] A, the case has been submitted to you for your decision by the court following arguments by counsel and jury instructions; [P] B, you are discussing the case with a fellow juror; [P] And, C, 12 jurors and no other persons are present in the jury deliberating room." While the discussion occurred after the case had been submitted to the jury for decision and did not involve nonjurors, it did not concern evidence admitted at trial and, though not directly about the guilt or innocence of the defendants, cannot be said to have had no bearing on the matter pending before the jury. (See <u>People v. Avila</u> (2006) 38 Cal.4th 491, 605.) Thus, again, arguably, misconduct occurred. (See <u>In re Hitchings</u> (1993) 6 Cal.4th 97, 118 [violation of duty, codified in § 1122, that jurors must not converse among selves on subject connected to trial, or form or express opinion thereon until cause finally submitted to them, constitutes misconduct]; but <u>see</u> <u>People v. Panah</u>, supra, 35 Cal.4th at p. 480 [jurors' understandable concerns about being followed by supporters of defendant did not amount to misconduct].)

"Juror misconduct … leads to a presumption that the defendant was prejudiced thereby and *may* establish juror bias. [Citations.]" (<u>People v. Nesler</u>, supra, 16 Cal.4th at p. 578 (lead opn. of George, C.J.), italics added.) "We assess prejudice by a review of the entire record. 'The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can arise in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding

circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.' [Citation.] In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized. [Citation.] An admonition by the trial court may also dispel the presumption of prejudice arising from any misconduct. [Citation.]" (People v. Tafoya (2007) 42 Cal.4th 147, 192-193; accord, People v. Danks, supra, 32 Cal.4th at p. 303; People v. Nesler, supra, 16 Cal.4th at pp. 578-579 (lead opn. of George, C.J.); In re Carpenter (1995) 9 Cal.4th 634, 653-654.)

"'Whether prejudice arose from juror misconduct … is a mixed question of law and fact subject to an appellate court's independent determination.' [Citation.] However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at pp. 303-304.) With respect to credibility determinations, the trial court's assessment of jurors' states of mind will not necessarily be dispositive, such as when there is inherent prejudice (see Holbrook v. Flynn (1986) 475 U.S. 560, 570 [courtroom security arrangement]) or where bias is "clearly apparent" from the record (People v. San Nicolas (2004) 34 Cal.4th 614, 646). While a juror's declaration of impartiality may not be conclusive (Irvin v. Dowd, supra, 366 U.S. at p. 728; People v. Williams (1989) 48 Cal.3d 1112, 1129), neither is it irrelevant: "'[O]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' [Citations.]" (Smith v. Phillips, supra, 455 U.S. at p. 217, fn. 7.)

Finally, the California Supreme Court has emphasized "'that before a unanimous verdict is set aside, the likelihood of bias under either test must be substantial …. [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 304, quoting In re Carpenter, supra, 9 Cal.4th at pp. 654-655.)

We turn first to the issue of inherent bias. "'[A] finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 305.) Stated in a way that is more applicable to what occurred here, was the information or event so inherently prejudicial that by its very nature it was likely to have influenced the vote of jurors? (See People v. Nesler, supra, 16 Cal.4th at p. 580 (lead opn. of George, C.J.).)

We conclude the answer is no. We do not find it surprising that a number of jurors initially jumped to the conclusion someone on the side of the defense was somehow responsible: so did Martinez's trial attorney, who mused, "I can't imagine our clients being so stupid," before being reminded (1) he was on the record, and (2) there was nothing to tie the incident to defendants and no suggestion from the prosecutor that they were to blame. Jurors were aware from the outset that defendants were incarcerated and could not have done it themselves, and, by the day after it happened, even those jurors who were still

upset were aware the source could have been anyone or it even could have been a coincidence. That some jurors may have been upset or harbored nebulous fears about the safety of themselves or their families does not mean what occurred was, by its very nature, likely to have influenced their deliberations. The test of inherent bias is not whether jurors may have been affected in some way, but whether their decisionmaking process -- and, ultimately, their votes -- likely were influenced.

"[W]e do not reverse unanimous verdicts because there is some possibility the juror was improperly influenced. Rather, the likelihood of bias under the inherent prejudice test 'must be substantial.' [Citation.] 'Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 305.)

Objectively considering what took place in light of the record in this case, we conclude the finding of the zip tie by Juror No. 10, and her dissemination of that information to other jurors and their discussion of it, were not inherently and substantially likely to bias any juror. (See People v. Danks, supra, 32 Cal.4th at p. 305.) Jurors were forcefully and directly admonished not to speculate as to the source of the zip tie and to disregard it completely, and we see no reason to find inapplicable "'[t]he crucial assumption underlying our constitutional system of trial by jury,'" to wit, that jurors follow instructions. (People v. Yeoman (2003) 31 Cal.4th 93, 139; cf. People v. Holloway (1990) 50 Cal.3d 1098, 1111-1112 [conclusion that presumption of prejudice unrebutted might have been different had misconduct been revealed in time for trial court to take corrective steps such as admonition], disapproved on other grounds in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1.) This is especially true where, as here, no actual threat was made (see Harris, supra, 43 Cal.4th at pp. 1300-1306 [death threat against juror's father, originally believed to be related to case, not too inherently prejudicial to be disregarded]); the communication -- assuming it was a communication -- was ambiguous (cf. Jeffries v. Wood (9th Cir. 1997) 114 F.3d 1484, 1488, 1490-1492 [where one juror informed others of defendant's prior criminal record, communication by its nature was intrinsically prejudicial; factors suggesting potential prejudice was diminished in particular case so that verdict was not affected include (1) whether prejudicial statement was ambiguously phrased; (2) whether extraneous information was otherwise admissible or merely cumulative of trial evidence; (3) whether curative instruction was given or other ameliorative steps taken; (4) the trial context; and (5) whether statement was insufficiently prejudicial given issues and evidence in case]), and jurors did not return guilty verdicts soon after learning of events, but instead continued to deliberate for several more days (see People v. Manriquez (1976) 59 Cal.App.3d 426, 429-431 [juror in robbery trial became victim of attempted armed robbery just prior to deliberations, then told other jurors; trial court did not learn of incident until deliberations were underway, at which time it questioned jurors about ability to decide case strictly on evidence presented].) Moreover, their verdicts demonstrate that they carefully and methodically worked through the issues before them.

Having found no inherent prejudice, "we now consider 'the nature of the misconduct and the surrounding circumstances' to determine whether it is substantially likely [any juror] was nevertheless actually biased as a result" of what occurred. (People v. Danks, supra, 32 Cal.4th at p. 306.) "What constitutes 'actual bias' of a juror varies according to the circumstances of the case. [Citation.] In assessing whether a juror is 'impartial' for federal constitutional purposes, the United States Supreme Court has stated: 'Impartiality is not a

technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' [Citation.] '"The theory of the law is that a juror who has formed an opinion cannot be impartial." [Citation.] [P] It is not required, however, that the jurors be totally ignorant of the facts and issues involved…. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' [Citations.] '"[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but … those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him.'" [Citations.] An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial. [Citations.]" (People v. Nesler, supra, 16 Cal.4th at pp. 580-581 (lead opn. of George, C.J.).)

Here, the receipt of the information was totally inadvertent, both on the part of Juror No. 10 and the jurors she then told. To the extent Juror No. 10 or other jurors disobeyed any admonitions, we find it significant that they simply had a very human reaction to a startling event and upset fellow juror. There was no deliberate misconduct or willful failure to follow instructions. (Compare People v. Holloway (2004) 33 Cal.4th 96, 125 [failure to discharge juror not abuse of discretion, and no substantial likelihood juror biased, where discussion of case with alternate juror was not deliberate disobedience to admonitions] with People v. Ledesma, supra, 39 Cal.4th at p. 743 [juror admitted discussing case with wife in violation of admonition, an act of deliberate misconduct; juror's serious and willful misconduct is good cause to believe juror will not be able to perform duty]; People v. Daniels, supra, 52 Cal.3d at pp. 863-864 [same; juror repeatedly violated court's instructions].) It was not discussed during deliberations; in fact, Juror No. 12 was very clear that jurors neither deliberated after finding out the information nor discussed how the zip tie came to be in Juror No. 10's newspaper box or who was responsible. Moreover, it was not information directly concerning defendants per se, and each juror ultimately realized the ambiguity of what occurred. (Compare People v. Danks, supra, 32 Cal.4th at p. 308 [juror's misconduct in sharing Bible passages with fellow jurors demonstrated neither substantial likelihood of her actual bias nor likelihood it resulted in actual bias of other jurors, where juror did not repeatedly refer to extrajudicial information or attempt to impose her views on others] with People v. Nesler, supra, 16 Cal.4th at pp. 583-585, 587, 588-589 (lead opn. of George, C.J.) [juror intentionally interjected extraneous information, directly concerning defendant and substantially related to important matters raised during trial, into deliberations, suggesting substantial likelihood of actual bias on her part].) Although some jurors were still upset, fearful, or at least nervous 24 hours later, a juror's safety concerns or even fear of a defendant do not necessarily suggest bias. (See People v. Jablonski (2006) 37 Cal.4th 774, 807; People v. Navarette (2003) 30 Cal.4th 458, 499-500.) What matters is whether the individual can separate feelings and emotions from his or her duties as a juror, and evaluate the evidence fairly and decide the case solely on the evidence presented at trial. (See People v. Farnam, supra, 28 Cal.4th at pp. 139-142.)

In the present case, the trial court's inquiry was more than adequate (compare People v. Farnam, supra, 28 Cal.4th at pp. 141-142 with People v. McNeal (1979) 90 Cal.App.3d 830, 835), and it was in the best position to observe jurors' demeanors when it questioned them about their ability to perform their duties. Their answers furnished substantial evidence to support its

credibility determinations. (<u>Harris</u>, supra, 43 Cal.4th at p. 1305.)

We conclude that, under the totality of the circumstances surrounding what took place, there is no substantial likelihood any juror was actually biased against defendants. (See <u>Harris</u>, supra, 43 Cal.4th at p. 1306.) In light of that conclusion and our conclusion of no inherent bias, any presumption of prejudice stands rebutted, and the trial court did not abuse its discretion in refusing to discharge any or all of the jurors. (See <u>People v. Holloway</u>, supra, 33 Cal.4th at p. 126; <u>In re Hamilton</u>, supra, 20 Cal.4th at p. 296; <u>People v. Zapien</u> (1993) 4 Cal.4th 929, 997.)

(Lodged Doc. 1, pp. 124-150.)

2.      Analysis

As stated above, The Fourteenth Amendment of the United States Constitution safeguards a criminal defendant's Sixth Amendment right to be tried by a panel of impartial and indifferent jurors. See <u>Irvin v. Dowd</u>, 366 U.S. 717 at 722; <u>Hayes v. Ayers</u>, 632 F.3d at 507. If the jury is exposed to extrinsic facts not introduced as evidence, a defendant is deprived of his right to confrontation, cross-examination, and assistance of counsel under the Sixth Amendment. <u>Dickson v. Sullivan</u>, 849 F.2d 403, 406 (9th Cir.1988). While the Supreme Court has never rejected the idea of implied juror bias, implied bias by a juror has rarely been applied. See <u>United States v. Plache</u>, 913 F.2d 1375, 1378 (9th Cir. 1990); <u>Tinsley v. Borg</u>, 895 F.2d 520, 527 (9th Cir. 1990). "Only in extreme or extraordinary cases should bias be presumed." <u>Plache</u>, 913 F.2d at 1377 (quoting <u>Tinsley</u>, 895 F.2d at 527.).

"[A] petitioner is entitled to habeas relief only if it can be established that the constitutional error had 'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Lawson v. Borg</u>, 60 F.3d 608, 612 (9th Cir.1995) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). The Ninth Circuit has found that whether a constitutional error is harmless is not a factual determination entitled to the presumption of correctness under 28 U.S.C. § 2254(d). <u>Lawson</u>, 60 F.3d at 612. Thus, this Court does not simply defer to the California court's finding that there was no prejudice.

However, there is no requirement that a defendant be given a new trial each time a juror has been placed in a situation that could potentially be compromising. <u>Smith</u>, 455 U.S. at 217 (1982). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to

1  determine the effect of such occurrences when they happen." Id.

2       In determining whether the jury's consideration of extrinsic evidence was so substantial

3  and injurious as to violate the Constitution, the Court must consider: "(1) whether the extrinsic

4  material was actually received, and if so, how; (2) the length of time it was available to the jury;

5  (3) the extent to which the jury discussed and considered it; (4) whether the material was

6  introduced before a verdict was reached, and if so, at what point in the deliberations it was

7  introduced; and (5) any other matters which may bear on the issue of ... whether the

8  introduction of extrinsic material [substantially and injuriously] affected the verdict." Lawson,

9  60 F.3d at 612; see also Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.1993). "None of these

10 factors should be considered dispositive." Jeffries, 5 F.3d at 1190. The Court is also to place

11 great weight on the nature of the extrinsic evidence introduced. See Jeffries, 5 F.3d at

12 1190-91.

13      Here, the 5th DCA, by employing the standard set forth by the United States Supreme

14 Court in Irvin v. Dowd and Smith v. Phillips, applied the relevant Supreme Court law to the

15 issue of juror prejudice or bias. Hence, the only issue remaining is whether that adjudication

16 is either contrary to or an unreasonable application of the standard set forth in those Supreme

17 Court cases. After careful consideration, the Court concludes that it was not.

18      The state court engaged in an exhaustive analysis of this issue.  Several points bear

19 emphasis. First, the trial judge's exercise of his or her responsibility to be "ever watchful to

20 prevent prejudicial occurrences and to determine the effect of such occurrences when they

21 happen," Smith, 455 U.S. at 217 n. 7, inherently involves the trial court's "appraisal of witness

22 credibility and demeanor." Thompson v. Keohane, 516 U.S. 99, 111 (1995); United States v.

23 Olsen, 2013 U.S. App. LEXIS 450 (9th Cir. Jan. 8, 2013). In performing that function, the trial

24 judge is best positioned to make decisions regarding credibility and demeanor; hence, the

25 "judgment of the jurist-observer" has been given "presumptive weight" in these matters.

26 Thompson, 516 U.S. at 111. The trial judge in this case interviewed all twelve jurors

27 extensively before concluding that Petitioner's motion to dismiss the jury should be denied for

28 lack of prejudice or bias. Petitioner has pointed to nothing in the record that would support a

conclusion that the trial judge did not execute his responsibilities regarding credibility and demeanor in a reasonable manner. Thus, the Court agrees with the 5th DCA that "the trial court's inquiry was more than adequate...and [the trial judge] was in the best position to observe jurors' demeanors when it questioned them about their ability to perform their duties." (Lodged Doc. 1, p. 149.)

Second, applying the standards set forth in Lawson, the triggering event was when Juror No. 10 discovered a black zip tie in her mailbox during deliberations. She was obviously shaken by this discovery, immediately shared it with the other jurors, and eventually the judge. Notably, the black zip tie found by Juror No. 10 was not, in and of itself, "evidence" of any culpability by Petitioner; rather, it was construed by Juror No. 10 as an anonymous veiled threat, presumably from someone affiliated with the defense. However, during the juror interviews, and after emotions had subsided somewhat, a more thoughtful and comprehensive perspective emerged as a consensus among the jurors that nobody could really know who placed the zip tie in the juror's mailbox, no one could prove that Petitioner was involved in the occurrence in any way or, indeed, that it was even done with his knowledge, that the event had no bearing on the evidence and testimony introduced at trial or the question of Petitioner's guilt or innocence, and that none of the jurors felt the event would affect their deliberations. Given the relatively short period of time that was consumed from the discovery of the zip tie to denial of Petitioner's motion to discharge the jury, given the lack of evidentiary value of the zip tie to the many factual and legal issues involved in the case, given the substantial evidence of Petitioner's guilt, and given the trial judge's thorough canvassing of the jury and his ultimate conclusion that no bias or prejudice had resulted, the judge's denial of Petitioner's motion was both reasonable and justified. Petitioner has not identified any circumstance or fact that would even suggest, much less establish, a "direct and rational connection between the extrinsic material and a prejudicial jury conclusion." Lawson, 60 F.3d at 612-13. Accordingly, the state court's adjudication of this issue was neither contrary to nor an unreasonable application of clearly established federal law.

### C.    Claim Three: Sufficiency of the Evidence

1    In his third claim, Petitioner renews his state court argument regarding the sufficiency

2    of the evidence supporting several of his convictions. Specifically, Petitioner asserts there was

3    insufficient evidence with respect to his convictions or enhancements as to counts 8-29 of his

4    criminal complaint. Petitioner presented this claim to the state appellate court on direct review.

5    (Lodged Doc. 1 at 88-114.) That court denied the majority of the claims in a reasoned

6    decision, and reversed the convictions as to the firearm enhancements on two counts, and the

7    "in concert" finding with respect to one count. (Id.) Petitioner also presented this claim to the

8    California Supreme Court which denied review. (Lodged Docs. 5, 6.)

9          1.    State Court Review

10   The state court of appeal summarized the relevant evidence and denied the claim as

11   follows:

12                     SUFFICIENCY OF THE EVIDENCE

13          Defendants make a number of claims of evidentiary insufficiency.[36] The
     test of sufficiency of the evidence is whether, reviewing the whole record in the
14   light most favorable to the judgment below, substantial evidence is disclosed
     such that a reasonable trier of fact could find the essential elements of the crime
15   beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 578;
     accord, Jackson v. Virginia (1979) 443 U.S. 307, 319.) Substantial evidence is
16   that evidence which is "reasonable, credible, and of solid value." (People v.
     Johnson, supra, at p. 578.) An appellate court must "presume in support of the
17   judgment the existence of every fact the trier could reasonably deduce from the
     evidence." (People v. Reilly (1970) 3 Cal.3d 421, 425.) An appellate court must
18   not reweigh the evidence (People v. Culver (1973) 10 Cal.3d 542, 548),
     reappraise the credibility of the witnesses, or resolve factual conflicts, as these
19   are functions reserved for the trier of fact (In re Frederick G. (1979) 96
     Cal.App.3d 353, 367). This standard of review is applicable regardless of
20   whether the prosecution relies primarily on direct or on circumstantial evidence
     (People v. Lenart (2004) 32 Cal.4th 1107, 1125), and applies equally to
21   convictions and enhancements (People v. Wilson (2008) 44 Cal.4th 758, 806).

22          Keeping the foregoing principles in mind, we examine each contention in
     turn.
23
     **A. Counts 8, 9, and 14**
24
            Silva and Martinez contend the evidence was insufficient to support their
25   convictions for assault by means of force likely to produce great bodily injury on
     Jose Hernandez (count 8), Francisco Hernandez (count 9), and Cynthia Gibbs
26   (count 14). They point to the fact  neither Hernandez testified at trial, and say no

27

28          [36] We decline the People's apparent invitation that we find some of these claims unreviewable or subject
     to summary rejection for failure to present all material evidence or because they are not separately asserted. (Cal.
     Rules of Court, rule 8.204(a); see People v. Sanghera (2006) 139 Cal.App.4th 1567, 1573-1574.)

evidence was presented as to their medical treatment, if any; the extent of their injuries; or the nature of the assaults. They further argue that Ms. Gibbs testified she was punched once, and neither testified to the extent of her injuries nor was evidence presented concerning her treatment, if any. We find the evidence sufficient to sustain the convictions.

In pertinent part, section 245, subdivision (a)(1) "'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does *in fact* produce such injury. While … the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.' [Citation.]" (<u>People v. Armstrong</u> (1992) 8 Cal.App.4th 1060, 1065; <u>People v. Muir</u> (1966) 244 Cal.App.2d 598, 604.) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses … on force likely to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.]" (<u>People v. Aguilar</u> (1997) 16 Cal.4th 1023, 1028.)

"Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate. [Citations.]" (<u>People v. Armstrong</u>, supra, 8 Cal.App.4th at p. 1066.) It is well established that the use of hands or fists alone may support a conviction for assault by means of force likely to produce great bodily injury. (<u>People v. Aguilar</u>, supra, 16 Cal.4th at p. 1028; <u>People v. Bumbaugh</u> (1941) 48 Cal.App.2d 791, 797.) What force is likely to produce great bodily injury is a question of fact to be determined by the jury based on all the evidence, including, but not limited to, any injury inflicted. (<u>People v. Armstrong</u>, supra, 8 Cal.App.4th at p. 1066; <u>People v. Muir</u>, supra, 244 Cal.App.2d at p. 604; <u>People v. Bumbaugh</u>, supra, 48 Cal.App.2d at p. 797.) "Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied. [Citation.]" (<u>People v. McDaniel</u> (2008) 159 Cal.App.4th 736, 748-749.)

With respect to counts 8 and 9, the evidence established a violent home-invasion robbery. According to Mechuca, Francisco Hernandez was threatened with death. He was kicked hard enough that it caused Mechuca's head to slide off the edge of the air mattress he was on. Francisco Hernandez was also beaten with a frying pan, and the perpetrators overturned a couch onto his and Mechuca's backs and jumped up and down on it. Francisco Hernandez sustained multiple facial injuries and swelling, and the jury was shown a photograph of the damage. Mechuca described Jose Hernandez as having a pillowcase over him that was "full of blood." Jose Hernandez said he was choking. When Mechuca got the pillowcase off, he could see that Jose Hernandez had been beaten about the eyes and was bleeding from the head. He was taken to the hospital by ambulance. Jurors were shown a photograph of his injuries.

The foregoing amply supports the jury's determination that defendants committed assault by means of force likely to commit great bodily injury on Jose and Francisco Hernandez. (<u>See, e.g.</u>, <u>People v. McDaniel</u>, supra, 159 Cal.App.4th at p. 749 [sufficient evidence found where defendant punched victim about head and upper body with closed fists, using such force defendant fractured a knuckle; victim sustained abrasions, contusions, scratches, bloody nose, and lacerations on neck, one of which required five stitches]; <u>People v. Armstrong</u>, supra, 8 Cal.App.4th at p. 1066 [sufficient evidence found where defendant grabbed victim's face and pinched both sides of her mouth, ripped her clothing, held her jaw tightly, and, while on top of her, shoved his hand down her

throat]; People v. Rupert (1971) 20 Cal.App.3d 961, 968 [sufficient evidence found where defendant struck victim with fist and possibly coffeepot; victim sustained several cuts to head and face, resulting in scar on cheek]; People v. Chambers (1964) 231 Cal.App.2d 23, 27 [sufficient evidence found where defendant struck elderly patient hard with closed fist; although blows apparently produced no visible results, jury shown photograph depicting victim's aged, possibly weak condition].)

With respect to count 14, the evidence again established a violent home-invasion robbery. At one point, Ms. Gibbs's chin was on the floor and someone was sitting on her head. When this person moved to bind her ankles, she called out to her children to call 911. She was then punched in the face hard enough to knock her head to the ground. She sustained a cut mouth and bruising, both inside and outside. There was swelling around her mouth area. Her lip was sore for at least a week and swollen for a couple of weeks. A photograph of her injuries was in evidence.

Although count 14 presents a closer question than do counts 8 and 9, we conclude the evidence, considered as a whole and especially in light of the circumstances under which the force was applied (People v. McDaniel, supra, 159 Cal.App.4th at pp. 748-749), is sufficient to sustain the conviction (see, e.g., People v. Rupert, supra, 20 Cal.App.3d at p. 968; People v. Chambers, supra, 231 Cal.App.2d at p. 27).

## B. Counts 10 and 11

Silva and Martinez also contend the evidence was insufficient to support their convictions for the robberies in concert of Richard Baker (count 10) and Christine Baker (count 11). They say there was no evidence of a third accomplice, as required to uphold the "in concert" finding. Again, we disagree.

Section 213, subdivision (a)(1)(A) provides for increased punishment "[i]f the defendant, voluntarily acting in concert *with two or more other persons*, commits the robbery within an inhabited dwelling house …." (Italics added.) This is a sentence enhancement, not a mere sentencing factor; it must be pleaded (as it was here) and proven beyond a reasonable doubt. (In re Jonathan T. (2008) 166 Cal.App.4th 474, 482.)

Defendants do not contend that an aider and abettor -- at least one, such as a getaway driver, who directly facilitates the group conduct against which the statute is aimed -- cannot be included for purposes of determining whether the numerical requirement has been met. (See People v. Preston (1961) 192 Cal.App.2d 86, 87 [getaway driver punishable as principal to robbery].)[37] Here, we conclude a jury reasonably could have found, based on the vehicle tracks less than 10 feet from where the Bakers' car was abandoned, that a third participant was involved in the robbery as a getaway driver.

We realize that speculation is not evidence, and that a reasonable inference may not be based on mere suspicion, speculation, conjecture, or guesswork. (People v. Raley (1992) 2 Cal.4th 870, 891.) We might find it speculative to rely on the fact a magenta-colored car passed the Baker residence several times in order to find a third person was involved: The record

---

[37] Jurors were instructed that acting in concert included those who personally engaged in the act or acts constituting the crime and those who aided and abetted.

does not appear to contain any evidence linking a car of that color to defendants. With respect to a number of the robberies, however, there was evidence that a getaway car was waiting for defendants when they finished inside the houses. Given the intercepted conversation between Silva and Fouse in which Silva talked about possibly needing a driver and Fouse asked if it would be the same as previously, with her dropping him off and then coming back to get him, an inference that a driver remained with the getaway car (as opposed to the perpetrators stashing the car some distance from the targeted house and then approaching and escaping on foot) can reasonably be drawn from the evidence and is not "'"a mere speculation as to probabilities without evidence."' [Citation.]" (Ibid.)

## C. Counts 22, 26, and 27

Defendants next contend the evidence was insufficient to support their convictions for the kidnappings for robbery of Steve Christy (count 22), M.J. (count 26), and Jane Doe Two (count 27). They claim the movements of the victims in each instance were merely incidental to a robbery and did not substantially increase the risk of harm over and above that present in the crime of robbery. We disagree.

Section 209, subdivision (b) proscribes so-called aggravated kidnapping, i.e., kidnapping to commit robbery or an enumerated sex crime. Under this section, "the victim must be forced to move a substantial distance, the movement cannot be merely incidental to the target crime, and the movement must … increase the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (People v. Dominguez (2006) 39 Cal.4th 1141, 1153 (Dominguez), italics omitted; see, e.g., People v. Martinez (1999) 20 Cal.4th 225, 232-233, 236-237; People v. Rayford (1994) 9 Cal.4th 1, 12-14 (Rayford); People v. Daniels (1969) 71 Cal.2d 1119, 1134, 1139 (Daniels)).[38]

In Dominguez, the evidence showed that the defendant forced the victim to move from the shoulder of a road, down an embankment and partially into a walnut orchard, approximately 25 feet away from the road and 10 to 12 feet below its surface. On appeal, he disputed whether the forced movement was for a distance greater than that which was merely incidental to the commission of

---

[38] Dominguez states the test as requiring a substantial increase in the risk of harm to the victim. (Dominguez, supra, 39 Cal.4th at p. 1153.) That was the test under former section 208, subdivision (d), the statute construed by Dominguez; in 1997, it stated: "If the person is kidnapped with the intent to commit rape, oral copulation, sodomy, or rape by instrument, the kidnapping is punishable by imprisonment in the state prison for 5, 8, or 11 years." At the same time, section 209, subdivision (b) provided: "Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole."

In 1997, subdivision (d) was deleted from section 208, and section 209, subdivision (b) was revised to read: "(b)(1) Any person who kidnaps or carries away any individual to commit robbery, rape, spousal rape, oral copulation, sodomy, or rape by instrument in violation of Section 289, shall be punished by imprisonment in the state prison for life with possibility of parole. [P] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (Stats. 1997, ch. 817, §§ 1-2.) Thus, subdivision (b)(2) no longer requires that the movement "substantially" increase the risk of harm to the victim, contrary to much of the decisional authority of the California Supreme Court. (People v. Martinez, supra, 20 Cal.4th at p. 232, fn. 4.)

the intended rape and substantially increased the risk of harm to the victim. (Dominguez, supra, 39 Cal.4th at p. 1151.) In discussing the appropriate standard for agg

Whether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases. We discussed the standard in Rayford and explained that the jury must 'consider[] the "scope and nature" of the movement,' as well as 'the context of the environment in which the movement occurred.' [Citations.] This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' [Citation.]

"The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.] We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. [Citation.] In finding insufficient evidence of asportation, the Court of Appeal below focused too narrowly on a subsidiary aspect of the analysis, measured distance, rather than considering how all the attendant circumstances related to the ultimate question of increased risk of harm. Although any assessment of the Daniels/Rayford test necessarily must include a consideration of the actual distance the victim was forced to move [citation], we have repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation].

"Measured distance, therefore, is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving robbery victims between six and 30 feet within their home or apartment [citation] or 15 feet from the teller area of a bank to its vault [citation] may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement. These examples are illustrative only; each case must be considered in the context of the totality of its circumstances." (Dominguez, supra, 39 Cal.4th at pp. 1151-1152.)

A brief reiteration of the evidence presented with respect to counts 22,

26, and 27, viewed in the light most favorable to the judgment, is helpful. With respect to count 22, armed intruders physically broke into Christy's house during the night, made him turn off the alarm that was sounding, bound him hand and foot, and essentially blindfolded him. One of them requested money and the location of the safe. Christy told him where the money was, but, when Christy repeatedly denied having a safe, the intruder placed a gun to the back of his head, threatened to kill him, and then dry-fired the gun. Christy was then forcibly taken to his shop, which was about 100 feet behind the house. Inside, he was again asked about the safe, then struck and knocked unconscious. When he regained consciousness, he was returned to the house.

With respect to counts 26 and 27, armed intruders physically broke into M.J. and Jane Doe Two's home during the night. The couple's son and pregnant daughter were present, and all four were tied up and essentially blindfolded. M.J. was beaten; his son was also struck. The perpetrators demanded money, jewelry, and guns. A gun was held to the back of M.J.'s head and dry-fired. He was moved to various rooms in the house so that he could show the location of valuables; when he was returned to his original location and placed on the floor, he was kicked several times in the head. One of the perpetrators then took Jane Doe Two to get the combination to the safe. He moved her to various rooms to open the safe, get more money, et cetera. Her underwear, in which she had been sleeping, was then cut off and she was taken to the living room, where she was sexually assaulted with a gun and threatened. One of the robbers then carried her from the living room, through her son's bedroom, and outside to the deck, where a hot tub was located about eight to 10 feet from the door. Once there, the perpetrator asked where the money was and forced her head underwater a couple of times. While this was going on, M.J. was also brought out to the deck. He was asked for money, his head was held underwater, and he was struck several times. He tried to escape, but the intruder controlling Jane Doe Two pointed a gun at his face and he allowed himself to be restrained again. The couple was then returned to the house, where Jane Doe Two was again sexually assaulted.

None of the three victims was merely moved around inside the premises in which he or she was found. Accordingly, cases in which movement of a victim around and into the rooms of a private residence (People v. Morrison (1971) 4 Cal.3d 442, 443) or hotel (People v. Smith (1971) 4 Cal.3d 426, 427) have been found merely incidental to the robbery, are distinguishable. We also find distinguishable cases holding that movement around the premises of a service station was merely incidental to the robbery thereof (In re Crumpton (1973) 9 Cal.3d 463, 466; People v. Williams (1970) 2 Cal.3d 894, 899-901); in our view, there is a significant difference between a location that is primarily devoted to business and where business is conducted throughout most, if not all, of the premises, and a location that is primarily used as private living quarters and environs.

People v. John (1983) 149 Cal.App.3d 798, upon which defendants rely, is also distinguishable. In that case, the victim lived in a pool house situated in a cluster of buildings on his parents' eight-acre plot. Also in the cluster were the main house, where his parents lived, and some rental units. Although the pool house was separate and detached from the main house, the victim could enter the main house at will. The buildings were connected by a system of driveways, stairs, and open-air causeways. On the night in question, the victim was confronted by an armed robber, who walked him about the premises and into the pool house. After the defendant entered, the victim's hands were tied and he was momentarily blindfolded, then the blindfold was removed and he was

taken through the causeway and two sets of sliding doors, into the master bedroom of the main house. Once inside, he was blindfolded again and his feet were tied. He was told to lie still on the couch, and could hear the intruders rifling through drawers. (Id. at pp. 802-803.) The Court of Appeal found only incidental movement and no substantial increase in the risk of harm beyond that inherent in the robberies themselves, because, although the victim was initially confronted with an armed assailant, his subsequent treatment was not violent; moreover, all of the movement was an integral part of the robbery and burglary which occurred, and he was never forced to move outside of the interconnected living quarters. (Id. at pp. 805, 806-807.)

In the present case, by contrast, the victims' treatment was exceedingly violent. Under the circumstances, jurors reasonably could conclude that the distance all three victims were moved was substantial, not slight or trivial. (Dominguez, supra, 39 Cal.4th at p. 1153; People v. Martinez, supra, 20 Cal.4th at pp. 236-237; see CALJIC No. 9.54.) Moreover, the circumstances lend themselves to the reasonable conclusion that the movements from inside the house to the shop (count 22) and from inside the house to the hot tub (counts 26 and 27) were not integral parts of the robberies. Although those movements were related to the perpetrators' desire for more loot than they had already been directed to by the victims or found by their own ransacking of the victims' homes, the movements were not merely incidental to the commission of the robberies because, in each instance, the perpetrators did not need to take the victims outside the homes in order to rob them. To hold that movement is merely incidental to a robbery any time the robber wants more than he or she has already stolen, simply because the robber's primary aim is to steal, would permit robbers to force their victims to move over extensive distances without any fear of an aggravated kidnapping conviction, as long as all of the movement was undertaken because the robber wanted more loot than was available at the robbery's initial location. Such is not the law. (See In re Earley (1975) 14 Cal.3d 122, 130 & fn. 11 [where movement is substantial, it is not merely incidental to the commission of the robbery, even though it may have been solely to facilitate the commission of the robbery].)

"The 'risk of harm' test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. [Citation.]" (In re Earley, supra, 14 Cal.3d at p. 131, fn. omitted.) That the potential for serious injury inherent in the situation may not be actualized during the course of the asportation is immaterial. (People v. Lara (1974) 12 Cal.3d 903, 908.)

We have no trouble concluding that a reasonable juror could find the movement increased the risk of harm to the victims in the present case.[39] In Steve Christy's case, although we do not know the relative locations of the house and shop vis-a-vis the neighbors, we do know the shop was a considerable distance behind the house. The alarm went off when the intruders broke in. Even though no one ultimately responded to the alarm, moving Christy away from the house made it less likely he would be rescued if anyone did respond. In addition, taking him outside increased the risk he might try to

---

[39] In this regard, "harm," as used in section 209, subdivision (b), includes psychological harm. (People v. Nguyen (2000) 22 Cal.4th 872, 886.)

escape, with the inherent danger he would be shot and killed.[40] (See Dominguez, supra, 39 Cal.4th at p. 1152.) As for M.J. and Jane Doe Two, the movement allowed the perpetrators to nearly drown them. Additionally, Jane Doe Two initially was isolated from her family, and both were moved away from their children. The increased risk of physical and psychological harm was tremendous. Defendants' movement of the victims out of the house and to the hot tub went well over and above that necessary to commit the robbery; the violence defendants perpetrated there "was clearly 'excess and gratuitous.'" (People v. Corcoran (2006) 143 Cal.App.4th 272, 280.)

Because a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt (People v. Panah (2005) 35 Cal.4th 395, 487), we reject defendants' claims and uphold their convictions on counts 22, 26, and 27.[39]

## D. Counts 30 and 31

Morrison next contends the evidence was insufficient to support his convictions for the attempted murder (count 30) and attempted robbery in concert (count 31) of Marcos Renteria. He says Renteria only saw two intruders, whom Renteria's identification and DNA evidence showed to be Martinez and Silva. Silva and Martinez challenge their convictions on count 31, contending there was no evidence of a third participant as required to uphold the "in concert" finding. We will uphold the conviction on count 30, but conclude the "in concert" findings on count 31 must be reversed.

Perhaps because it was not emphasized by the prosecution in its argument to the jury at trial, the parties overlook conspiracy as the basis of Morrison's liability with respect to count 30. Despite the lack of prominence given the theory, however, it is apparent from the charges, jury instructions, and various comments by the prosecutors that they were relying on a conspiracy theory of liability. (See In re Hardy (2007) 41 Cal.4th 977, 1026-1029.)

"One who conspires with others to commit a felony is guilty as a principal. (§ 31.) "'"Each member of the conspiracy is liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]"' (In re Hardy, supra, 41 Cal.4th at pp. 1025-1026.) In short, "'"[i]n contemplation of law the act of one [conspirator] is the act of all."'"' (People v. Morante (1999) 20 Cal.4th 403, 417.) Jurors were so instructed; although they were not required to determine whether the crime charged in count 30 was a reasonable and probable consequence of the common design, nothing precluded them from

---

[40] It does not appear Christy's ankles were bound, at least when he was taken to the shop. Christy testified that when the intruders first entered the house, they took him to the bedroom, put a plastic zip tie around his wrists, and laid him on the floor. He said nothing about being bound at the ankles until the prosecutor asked, "Were you tied up in any other fashion besides your ankles?" As Christy replied "No," we are not sure whether the prosecutor misspoke. In any event, he further testified that, when he was outside, his head was still covered and his wrists were still tied up in front. There is no suggestion he had trouble walking -- as he would if his ankles were bound -- until after he had been knocked unconscious. Christy testified that, after the intruders left, he got up, went out to the shop, and used some of his machinery to cut the plastic tie on his wrists. Only one plastic zip tie was subsequently collected from the scene.

[39] We need not discuss Silva's additional claim that the evidence was insufficient even to show simple kidnapping.

doing so, and other instructions told them how to conduct such an analysis.

As previously described, jurors convicted Morrison of conspiracy to commit residential robbery. Accordingly, since the conspiracy theory of liability was presented to jurors and the record establishes they relied on it at least in part (see In re Hardy, supra, 41 Cal.4th at p. 1029), Morrison's conviction must be upheld so long as the evidence was sufficient to show that he intended for his coconspirators' act to achieve the object of the conspiracy, and the attempted murder of Renteria was the natural and probable consequence of any act of a coconspirator to further the object of the conspiracy (People v. Hardy (1992) 2 Cal.4th 86, 189).

The evidence amply supports such a finding. Morrison does not challenge his conviction of conspiracy to commit residential robbery. The attempted robbery of Renteria fell within the object of that conspiracy. Renteria was shot when, after pulling off Martinez's mask, he managed to flee. The attempted murder of a fleeing victim who can identify one of the perpetrators can reasonably be found to be a natural and probable consequence of an attempted robbery. (See People v. Cummins (2005) 127 Cal.App.4th 667, 677-678 & cases cited; People v. Nguyen (1993) 21 Cal.App.4th 518, 530-531 & cases cited.) Accordingly, whether Morrison was present, intended the shooting, or was even aware Renteria had been shot is irrelevant. (People v. Morante, supra, 20 Cal.4th at p. 417; People v. Hardy, supra, 2 Cal.4th at p. 189.) The evidence was sufficient to sustain his conviction for attempted murder.[40]

We turn now to the "in concert" finding with respect to count 31. We have found no authority for the proposition that a mere coconspirator -- as opposed to an aider and abettor who directly facilitates the commission of the robbery -- can constitute the requisite third participant required by section 213, subdivision (a)(1)(A). To so hold would be to allow imposition of an increased sentence where, for example, three people conspire to commit a residential robbery, but two remain at home while the third actually carries out the plan. Since such a scenario does not appear to us to fall within the evil at which the "in concert" provision is aimed -- a home-invasion robbery directly perpetrated by multiple assailants such as a gang (see In re Jonathan T., supra, 166 Cal.App.4th at p. 481) -- we decline to find the existence of a third perpetrator based strictly on Morrison's participation in the conspiracy.

Accordingly, we examine the evidence to determine whether it supports the People's contention that a third person directly participated in the attempted robbery. The People argue that, because Renteria's home was in a rural area, getting away would require a waiting car; Renteria testified he saw lights running back to the canal as he lay injured; and, within an hour of the attempted robbery, surveillance at Silva's home showed a heavy duffel bag being removed from a vehicle and then the car associated with Morrison arrived minutes later.[41]

---

[40] As the jury made no finding, as to him, on the allegation the attempted murder was deliberate and premeditated, we need not consider whether attempted premeditated murder was a natural and probable consequence of conspiracy to commit robbery.

[41] The People argue that defendants ignore testimony about how they gathered just before the Renteria incident and then regathered briefly at Silva's home just afterward. As support for this assertion, the People rely in part on surveillance conducted shortly before 10:00 p.m. on August 15, and again around midnight. The People appear to have confused the times. The Renteria incident took place early on the *morning* of August 15.

We find these "layers of inference far too speculative to support" the "in concert" finding. (People v. Raley, supra, 2 Cal.4th at p. 890.) Contrary to the situation that existed with respect to counts 10 and 11, discussed ante, no signs of a vehicle were found anywhere near the Renteria residence. Renteria testified to seeing some lights moving away from the house, toward the nearby canal. He said he did not know if it was a flashlight or what, but "it was light I could see running that way." When asked who was running, he replied, "The guy with the flashlights." This testimony does not give rise to a reasonable inference that what he saw was a waiting car. Moreover, the evidence is not such that we can infer defendants always had a third participant, if not in the house, then waiting in a getaway car.

People v. Raley, supra, 2 Cal.4th 870, is instructive. In that case, the defendant was convicted, inter alia, of attempted oral copulation of one Jeanine. On appeal, he claimed the evidence was insufficient to sustain the conviction. There was no direct evidence of what happened to Jeanine; another victim, Laurie, testified that the defendant said he would not let them go unless they took off their clothes and "'fool[ed] around'" with him. He took Jeanine away, after which Laurie heard a scream. When he returned with Jeanine, he took Laurie and made her orally copulate and masturbate him. Later, Jeanine told one of her rescuers that she had not really been raped, but that the defendant made the victims take off their clothes and he fooled around with them. (Id. at pp. 889-890.) The California Supreme Court found clear and substantial evidence of some sort of sexual attack on Jeanine and of a forcible oral copulation on Laurie, but no evidence of the particular nature of the assault on Jeanine apart from an inference that, because the defendant committed a forcible oral copulation against Laurie, he may have attempted to do the same to Jeanine. The People sought to bolster the inference by arguing that since he told both victims they would have to fool around with him and he committed an act of oral copulation against Laurie, "fool around" must have meant oral copulation to the defendant and, when Jeanine used the term with her rescuer, it must have meant the same to her. (Id. at p. 890.) The high court rejected the argument, stating:

"We find these layers of inference far too speculative to support the conviction of this count. Oral copulation was not the only sexual activity defendant had in mind with his second victim; 'fooling around' seemed to mean several things to him. It is also speculative to conclude that Jeanine would use the term in the same restricted sense respondent claims defendant intended to convey. 'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [P] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence.'" [Citation.]

"Evidence is sufficient to support a conviction only if it is substantial, that is, if it '"reasonably [184] inspires confidence"' [citation], and is 'credible and of solid value.' [Citations.] We conclude, considering the record as a whole, that it is speculative to infer because defendant committed an oral copulation on one victim, he necessarily attempted the same crime on another victim. This inference does not appear to us of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt that defendant perpetrated an attempted oral copulation, as opposed to any other forcible sexual assault,

against Jeanine." (Id. at pp. 890-891.)

In the present case, we are similarly asked to speculate, based essentially on the rural surroundings and defendants' presence together not long after the incident, that a third participant was involved in the attempted robbery. Although the presence together of men we may infer were defendants soon after events bolsters a finding of conspiracy, if anything, the fact Silva and Morrison arrived in separate vehicles suggests they were not together at the Renteria premises. In any event, an examination of the entire record shows that an "in concert" finding as to count 31 can be based only on speculation. Accordingly, that finding must be stricken as to all three defendants.

## E. Count 37

Morrison and Silva say there was insufficient evidence of a specific intent to kill Sergeant Allen; hence, their convictions on count 37 must be reversed. They argue that, because Allen was outside the vehicle being driven by Detective Nuno, and because the driver's side of the windshield and door post were hit by a single bullet, the evidence was insufficient to establish Allen was within the zone of risk. We disagree.[42]

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (People v. Lee (2003) 31 Cal.4th 613, 623.) "'"[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred." [Citation.]' [186] [Citation.]" (People v. Smith (1998) 64 Cal.App.4th 1458, 1469.)

The doctrine of transferred intent does not apply to the crime of attempted murder. (People v. Bland (2002) 28 Cal.4th 313, 317 (Bland).) "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill." (Ibid.) Thus, in order to be convicted of two counts of attempted murder, each involving a different victim, the prosecution must prove the perpetrator acted with the specific intent to kill each victim. (See People v. Smith (2005) 37 Cal.4th 733, 736, 739.) "The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (Bland, supra, 28 Cal.4th at p. 328.)

A person who shoots at a group of people may nevertheless be found guilty of the attempted murder of everyone in the group, even if he or she primarily targeted only one of them, if the person also, concurrently, intended to kill others within what has been termed the [187] "'kill zone.'" (Bland, supra, 28 Cal.4th at p. 329.) "'The intent is concurrent … when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this

---

[42] The jury found Silva to be the actual shooter. We will address Morrison's contentions concerning the natural and probable consequences doctrine and related jury instructions, post.

method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (Id. at pp. 329-330; see People v. Vang (2001) 87 Cal.App.4th 554, 563-564.)

This does not mean that an attempted murder is committed as to all persons in a group simply because a gunshot is fired indiscriminately at them, or that a defendant may be found guilty of the attempted murder of someone he or she did not intend to kill merely because the victim was in some undefined zone of danger. (People v. Anzalone (2006) 141 Cal.App.4th 380, 392-393.) Rather, "to be found guilty of attempted murder, the defendant must either have intended to kill a particular individual or individuals or the nature of his attack must be such that it is reasonable to infer that the defendant intended to kill everyone in a particular location as the means to some other end, e.g., killing some particular person." (Id. at p. 393.)

"The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill ….' [Citation.]" (People v. Chinchilla (1997) 52 Cal.App.4th 683, 690.) This is especially true where the individual aims a loaded firearm at people he or she knows to be armed law enforcement officers, and then takes matters a step further by firing at them from a distance of 15 to 20 feet -- near point blank range. (See People v. Lee (1987) 43 Cal.3d 666, 679.)

Morrison and Silva implicitly concede the requisite showing of intent with respect to Nuno, but claim that, because only a single bullet struck Nuno's vehicle, and struck at such an angle that, although Nuno nearly was hit, the bullet's trajectory necessarily was from Nuno's right to his left and away from the passenger side of the car, there was insufficient evidence Allen was either a primary target or within a zone of danger. They also say a determination of the location of a zone of danger requires evidence showing the paths of the shots fired.

Understandably, given the rapidity with which events unfolded, testimony at trial from officers involved in the pursuit and arrest differed somewhat as to Allen's precise location, and whether he had cleared Nuno's vehicle, when Silva opened fire. Allen himself testified, however, that, when he heard what the jury determined to be Silva's gunfire, it was coming from the Cold Pimp'n vehicle back into Allen's direction, and that he was still standing behind the door of Nuno's car at the time. He elaborated that, when he heard the gunfire from the other vehicle, "I stepped out of [Nuno's] car, so I was standing right next to the

car. Our car moved forward, so I was still somewhat in the doorway, but the car was moving away from me. So basically right next to the car in line with the door as the car would move forward away from me."

We have viewed the pursuit video, which was shown to the jury, and conclude it confirms Allen's testimony. Given his position and testimony that the gunfire was coming in his direction, together with Nuno's description of a "volley of gunfire" and multiple shots with approximately a half second in between, jurors reasonably could have concluded Silva was firing at the car with an intent to kill both Nuno and Allen, whom he perceived to present the most immediate threat to him and his cohorts. Even assuming jurors found Silva primarily wanted to kill Nuno, they reasonably could also have found a concurrent intent to kill Allen, and that Silva created a kill zone by firing multiple rounds at the car when Allen was in such close proximity to it. (See Bland, supra, 28 Cal.4th at pp. 330-331; People v. Anzalone, supra, 141 Cal.App.4th at p. 393.)[43]

The fact that only one bullet actually struck Nuno's vehicle does not alter our conclusion. Silva did not just fire one shot; he fired *multiple* rounds.[43] Cases such as People v. Smith, supra, 37 Cal.4th 733 and People v. Chinchilla, supra, 52 Cal.App.4th 683, which involve two victims in the line of fire of a single shot, are thus not controlling. Nor are we persuaded that a determination of the trajectories of the shots fired is required. The evidence here was sufficient to permit jurors reasonably to conclude Silva intended to kill both Nuno and Allen. That is all that is required. (See Bland, supra, 28 Cal.4th at p. 331, fn. 6.)

## F. Firearm Enhancements

As previously described, personal firearm use allegations, pursuant either to section 12022.5, subdivision (a) or section 12022.53, subdivision (b), were found true with respect to a number of counts. Silva and Morrison now challenge the sufficiency of the evidence to sustain certain of these enhancements. We conclude some do not find adequate support in the evidence.

Insofar as is pertinent here, section 12022.5, subdivision (a) provides for imposition of a consecutive enhancement of three, four, or 10 years upon "any person who *personally* uses a firearm in the commission of a felony or attempted felony …." (Italics added.) Under section 12022.53, subdivision (b), however, "any person who, in the commission of [kidnapping for robbery, robbery, or sexual penetration], *personally* uses a firearm" is subject to a consecutive enhancement of 10 years. (Italics added; see § 12022.53, subd. (a)(3), (4) & (13).) Although neither statute requires "'conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified

---

[43] Jurors were given both the standard instruction on attempted murder (CALJIC No. 8.66) and the instruction on concurrent intent (CALJIC No. 8.66.1).

[43] That he did not use an automatic weapon is of no import under the circumstances; although the "kill zone" explanation the California Supreme Court quotes from sister-state authority in Bland uses the example of an attack with automatic weapon fire (Bland, supra, 28 Cal.4th at p. 330), the gun used in Bland itself was a .38-caliber handgun (id. at p. 318).

Morrison and Silva suggest the shots may have been fired into the air or ground in order to freeze pursuit. Such a scenario is inconsistent with Allen's testimony that, when he heard the gunfire, it was coming back into his direction. Jurors were entitled to credit his version of events.

felonies'" (People v. Bland (1995) 10 Cal.4th 991, 997), both require that, in order for a principal to be subject to the enhancement, he or she must have personally used a firearm in commission of the underlying offense, whether he or she was the direct perpetrator, or an aider and abettor, of that offense (People v. Hernandez (2005) 134 Cal.App.4th 474, 480).[44] The statutes are interpreted similarly with respect to this requirement (see People v. Masbruch (1996) 13 Cal.4th 1001, 1007; People v. Carrasco (2006) 137 Cal.App.4th 1050, 1058, 1059-1060); the only exception is contained in subdivision (e) of section 12022.53, and permits imposition of the enhancement on one who did not personally use a firearm if the offense was committed for the benefit of a criminal street gang under section 186.22, subdivision (b) and a principal in the offense personally used a firearm (People v. Hernandez, supra, 134 Cal.App.4th at p. 480). In the present case, of course, the section 186.22, subdivision (b) allegations were found not true. Accordingly, only if the prosecution proved personal use by a specific defendant, beyond a reasonable doubt, can the enhancement be upheld as to that defendant. (See People v. Jones (1999) 75 Cal.App.4th 616, 631.)[44]

1. Count 1

With respect to count 1, the Lasater robbery, jurors found the section 12022.53, subdivision (b) allegation true as to Morrison, but were unable to reach a verdict as to Martinez and Silva. Morrison now contends that, because Lasater testified there were three intruders, but he saw only two guns, there is no evidence the third intruder was armed with a firearm, much less used it. The People claim the argument fails because (1) jurors only found the enhancement true as to Morrison; (2) the evidence supported a rational conclusion at least two intruders pointed guns at Lasater's head; and (3) Lasater's gun, which was stolen in the robbery, was found at the scene of defendants' arrests some three and a half months later. We agree the evidence was uncontroverted that two intruders each used a gun in committing the robbery. Morrison does not contend otherwise. The problem is identifying which intruders used guns.

Lasater testified that the intruders sounded Hispanic to him, and he related some of the things they said and their different levels of courtesy and composure. He also testified to seeing brown skin, but no tattoos, through the

---

[44] Jurors here were instructed: "The term personally used a firearm, as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it."

[44] Courts have carved a so-called "group beating exception" to the requirement of section 12022.7 that, in order to be subject to the enhancement contained in that section, a defendant must personally inflict great bodily injury. (See, e.g., People v. Modiri (2006) 39 Cal.4th 481, 485-486; People v. Corona (1989) 213 Cal.App.3d 589, 593-594.) The exception applies where a defendant participated in a group attack, it cannot be determined which assailant inflicted which injury, and the defendant personally applied physical force to the victim of a nature that, by itself, could have caused great bodily injury, or under such circumstances that the cumulative effect of the force used by all participants would have caused the injury. (People v. Modiri, supra, 39 Cal.4th at p. 485; People v. Corona, supra, 213 Cal.App.3d at p. 594.) In the case of a section 12022.53 enhancement, the Legislature has specified a type of "group use" exception in subdivision (e) of the statute, and it is not for this court to expand that exception to situations beyond those for which the Legislature has provided. Moreover, the logic behind the group beating exception does not apply where, as here, the evidence shows which perpetrator did what, but not necessarily who each was.

eye holes in the masks the intruders were wearing. We recognize that, on appeal, the judgment is presumed to be correct and the defendant bears the burden of showing the evidence was insufficient. (People v. Sanghera, supra, 139 Cal.App.4th at p. 1573.) We also recognize, as did the trial court when ruling on defendants' new trial motions concerning the firearm use enhancements, that jurors heard recordings of defendants' intercepted conversations, and so might have been able to ascertain whether any particular defendant spoke with a discernable accent. Jurors were also able to view defendants at trial. These circumstances are insufficient to support a rational inference as to which defendant(s) used a firearm in commission of count 1, however, especially when we take into account other victims' varying descriptions of the intruders' voices and the fact Lasater described seeing brown skin through the eyeholes of all the masks. Thus, there simply is no rational way to separate one defendant from the others; hence, the firearm use enhancement on count 1 must be reversed as to Morrison.

2. Counts 2 and 3

With respect to counts 2 and 3, the robberies of P.S. and Jane Doe One, jurors found the section 12022.53, subdivision (b) allegations true as to Silva, but were unable to reach verdicts as to Martinez and Morrison. Silva contends, with respect to these and the other enhancements he challenges (post), that there was no testimony from the victims identifying which defendant used a firearm in commission of the offenses. As to all of Silva's claims, the People argue review has been waived by appellate counsel's failure to mount a separate argument for each enhancement or to cite pertinent authority. We reject these assertions. On the merits, the People point largely to the fact the victims' heads were covered, and property taken in the robberies was found at Silva's residence following his arrest. We are not persuaded: If anything, the fact the victims' heads were covered militates against a finding they were able to identify which defendant(s) used a gun; moreover, the finding of stolen property is relevant to participation in the robberies, but says nothing about who used a gun. Additionally, there is insufficient evidence for us to conclude a particular defendant used a certain firearm in each incident.

Specifically as to counts 2 and 3, Jane Doe One testified to seeing one man with a handgun at her forehead and four other hands with guns facing her way. In contrast, P.S. believed there were two hands and two guns, although he heard footsteps elsewhere in the house. If jurors had credited Jane Doe One's memory of the number of intruders, it seems unlikely they would have failed to reach verdicts as to Martinez and Morrison. Further, the testimony and evidence demonstrate substantial uncertainty in the specifics of Jane Doe One's testimony, which is clearly understandable given the terrifying nature of the assault. Jane Doe One believed, from the intruders' voices, that they possibly were African-American. P.S. did not notice anything unusual about any of their voices. Both related things the intruders said and their varying levels of courtesy and composure. As with respect to count 1, however, and even taking into consideration the wiretap evidence, these circumstances are insufficient to support a rational inference as to which defendant(s) used a firearm in commission of counts 2 and 3. Accordingly, the firearm use enhancements on counts 2 and 3 must be reversed as to Silva.

3. Counts 12 and 13

With respect to counts 12 and 13, the robberies of Cynthia and William Gibbs, jurors found the section 12022.53, subdivision (b) allegations true as to Silva and Morrison, but were unable to reach verdicts with respect to Martinez. The incident involved three intruders, but apparently only two guns. Again, the couple described voices and some of the words spoken by the intruders, as well as their levels of courtesy and composure. The descriptions of voices varied: Ms. Gibbs did not believe any of the intruders sounded African-American, Gibbs believed at least some of them might have been, and the couple's son thought all three voices sounded African-American. The voice evidence thus does not provide a rational basis for distinguishing between defendants. Significantly, however, Ms. Gibbs testified to seeing a black boot that looked like a motorcycle boot or a heavy work boot. The Gibbses' daughter described one of the men, who pointed a gun at her face, as wearing black combat-style boots. While boots of that type were seized from both Silva and Martinez following their arrests, the boots seized from Silva could not be excluded as the source of some of the shoe impressions, and most likely were the source of one of the shoe impressions, found near the Gibbs residence following the robbery. Accordingly, a rational trier of fact could have concluded Silva was the intruder who pointed a gun at the Gibbses' daughter; hence, he was one of the two intruders who used a firearm in commission of the robberies.

## 4. Count 15

With respect to count 15, the F.G. robbery, a section 12022.53, subdivision (b) enhancement was found true as to each defendant. F.G. and Z.M. both testified there were three intruders. According to F.G., each had a gun. Given the violent circumstances of the robbery, a jury rationally could have concluded that, even assuming the third intruder merely displayed a firearm, that display produced a fear of harm or force in aiding the commission of the robbery and, hence, constituted a use under the statute. (People v. Bland, supra, 10 Cal.4th at p. 997.) As the evidence was sufficient to allow a rational trier of fact to infer that each defendant used a firearm, it was necessarily sufficient to sustain the enhancement as to Silva.

## 5. Counts 16 and 17

Counts 16 and 17 were the robberies of Renae Frye and Williams Cozine. Jurors found section 12022.53, subdivision (b) allegations true as to Silva, but where unable to reach verdicts with respect to Martinez and Morrison. According to Frye, there were three intruders, all with guns drawn. The evidence was thus sufficient to support the firearm use enhancement as to Silva, the jury's inability to reach verdicts on Martinez and Morrison notwithstanding.

## 6. Counts 18, 19, and 20

Counts 18, 19, and 20 were the robberies of Vicki and Kenneth Myers, and the assault by means of force likely to produce great bodily injury of Myers. Jurors found section 12022.5, subdivision (a) and 12022.53, subdivision (b) enhancements true as to Morrison and Silva, but were unable to reach verdict with respect to Martinez. As the trial court granted defense motions for a new trial on these enhancements and noted that, because its ruling was based on insufficiency of the evidence, the enhancements could not be retried (see People v. Lagunas (1994) 8 Cal.4th 1030, 1038-1039, fn. 6), Silva's claim is moot and we need not address it.

1

2

7. <u>Counts 21, 22, and 23</u>

These were the robbery, kidnapping for robbery, and assault by means of force likely to produce great bodily injury counts involving Steve Christy. Jurors found section 12022.5, subdivision (a) and 12022.53, subdivision (b) enhancements true as to Martinez and Silva, but were unable to reach verdicts with respect to Morrison. According to Christy, there were three intruders, each of whom pointed a gun at his head. The evidence is thus sufficient to support the section 12022.53, subdivision (b) enhancements as to Silva, jurors' inability to reach a verdict as to Morrison notwithstanding.

8. <u>Counts 24, 25, 26, 27, 28, and 29</u>

These were the robberies, kidnappings for robbery, and sexual assaults involving M.J. and Jane Doe Two. Section 12022.53, subdivision (b) allegations were found true as to all defendants on all counts. M. saw three people enter. Jurors reasonably could have concluded each used a gun, as they rationally could have inferred one intruder struck M.J. with a gun and then put the weapon to his head, a second intruder struck M. on the head with a handgun, and a third intruder went to T.'s room with a gun visible. Even assuming this was not the same person who subsequently placed a gun to her temple, jurors reasonably could have concluded that a display of the weapon under the circumstances constituted a use within the meaning of the statute. Accordingly, the evidence being sufficient to support a conclusion each defendant used a gun, it necessarily was sufficient to sustain the enhancements with respect to Silva.

(Lodged Doc. 1 at 88-114.)

    2.    Analysis

        a.    *Legal Standard - Sufficiency of the Evidence*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that based on the evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). <u>Jackson</u> established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. <u>United States v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. <u>Id.</u>, citing <u>Jackson</u>, 443 U.S. at 319. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" <u>Id.</u>, quoting

1   <u>Jackson</u>, 443 U.S. at 326, 99 S.Ct. 2781.

2       "Second, after viewing the evidence in the light most favorable to the prosecution, a

3   reviewing court must determine whether this evidence, so viewed is adequate to allow '*any*

4   rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"

5   <u>Id.</u>, quoting <u>Jackson</u>, 443 U.S. at 319 (emphasis in original). "At this second step, we must

6   reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all

7   rational fact finders would have to conclude that the evidence of guilt fails to establish every

8   element of the crime beyond a reasonable doubt." <u>Id.</u>

9       Superimposed on these already stringent insufficiency standards is the AEDPA

10  requirement that even if a federal court were to initially find on its own that no reasonable jury

11  should have arrived at its conclusion, the federal court must also determine that the state

12  appellate court not have affirmed the verdict under the <u>Jackson</u> standard in the absence of an

13  unreasonable determination. <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir. 2005); <u>see also</u> <u>Boyer</u>

14  <u>v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011) ("Thus, when we assess a sufficiency of

15  evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject

16  to the strictures of AEDPA, there is a double dose of deference that can rarely be

17  surmounted.")

18  ///

19              b.   *Argument and Analysis*

20      In the present petition, Petitioner repeats the same claims of insufficiency of evidence

21  presented to the state court and does not even attempt to describe why the state court's

22  determinations were unreasonable.

23      With regard to claims 8, 9, and 14, Petitioner contends the evidence was insufficient

24  for convictions for assault by means of force likely to produce great bodily injury because the

25  victims (Jose Hernandez, Francisco Hernandez, and Cynthia Gibbs) either did not testify at

26  trial or present evidence as to the extent and the medical treatment of injuries. Petitioner does

27  not challenge relevant California law regarding assault by means of force likely to produce

28

great bodily injury. With regard to the assault of Jose and Francisco Hernandez, the state court found sufficient the testimony of another victim, Mechuca, who witnessed Petitioner and his co-defendants beating the other victims. The jury was also shown photographs of the victim's injuries. With regard to Cynthia Gibbs the jury was provided with her testimony and photographs of her injuries.

Petitioner asserts that the evidence was not substantial enough to support the convictions. (Pet. at 18.) The Court disagrees. The jury was presented with significant evidence of the assaults, and it is without question that any rational trier of fact would find the essential elements of the crime beyond a reasonable doubt. <u>Jackson</u>, 443 U.S. at 319.

With regard to claims 10 and 11, Petitioner asserts the evidence was insufficient to support his conviction for the robberies in concert of Richard Baker and Christine Baker based on the lack of evidence of a third accomplice, as required to uphold the "in concert" finding. Here, the state court found that there was sufficient evidence that a getaway driver was involved based on vehicle tracks close to where the victims car was abandoned, and that with respect to the overall record, there was evidence that there was a getaway driver was used in a number of the robberies, and evidence of intercepted conversations that a getaway driver was needed. Under the doubly deferential review created by ADEPA, this Court finds that after viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented for a reasonable factfinder to believe that a getaway driver was involved.

Petitioner next contends the evidence was insufficient to support the conviction for the kidnaping for robbery of Steve Christy (count 22) because the movements of the victim was merely incidental to a robbery and did not substantially increase the risk of harm over and above that present in the crime of robbery. Here, Christy was bound and blindfolded, and then forcibly taken to his shop, which was about 100 feet behind his house, where he was struck and knocked unconscious. The state court found that the movements from inside the house to the shop was not an integral part of the robbery even if "the movement was undertaken because the robber wanted more loot than was available at the robbery's initial location."

(Lodged Doc. 1 at 97-98.) The state court also found the movement increased the risk of harm because moving Christy away from the house made it less likely he would be rescued if anyone responded to his home alarm. The state court throughly described how there was sufficient evidence of the conviction, and Petitioner has not provided any argument to persuade this Court that the decision was an unreasonable application of applicable federal law.

Petitioner next challenges his conviction as to count 31. As the state court already granted relief as to this count, his present challenge is moot.

Finally, Petitioner challenges the firearm enhancements as to counts 12-13 and 15-29. With regard to counts 12 and 13 the state court found that Petitioner's boots could not be excluded as the source of some of the shoe impressions at the scene, and most likely were the source of one of the shoe impressions, and therefore a rational trier of fact could have concluded Petitioner was the intruder who pointed a gun at one of the victims. With regard to counts 15-17 and 21-29, the respective victims testified that all the intruders had guns. Under the doubly deferential review created by ADEPA, this Court find that the state court was not unreasonable in finding that the testimony of the victims established sufficient evidence when viewing it in the light most favorable to the prosecution. Finally, the trial court struck the enhancements as to counts 18-20. Accordingly Petitioner's present challenge as to those counts are moot.

In this case, the state court addressed Petitioner's claims in a very thorough and reasoned opinion. Petitioner has restated the same arguments presented in state court in the present petition, but has not even attempted to explain why the state court's reasoning was unreasonable and not entitled to deference under ADEPA. Petitioner even failed to remove claims for which he had already obtained relief in state court. Viewing the evidence in the light most favorable to the prosecution, and for the reasons expressed by the state court, there was sufficient evidence introduced at Petitioner's trial to support the jury's verdict as to the challenged charges. The conclusion of the state court that sufficient evidence supported the

1   guilty verdicts in this case is not contrary to or an unreasonable application of United States

2   Supreme Court authority. Accordingly, Petitioner is not entitled to relief on this claim.

3           **D.     Claim Four: Failure to Suppress Wiretap Evidence**

4           Petitioner, in his fourth claim for relief alleges that the trial court erred in refusing to

5   suppress evidence resulting from a wiretap of his telephone calls, and in so doing, violated his

6   Fourth Amendment rights against unreasonable searches. (Pet. at 17, 24-26.)

7                   1.      State Court Review

8           The last reasoned state court decision was the 5th DCA's unpublished decision, which

9   denied Petitioner's wiretap argument as follows:

10          SUPPRESSION OF WIRETAP EVIDENCE

11          A. Background

12                  In August 2003, the People sought and obtained judicial authorization for
        the interception of communications to and from cellular telephones with the
13      numbers (209) 505-9835, which was subscribed to Patricia Ramos, and (209)
        614-7098, which was subscribed to Silva. Silva subsequently filed a motion to
14      suppress all evidence obtained by means of wiretaps, in which the other
        defendants joined. The trial court[45] determined that the interceptions were lawful
15      and denied the motion. Consequently, the contents of intercepted cellular
        telephone conversations were admitted into evidence at trial, as described in the
16      statement of facts, ante.

17                  Defendants now say the trial court erred in denying the motion. They
        contend that SDEA Agent Hoek's affidavit in support of the application for the
18      interceptions failed to demonstrate the requisite necessity. We disagree.[46]

19          B. Analysis

20                  Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18
        U.S.C. §§ 2510-2520) comprises the comprehensive federal scheme for the
21

22      _____

23          [45] The motion originally was heard and denied by Judge Ashley. After she recused herself, it and several
        other motions were heard anew by the trial judge.

24
            [46] We need not concern ourselves with the fact one of the targeted telephones was subscribed to
25      someone other than a named defendant, or with who was a party to which conversation. Section 629.72 provides:
        "*Any person* in any trial, … may move to suppress … the contents of any intercepted … electronic cellular
26      telephone communications, or evidence derived therefrom, … on the basis that the contents or evidence were
        obtained in violation of the Fourth Amendment to the United States Constitution or of this chapter…." (Italics
27      added; see also 18 U.S.C. §§ 2510(11) [defining "aggrieved person" as a person who was a party to intercepted
        communication or against whom interception was directed], 2518(10)(a) [permitting any aggrieved person to seek
28      suppression of contents of intercepted communication or evidence derived therefrom].)

regulation of wiretapping and electronic surveillance.[47] (People v. Otto (1992) 2 Cal.4th 1088, 1097.) It "establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act." (Id. at p. 1098.) Thus, "[i]n 1995, the Legislature enacted section 629.50 et seq. in order 'to expand California wiretap law to conform to the federal law.' [Citation.]" (People v. Leon (2007) 40 Cal.4th 376, 383.) Under section 629.50, a district attorney or other specified individual can apply to the presiding judge of the superior court (or a designee) for an order to intercept wire, electronic pager, or electronic cellular telephone communications.[48] (Id., subd. (a).) Among other requirements, the application must contain "[a] full and complete statement of the facts and circumstances relied upon by the applicant to justify his or her belief that an order should be issued, including … (B) the fact that conventional investigative techniques had been tried and were unsuccessful, or why they reasonably appear to be unlikely to succeed or to be too dangerous …." (Id., subd. (a)(4).)

Under section 629.52, the designated judge may authorize the interception if there is probable cause to believe that an individual is committing, has committed, or is about to commit one or more of the crimes listed in the statute, including murder, a felony violation of section 186.22, or an attempt or conspiracy to commit such crimes (§ 629.52, subd. (a)(2), (3), (5)); there is probable cause to believe communications concerning the illegal activities will be obtained through the interception (id., subd. (b)); there is probable cause to believe the targeted communication device is being used, or will be used, by the person whose communications are to be intercepted (id., subd. (c)); and "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous" (id., subd. (d)).

Defendants do not challenge the issuing court's finding of probable cause as to any of the interceptions. Rather, their sole assertion is that the application was not supported by an adequate showing of necessity within the meaning of section 629.52, subdivision (d), so that evidence seized as fruit of the interceptions should have been suppressed under section 629.72.

Because section 629.52, subdivision (d) and its federal counterpart, 18 United States Code section 2518(c)(3) employ identical language, federal courts' interpretation of the latter section necessarily informs our analysis. The California Supreme Court has summarized the applicable case law thus:

"The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' [citation] nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Citation.] The necessity requirement can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.' [Citation.] As numerous courts have explained, though, it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap. [Citations.]

---

[47] In our discussion, we refer to interceptions and wiretaps or wiretapping interchangeably.

[48] Amendments made to the statutes after the interception authorization was obtained in this case are not pertinent to this appeal.

Instead, the adequacy of the showing of necessity "'is 'to be tested in a practical and commonsense fashion,' … that does not 'hamper unduly the investigative powers of law enforcement agents.'"' [Citation.] A determination of necessity involves "'a consideration of all the facts and circumstances.'" [Citations.]" (People v. Leon, supra, 40 Cal.4th at p. 385.)

A motion to suppress evidence obtained pursuant to section 629.50 et seq. is made, determined, and reviewed in accord with section 1583.5. (§ 629.72.) The standard of appellate review of a trial court's ruling under section 1538.5 "is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (People v. Glaser (1995) 11 Cal.4th 354, 362.) Within this framework, although generally "the government must overcome the statutory presumption against granting a wiretap application by showing necessity" (United States v. Ippolito (9th Cir. 1985) 774 F.2d 1482, 1486, citations omitted), "[a] defendant bears the burden of proving that a wiretap is invalid once it has been authorized. [Citation.]" (United States v. Ramirez-Encarnacion (10th Cir. 2002) 291 F.3d 1219, 1222; cf. Franks v. Delaware (1978) 438 U.S. 154, 171; People v. Amador (2000) 24 Cal.4th 387, 393.) "The finding of necessity by the judge approving the wiretap application is entitled to substantial deference. [Citations.]" (People v. Leon, supra, 40 Cal.4th at p. 385.)[49]

Agent Hoek's affidavit in support of the application for intercept authorization was 52 pages long. In pertinent part, Hoek recited his experience in investigations involving wire intercepts and electronic surveillance. He certified that named law enforcement agencies/task forces were conducting a criminal investigation of Morrison, Silva, Martinez, "and others yet unidentified" in connection with possible violations of specified provisions of the Penal Code, and that there was probable cause to believe the three named individuals and "others known and others not yet known" had committed, were committing, and would continue to commit violations of the criminal statutes set forth in section 186.22 of the Penal Code, viz., participating in criminal street gangs. After describing the kind of information he asserted there was probable cause to believe would be obtained through the requested interception, Hoek asserted: "Normal investigative techniques have been tried, and have been successful, in identifying and securing some evidence against the Target Subjects. However, normal investigative techniques have been tried and have been unsuccessful in identifying any other co-conspirators involved in the Subject Offenses and in securing any evidence against anyone else. Normal investigative techniques have not identified any other individual conspiring in this case. Normal investigative techniques have failed to produce sufficient evidence to arrest and prosecute the Target Subjects. Normal investigative techniques targeting these

---

[49] Although the federal circuits agree that the standard of review is deferential, they describe that standard in different ways. (United States v. Smith (4th Cir. 1994) 31 F.3d 1294, 1298.) The Eighth Circuit treats the authorizing judge's necessity finding as a factual determination that is reviewed for clear error. (E.g., United States v. Jackson (8th Cir. 2003) 345 F.3d 638, 644; United States v. Davis (8th Cir. 1989) 882 F.2d 1334, 1343.) The majority view, and that adhered to by the Ninth Circuit, holds that the necessity finding is reviewed for abuse of discretion. (People v. Leon, supra, 40 Cal.4th at p. 385, fn. 3; United States v. Blackmon (9th Cir. 2001) 273 F.3d 1204, 1207.) Because our analysis and conclusion remain the same under either formulation, we need not decide which phraseology to adopt. (See People v. Leon, supra, 40 Cal.4th at p. 385, fn. 3; United States v. Smith, supra, 31 F.3d at p. 1298.)

goals have been tried and have failed, or reasonably appear unlikely to succeed if tried, as is described further in the 'Conclusion' section."

Hoek then proceeded to describe and detail the criminal histories of Morrison, Martinez, Silva, and several other persons.[50] By incorporating the statement of Detective Green, who was assigned to the Stanislaus County Sheriff's Special Investigation Unit and whose responsibilities included investigation of crimes committed by criminal street gangs and their membership, Hoek then set out information establishing a pattern of criminal gang activity for the Norteno criminal street gang, Silva's and Morrison's association with the gang, and the fact Silva was reputed to be a lieutenant in the Northern Structure portion of the overall Norteno gang organization.

Hoek then summarized the current investigation, which began in May 2003. He included the fact that he had been advised, by Detective Campbell, that Campbell's agency had received information from four separate, independent sources, naming Morrison, Martinez, and Silva, and possibly two others, as being responsible for at least some of the robberies. One source handed a deputy a card that bore the names of Morrison, Martinez, and two others, and said they were the perpetrators. The second source was a citizen who informed the assistant sheriff that the perpetrators were related to an ex-felon who went by the name Yo-Yo, and that Yo-Yo's son was involved. The third source was a citizen who told a detective that Morrison used to be a stereo thief but was now driving nice cars with expensive rims, and the person believed he was involved. The fourth source was a citizen who was known to one of the detectives. This person informed the detective that she had been in contact with two people who had information about the robberies. She put one of these people, "X," in phone contact with the detective. "X" agreed to provide information on condition that she remain anonymous. She would not identify herself to the detective and expressed fear of retaliation. "X" stated that she had personal knowledge of the robberies; named Morrison, Silva, and Martinez as the perpetrators; and furnished details that had not been made public. Hoek recited the information given by "X" and the extent to which some of it had been corroborated.

Next, Hoek described the surveillance that had been conducted on Morrison's, Silva's, and Martinez's residences since August 13, 2003. In part, Hoek related that surveilling agents could not park on Davis Court, thus limiting what they were able to see there. Hoek further related that he had attended a debriefing on August 18, at which time Detective Campbell informed him that Campbell had received information concerning the August 15 robbery from a fifth source ("Y"), who requested to remain anonymous.[51] Campbell had been able to determine the identity of the source, but did not furnish the name to Hoek. "Y" told Campbell that another person had told him that, when Silva and Morrison arrived at the First Street residence on the morning of August 15, they were wearing black clothing that was covered with blood. This person told "Y" how Silva and Morrison cleaned the clothing and then disposed of it in a dumpster in an apartment complex in the vicinity of Liberty Market in Delhi. "Y" described to Campbell how to get to Morrison's residence, and said Morrison had buried some guns under a piece of tin siding in an empty lot behind his house. SDEA agents went to the lot the day after receiving the information, but

---

[50] Fouse is not named in the affidavit.

[51] August 15 was the date of the Renteria shooting and attempted robbery.

did not see a piece of tin siding anywhere at the location. An aerial check likewise did not reveal any tin siding and, because of the close proximity of Morrison's residence and other homes, investigators did not attempt to use any type of metal detection device to scan the property. Subsequent investigation revealed that there were no apartments in the vicinity of Liberty Market in Delhi, and that in fact, the only apartment complex in Delhi was across from Davis Court. Agents checked those dumpsters, but they had already been emptied.

Hoek related that the parole agent for one of the residents at the Davis Court address conducted a home visit at that location on the evening of August 18. The parole agent saw a black duffel bag, which was closed and appeared to be full, behind the front door. The next day, a parole search was conducted at the residence. The duffel bag was not located. However, ammunition -- some of which was the same caliber as spent shell casings found at the scene of the August 15 robbery and shooting -- was found. Hoek further related that he had obtained subscriber information for one telephone by means of a search warrant served on the telephone company, and that he had obtained a court order for a pen register and trap-and-trace for Silva's phone. Information from the pen register, coupled with surveillance, revealed that Morrison was connected to Silva's phone on the evening of August 26.

Hoek provided a summary of the robberies, and related Detective Campbell's belief, based on the method of operation and the information being received from various sources, that the same group of suspects was responsible. Campbell further related to Hoek that, on August 21, he was contacted by an individual ("Z"), whom he believed to be a citizen informant, and who stated he would give information on condition that he remain anonymous. According to Campbell, "Z" identified himself by first name only and said he was related to the family of one of the responsible parties. Campbell met with "Z" in person. "Z" named Morrison and Martinez as the two main responsible parties. "Z" said others were also involved, and he identified them and their relationship to Morrison. "Z" related that Morrison's mother was getting all the jewelry from the robberies and was selling drugs out of her home, and when she ran out of drugs, she would trade some of the jewelry for more. "Z" further related that Martinez's cousin worked for the Gibbs family, and that the cousin had once taken Martinez to the Gibbs residence.

Hoek related that 10 distinctive shoe prints had been found at the various crime scenes, but that there had been no more than three shoe prints found at any one scene. One victim, however, thought there were five individuals involved in his robbery, based on the different voices and locations from which the voices had come.

Hoek requested that one page of the affidavit be sealed. He based his request on the fact that the information was sufficiently specific as to reveal the source; to Hoek's knowledge, only the source knew the information; the source would not give a name for fear of reprisal; and if the information were released, the source's safety would be endangered.

Hoek next summarized the target telephone information, including toll analysis and analysis of call data records and cell site information, which was obtained and analyzed in an attempt to determine which cell sites were used by the target phones two hours before and after each robbery. Hoek explained that, due to the possibility a call would be sent to a secondary tower during peak hours, the call data records and cell site tower information obtained from the pen register were not an exact reflection of the location of the phone when it was in

use.

In an eight-page section titled "EXHAUSTION/NEED FOR INTERCEPTION," Hoek stated:

"As set forth, law enforcement has obtained a great deal of information pertaining to this investigation. At present, applicant believes there is circumstantial evidence against the Target Subjects. However, applicant believes that this case could be strengthened by a continued investigation.

"Interception of wire communications to and from (209) 505-9835 and (209) 614-7098 are necessary in order to achieve all of the objectives of this investigation (as described previously), because normal investigative techniques have failed or appear reasonably unlikely to succeed if tried, or are too dangerous. In the preceding paragraphs, applicant detailed the probable cause showing (209) 505-9835 being used by David Morrison and (209) 614-7098 being used by David Silva. Probable cause was also documented by showing the results of traditional investigative techniques. These techniques have failed to provide the necessary evidence for proof beyond a reasonable doubt against Target Subjects.

"Traditional investigative techniques have taken place. Likewise, they will continue to be employed if approval for this intercept is obtained. However, so far those traditional means of investigation noted below have failed to uncover the direct evidence in this investigation, the activities and identities of any and all other co-conspirators, and for reasons set forth below, Applicant believes that the investigative goals set forth, likely will not be achieved in the future through alternative investigative techniques alone."

Hoek then proceeded to separately discuss each traditional means of investigation, as follows:

Physical surveillance: Hoek related that the method had been successful in physically linking addresses, vehicles, and cellular phones used by the target suspects, and establishing that the suspects associated with each other. However, agents were unable to watch all three known residences at the same time due to manpower restrictions; moreover, Delhi and Hilmar were small communities, and so it was hard for agents to be in either area for any great length of time without being noticed. Hoek stated his belief that further surveillance, conducted without the support of the requested interception, would compromise the investigation by increasing the opportunities for detection by the target subjects. Such detection could cause the subjects to abandon their communication facilities, making it extremely difficult to obtain incriminating information from them, and could also cause them to flee the area, making an arrest difficult or nearly impossible. Hoek asserted that an intercept would permit agents to initiate selective surveillance when it appeared criminal activity was taking place, thus reducing the chance of surveillance being compromised. He noted that normal duty hours for surveillance had been from 6:00 p.m. to 6:00 a.m., seven days a week, with the amount of man-hours dedicated to the investigation causing a substantial burden on the agencies involved and other pending investigations.

**Interviews, grand jury subpoenas, and immunity:** Hoek asserted that subpoenaing the target subjects or anyone else who might be involved would not be completely successful in achieving the goals of the investigation, because any coconspirator likely would invoke his or her Fifth Amendment privilege not to testify before a grand jury. Granting immunity to one of the target subjects was unadvisable, because to do so might foreclose prosecution in this case; moreover, there would be no way to ensure such immunized witness(es) would provide truthful testimony, should additional conspirators be identified. Furthermore, the service of grand jury subpoenas on the target subjects or anyone else would only alert them to the existence of this portion of the investigation, causing them to alert other, unknown perpetrators, become more cautious in their activities, flee, threaten the lives of cooperating witnesses, or otherwise compromise the investigation.

**Confidential informants:** Hoek related that, according to Detective Campbell, the sources who talked to law enforcement expressed fear of retaliation by the target subjects, and there were no reliable confidential informants other than anonymous citizens. Merced County Sheriff's Detective Garcia advised that he had no reliable informants providing information on the target subjects, and he was only receiving information from persons who obtained it second- and third-hand. Although a search for testifying witnesses continued, Hoek knew of no other possible witnesses who could and would be willing to disclose information about the target subjects and the gang activity. He believed any potential witnesses would need to have preexisting ties, or be engaged in some type of conspiracy, with the target subjects for several weeks and that, in his experience, such individuals would be rare because they would not want to cooperate against a family member or loved one, or would live near the target subjects and be in fear for their safety should their cooperation become known. Hoek related that he did not know of any confidential informant who could assist in the investigation, and he believed that if such an informant did not know the target subjects or their immediate families, the target subjects would not talk in detail about what was occurring because they would not know whether the informant could be trusted. Furthermore, an informant approaching one of them might alarm them by leading them to believe they were now being considered the main suspects in this investigation.

**Undercover agents:** Hoek related that the only informants who had provided information had not identified themselves, and so he believed they would not introduce an undercover agent to the target subjects. He further asserted that, without knowing who the informants were, an introduction would be too dangerous, and that, because of the violent nature of the crimes, the use of an undercover agent would be too dangerous.

**Interviews of suspect:** Based on his training and experience, Hoek believed that interviewing the target subjects would not be successful in developing sufficient evidence, as, if arrested, the suspects would not admit their criminal involvement. Hoek noted that the target subjects had been incarcerated in state facilities before, and expressed his opinion they were not likely to cooperate with law enforcement.

**Search warrants:** Hoek reiterated that he had obtained and served search warrants and orders for phone subscriber information, call data records, and pen registers. He acknowledged that he and detectives believed there might be probable cause to search the residences of the target subjects. He further believed, however, that any residential search would be futile and that, without intercepted communications to guide the timing of when to conduct searches of

vehicles or other locations, such searches likely would produce little evidence. Hoek noted that a parole search of Morrison's residence had been conducted, but that sufficient evidence to show guilt or innocence was not found. As Silva was reputed to be an officer in the Northern Structure and almost all of the target subjects had been through the judicial system, Hoek related that investigators believed the target subjects had been schooled not to keep evidence of their criminal activities in their residences or vehicles. Accordingly, Hoek did not believe the execution of search warrants would achieve all the goals of the investigation.

Toll records: Hoek related that pen registers, toll information, and trap-and-trace devices would provide identifying information regarding calls made from or to a particular telephone, along with the frequency of those calls, but would not establish the identities of those actually conversing or the content of the conversations. Thus, while valuable tools, they would not, by themselves, achieve the goals of the investigation.

Trash searches: Hoek noted that the trash search at the apartment complex was unsuccessful, and related that agents were fearful of being discovered if they attempted residential trash searches. He related that Davis Court was a small court, and that there was too much street activity on South Orange. He noted that on one occasion, when agents were doing a walk-by in an attempt to obtain license numbers of vehicles parked in the yard, they could see someone standing in the shadows of 733 South Orange, and that this occurred when the agents thought the residents were asleep. Based on his training and experience, Hoek asserted that suspects such as those in this case go to great lengths to destroy possibly incriminating evidence and will not frequently use their residential trash containers to dispose of it. Instead, they will commonly shred their documents, carry their trash away from their residences, and place it in commercial dumpsters to avoid having it examined. Because Hoek knew of no other locations at which trash searches could be conducted, he did not believe any further such searches would achieve the goals of the investigation, although the interception of conversations concerning certain locations might make it appropriate to conduct trash searches at that time.

Tracking devices and cameras: Hoek related that on August 20, pursuant to court order, a radio frequency tracking device was installed on the Buick the target subjects were believed to be using to commit the crimes. The device did not record the vehicle's movement, however, and was only used in locating the vehicle should it become lost during surveillance. Hoek related that installation of a device, such as a GPS tracker, that was capable of recording and downloading data would not be practical, as the vehicle would have to be taken to a secure location in order to properly install the equipment. Hoek further related that, on the evening of August 20, agents were able to install a camera in a warehouse in Hilmar. The camera allowed a view of the front of Silva's residence. Within a week, the camera's location and target(s) were the subject of rumors in Hilmar, however, and so the camera was removed and the warehouse's owner told that a suspect had been apprehended in Sacramento. Agents had been unable to find a location on Davis Court or South Orange at which discretely to install a camera.

We conclude that, when tested in a practical and commonsense fashion, the foregoing adequately establishes the requisite necessity. (See People v. Leon, supra, 40 Cal.4th at p. 385.) The fact the investigation had been successful in many respects does not mean necessity, based on the failure of traditional investigative techniques, was not or could not be shown. "[T]he mere

attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap. [Citations.]" (United States v. Bennett (9th Cir. 2000) 219 F.3d 1117, 1122.) "[A] wiretap can be necessary if it gives the government the ability to 'develop an effective case.' [Citation.]" (United States v. McGuire (9th Cir. 2002) 307 F.3d 1192, 1198.) "'An effective case'" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." (Ibid.) "[A]s the federal cases have recognized, '[w]hat amount of evidence will be sufficient to obtain a conviction is an imprecise concept.' [Citation.]" (People v. Zepeda (2001) 87 Cal.App.4th 1183, 1204.) In the present case, while the use of normal investigative techniques may have produced probable cause to search and/or arrest, the case against the male defendants was far from overwhelming -- and, at the time interception was sought, the case against Fouse was nonexistent. (See id. at p. 1205 [adequate showing made where eyewitness descriptions were general and insufficient to identify perpetrator of apparently gang-related drive-by shooting, information connecting defendant to crime came from telephone callers who wished to remain anonymous, and evidence gathered produced only circumstantial case].)

Nor is the necessity requirement an exhaustion requirement. (United States v. Castillo-Garcia (10th Cir. 1997) 117 F.3d 1179, 1187, overruled on other grounds in United States v. Ramirez-Encarnacion, supra, 291 F.3d at p. 1222, fn. 1.) While electronic eavesdropping procedures are not to be routinely employed as the initial step in criminal investigations (United States v. Giordano (1974) 416 U.S. 505, 515), "the government does not need to exhaust all other investigative procedures before resorting to wiretapping. [Citations.] Nor must ordinary techniques be shown to have been wholly unsuccessful. [Citations.] Rather, the [authorizing] court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence -- to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable. [Citations.]" (United States v. Abou-Saada (1st Cir. 1986) 785 F.2d 1, 11.) "[T]he necessity requirement does not compel law enforcement agents to use wiretaps only as a last resort" (United States v. Carneiro (9th Cir. 1988) 861 F.2d 1171, 1181; United States v. Brown (9th Cir. 1985) 761 F.2d 1272, 1275); "[t]he statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope" (United States v. Baker (9th Cir. 1979) 589 F.2d 1008, 1013). "The overall burden on the government 'is not great.' [Citations.]" (United States v. Verdin-Garcia (10th Cir. 2008) 516 F.3d 884, 890.) It "'need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient.'" [Citation.]" (People v. Leon, supra, 40 Cal.4th at p. 392.)

We recognize that boilerplate recitations of the limitations inherent in certain methods of investigation, and generalities or statements that are true of most or all investigations of the kind at issue here, are insufficient to establish necessity. (United States v. Blackmon, supra, 273 F.3d at pp. 1210-1211; United States v. Ippolito, supra, 774 F.2d at p. 1486.) Similarly, conclusory statements about the likely outcome of future investigations carry little weight. (United States v. Kerrigan (9th Cir. 1975) 514 F.2d 35, 38.) "An affidavit composed solely of conclusions unsupported by particular facts gives no basis for a determination of compliance with [the necessity requirement]." (United States v. Spagnuolo (9th Cir. 1977) 549 F.2d 705, 710.)

However, "the affidavit here did not simply reiterate conclusory language. It instead analyzed with particularity the limitations of each alternative investigative technique in achieving the goals of this investigation. That many of those limitations are common to most [similar] conspiracy investigations does not necessarily preclude a finding of necessity. [Citation.]" (People v. Leon, supra, 40 Cal.4th at pp. 389-390.) Similarly, the fact that some of Hoek's statements and conclusions were based on his training and experience did not render them unworthy of consideration. (See id. at pp. 388-389.)

Moreover, although "a mere allegation 'that a person is a member of a conspiracy … is not a sufficient reason to obtain a wiretap' [citation]," "the fact of a conspiracy is a circumstance to be considered, along with all the other facts and circumstances, in determining whether conventional investigative techniques have failed, are unlikely to succeed if tried, or are too dangerous to try." (People v. Leon, supra, 40 Cal.4th at p. 391.) "[I]n many cases, the existence of a conspiracy will suggest not only that there will be communications in order to plan the crime, but that such planning will occur almost exclusively during such communications. Furthermore, the existence of the conspiracy may not only increase the likelihood any given crime will succeed, but also the likelihood the criminal enterprise will survive the arrest of less than all of its participants …. In sum, the existence of a conspiracy, while not determinative, is an important factor in analyzing the necessity for a wiretap. [Citation.]" (Id. at pp. 391-392.)[52]

Here, the affidavit showed that law enforcement officers from multiple jurisdictions were investigating a series of increasingly violent, possibly gang-related home invasions that were being committed by at least three, and possibly more, individuals. Although the investigation was approximately three months old and officers had employed a variety of conventional techniques, the case against defendants was less than overwhelming, and the number of conspirators still uncertain.

The affidavit explained that, while surveillance was continuing, its efficacy was limited both by manpower considerations and by the possibility it would be detected due to the fact it was taking place in small communities and, in the case of Davis Court, on a small street. "These facts were sufficient to permit the issuing court to conclude" (United States v. Smith, supra, 31 F.3d at p. 1300) that further surveillance -- at least without intercepted communications to inform its timing and location -- was unlikely to succeed in producing an adequate case against the target subjects and their coconspirators. (See United States v. Young (2d Cir. 1987) 822 F.2d 1234, 1237 [surveillance of subject's residence impractical where such surveillance in residential neighborhood likely to be conspicuous and draw attention to assigned officers]; United States v. Ai Le (E.D.Cal. 2003) 255 F.Supp.2d 1132, 1139 [covert surveillance of residence difficult because of location in sparsely populated new development].) We do not know whether additional manpower might have been obtained from other law enforcement agencies, but its availability is of no consequence. "To show that 'other investigative procedures have been tried and failed' the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed

---

[52] The Ninth Circuit Court of Appeals has gone so far as to say that "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy." (United States v. McGuire, supra, 307 F.3d at p. 1198.)

to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques *employing a normal amount of resources* have failed to make the case within a reasonable period of time." (United States v. Spagnuolo, supra, 549 F.2d at p. 710, fn. omitted, italics added.) Moreover, additional manpower would not have solved the problems caused by the nature and character of the locations being watched.

The affidavit related the information obtained from individuals, but explained that almost all were anonymous and/or fearful of retaliation; moreover, the source of information was not always clear and sometimes was second- or third-hand. It also explained the problems that likely would be encountered in using known, reliable confidential informants. These facts were sufficient to permit the issuing court to conclude that this investigative technique was not likely to be productive. (See People v. Zepeda, supra, 87 Cal.App.4th at pp. 1206-1207 [finding of necessity supported where police obtained significant information from confidential or anonymous informants who were afraid to come forward; in light of demonstrated reluctance and fact offense appeared to be gang-related, police likely to encounter difficulty finding people willing to testify at trial]; United States v. Smith, supra, 31 F.3d at pp. 1299-1300 [facts supported conclusion that continued use of confidential informants not likely to be productive where police exhausted knowledge of all known informants and knew of no one else who was willing to provide information or testify]; United States v. Ai Le, supra, 255 F.Supp.2d at p. 1139 [government clearly detailed limitations on traditional investigative techniques where affidavit explained, for example, that some of its confidential sources were unwilling to testify, were unavailable for further interviews, and did not know full extent of target organization's operations].)

The affidavit also discussed the potential use of search warrants. Although "Z" related that Morrison's mother was getting most of the jewelry from the robberies, he did not say where that jewelry was being kept. Even assuming it was at her house, it could reasonably be concluded execution of a search warrant would turn up nothing more than stolen property, which would provide only circumstantial evidence linking the target subjects to perpetration of the robberies themselves, while alerting those subjects to the investigation. Moreover, a parole search of Morrison's residence was unproductive. These facts were sufficient to permit the issuing court to conclude the execution of search warrants, without intercepted conversations to inform their timing, was unlikely to produce significant evidence.

The affidavit also explained investigators' reasons for rejecting the option of interviewing and/or subpoenaing the target subjects or other potential suspects. The facts were sufficient to permit the issuing court to conclude such techniques were likely to fail. (See People v. Zepeda, supra, 87 Cal.App.4th at p. 1206 [government's obligation to show necessity satisfied where alternative investigative procedures, such as directly questioning defendant and associates, would likely alert subjects to presence and scope of investigation]; United States v. Smith, supra, 31 F.3d at p. 1300 [affidavit explained that police did not believe any of participants in conspiracy would testify about it before grand jury, even under subpoena, without grant of immunity, which would alert other conspirators to investigation].) By the time the approval for interceptions was requested, the target subjects had no reason to talk to law enforcement or to testify before a grand jury without a grant of immunity; given the nature of their alleged crimes, it was reasonable to assume such a grant would not be forthcoming. Although others close to them might have been willing to talk in return for a deal, there

were no guarantees such a course of investigation would have been successful, especially since family members were involved, and failure of this technique would have been extremely detrimental to the investigation because it would have alerted the suspects without gaining anything in return. We do not believe the government is required to attempt a conventional investigative technique where the likelihood of success is only speculative and the cost of failure would be great.

The affidavit also furnished facts sufficient to permit the issuing court to conclude that other conventional investigative techniques had failed or were unlikely to succeed or too dangerous to try. A commonsense reading of the affidavit makes it clear there were no known, reliable informants who could get an undercover officer into the group of conspirators. Concerns expressed about the potential danger in allowing an unfamiliar informant to attempt to place an undercover officer in the group -- even assuming the identity of one of the anonymous informants could be ascertained -- were reasonable. (See United States v. Smith, supra, 31 F.3d at p. 1300; United States v. Young, supra, 822 F.2d at p. 1237.) Limitations on the information provided by pen registers and telephone records, while inherent in those methods, nevertheless were such that the issuing court reasonably could conclude further use would be unproductive. (See ibid.) Additional trash searches were impractical without additional information. Further camera surveillance was likely to be thwarted by the lack of good camera angles and the likelihood the target suspects had been alerted, by apparently widespread knowledge of the initial camera surveillance, to the government's use of that technique, and so would be on the lookout for further attempts. In addition, the facts contained in the affidavit were sufficient to permit the issuing court to conclude further use of tracking devices likely would not succeed.

We recognize that, in the motion to suppress, the defense suggested the government could have employed a tracking device affixed to the target vehicle by a strong magnet, or could have had a surveillance camera installed on a light pole, telephone box, etc., by officers disguised as municipal workers. Such a camera would have been visible and, according to the defense exhibit, the tracking device would have been powered by batteries that necessarily had a limited life, thus rendering the efficacy of either or both questionable. Moreover, "'courts are reluctant to impose their hindsight upon law enforcement agencies, and the proponent of the application need not establish that "every other imaginable mode of investigation would be unsuccessful."' [Citation.] In particular, '[a]fter-the-fact suggestions by defense attorneys as to how an investigation might have been handled are entitled to little weight in the analysis…. The fact that the government could have taken some different or additional steps in its investigation does not demonstrate that the wiretap orders were issued in error,' because '"[t]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping."' [Citation.]" (People v. Leon, supra, 40 Cal.4th at p. 395; accord, United States v. Carneiro, supra, 861 F.2d at p. 1178.) "'Courts will not invalidate a wiretap order because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not. It is enough that the affidavit explains the … failure of several investigative techniques that reasonably suggest themselves.' [Citation.]" (United States v. Webster (5th Cir. 1984) 734 F.2d 1048, 1055.)

The interceptions in the present case did not violate section 629.52, subdivision (d). It necessarily follows that they did not violate the Fourth Amendment of the United States Constitution. (People v. Leon, supra, 40

U.S. District Court
E. D. California

1   Cal.4th at p. 396.) Accordingly, the suppression motion was properly denied.

2   (Lodged Doc. 1 at 42-62.)

3          2.      Analysis

4          A federal district court cannot grant habeas corpus relief on the ground that evidence

5   was obtained by an unconstitutional search and seizure if the state court has provided the

6   petitioner with an "opportunity for full and fair litigation of a Fourth Amendment claim." Stone

7   v. Powell, 428 U.S. 465, 482 (1976); Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir.

8   2005). The only inquiry this Court can make is whether petitioner had a fair opportunity to

9   litigate his claim, not whether petitioner did litigate nor even whether the court correctly

10  decided the claim. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also,

11  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal. Penal Code

12  § 1538.5 provides opportunity to challenge evidence, dismissal under Stone was necessary

13  even when the petitioner never moved to suppress).

14         The policy behind the Stone court's analysis is that the exclusionary rule is applied to

15  stop future unconstitutional conduct of law enforcement. Stone, 428 U.S. at 492. However,

16  excluding evidence that is not untrustworthy creates a windfall to the defendant at a

17  substantial societal cost. Id. at 489-90. Thus, the Ninth Circuit has described the rationale for

18  this rule by saying:

19             The holding is grounded in the Court's conclusion that in cases where a
               petitioner's Fourth Amendment claim has been adequately litigated in state
20             court, enforcing the exclusionary rule through writs of habeas corpus would not
               further the deterrent and educative purposes of the rule to an extent sufficient
21             to counter the negative effect such a policy would have on the interests of
               judicial efficiency, comity and federalism.
22
    Woolery v. Arave, 8 F.3d 1325, 1326 (9th Cir. 1993).
23
24         Petitioner's Fourth Amendment claim was litigated through a fully-briefed suppression

25  hearing in the trial court on September 20, 2005, on direct appeal to the 5th DCA, and in a

26  Petition for Review before the California Supreme Court. (Clerk's Transcript on Appeal ("CT")

27  6, pp. 1538-1609; Reporter's Transcript on Appeal ("RT") 1, pp. 135-149; LD 1; LD 5, p. 2).

28  Petitioner does not allege that any of these proceedings were inadequate or deficient, only that

    matters were ultimately decided against him. Accordingly, Stone precludes habeas review of

1    this claim.

2          To the extent that Petitioner's suppression motion was based upon a purported violation

3    of 18 U.S.C. § § 2510-2520, i.e., the Omnibus Crime Control and Safe Streets Act of 1968

4    ("the Act"), that claim should be rejected.

5          Respondent argues that the rationale of <u>Stone v. Powell</u> should be applied to

6    Petitioner's claim under the Act, thereby foreclosing the claim in these habeas proceedings

7    because Petitioner had a full and fair opportunity to litigate the claim before trial. (Answer, p.

8    78). Respondent notes a split among the federal circuits regarding whether to foreclose

9    statutory claims outright under <u>Stone</u> or to apply a "hybrid standard of review." (<u>Id.</u> at 80.)

10   Respondent does not cite any authority from the Ninth Circuit on this issue.  However, it

11   appears, based on the limited authority from the Ninth Circuit, that it has adopted the hybrid

12   standard rather than employ a <u>Stone</u> bar. Accordingly, the Court will employ the Ninth Circuit's

13   analysis.

14         In order for a state petitioner to assert a statutory claim in federal habeas corpus

15   proceedings, he must demonstrate that the error is "'a fundamental defect which inherently

16   results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary

17   demands of fair procedure.'" <u>Reed v. Farley</u>, 512 U.S. 339, 348 (1991) (alteration in original)

18   (quoting <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962)). As the Ninth Circuit has observed:

19                 Not every asserted error of law will prompt habeas relief. [Citation
            omitted.] Where the error is neither jurisdictional nor constitutional, the
20          appropriate inquiry is whether the error is "a fundamental defect which inherently
            results in a complete miscarriage of justice," or "an omission inconsistent with
21          the rudimentary demands of fair procedure," and whether the error "present[s]
            exceptional circumstances where the need for the remedy afforded by the writ
22          of habeas corpus is apparent."

23   <u>Lord v. Lambert</u>, 347 F.3d 1091, 1094 (9th Cir.2003) (quoting <u>Hill</u>, 368 U.S. at 428.).

24         A claim is not cognizable on habeas review if "the claim does not involve an 'error of

25   the character or magnitude' to justify habeas relief." <u>Lord</u>, 347 F.3d at 1094 (quoting <u>Hill</u>, 368

26   U.S. at 428); <u>see also</u> <u>Key v. Walker</u>, 2009 U.S. Dist. LEXIS 119131, 2009 WL 3878080 at *31

27   (N .D. Cal. 2009) (holding "there is no clearly established Supreme Court precedent holding

28   that a violation of [Title III] may result in a due process claim cognizable in federal habeas

corpus"); cf. Phillips v. Marshall, 2009 U.S. Dist. LEXIS 34074, 2009 WL 1035211 at *4 (E.D. Cal. April 17, 2009) (challenge to legality of wiretap under federal statute barred by Stone v. Powell where petitioner had full and fair hearing on issue).

In Lord, the petitioner sought habeas relief in the Ninth Circuit, claiming the government had intercepted communications from his cordless phone. The district court had found that (1) the claim was "not cognizable upon federal habeas review because any error by the state court did not result in a complete miscarriage of justice," Lord, 347 F.3d at 1093 (internal quotation marks omitted); and (2) "even if Lord had stated a cognizable habeas claim, he has not demonstrated that the decision by the [state] courts (that there was no Title III violation) was contrary to, or involved an unreasonable application of clearly established federal law," Id. at 1093-94. In affirming, the Ninth Circuit agreed that Lord had received a full and fair opportunity to present his claim to the state courts and as such, any error was not "inconsistent with the rudimentary demands of fair procedure." Id. at 1095 (quoting Hussong v. Warden, 623 F.2d 1185 (7th Cir.1980)). Because petitioner had received a full and fair opportunity to litigate the Title III issue, the Ninth Circuit found Lord's claim to be noncognizable on federal habeas review.

Here, as in Lord, Petitioner had a full and fair opportunity to litigate this claim in state court, and therefore he fails to demonstrate that the violations, if any, of Title III's requirements resulted in a miscarriage of justice, or were omissions inconsistent with the rudimentary demands of fair procedure. See Lord, 347 F.3d at 1094. Further, Petitioner fails to demonstrate that the wiretap evidence used at trial was otherwise unreliable. See id. at 1095. Accordingly, Petitioner's Title III claim is not cognizable on habeas corpus review.

Based on the foregoing, Petitioner has failed to show that the state court adjudication was an unreasonable application of clearly established federal law.

**E.     Claim Five: Failure to Suppress Voice Identification Evidence**

In his fifth claim, Petitioner renews his state court argument regarding the admissibility of voice identification testimony. Specifically, Petitioner argues that the trial court should have suppressed evidence of Detective Campbell's opinion regarding the identity of the persons

1   whose voices were on the intercepted telephone conversations described above. The state

2   appellate court denied the claim in a reasoned decision, and the California Supreme Court

3   denied review. (Lodged Doc., 1 at 81-88.)

4         1.     State Court Review

5        The state court of appeal summarized the relevant facts and denied Petitioner's claim

6   as follows:

### VOICE IDENTIFICATION TESTIMONY

**A. Background**

Silva moved, in limine, to exclude testimony by Detective Campbell regarding his opinion about the identity of the persons whose voices were heard on the tape recordings of the intercepted cell phone conversations, as well as any transcripts of those recordings that purported to identify the participants by name. He asserted that the tape recordings could not be authenticated without corroborating testimony from someone who was personally familiar with Silva's voice, was present at the time of the conversations, or was a participant in the conversations. Silva further claimed that the voice identification by Campbell violated due process because Silva was the only suspect in a one-voice lineup, which was thus impermissibly suggestive. The other defendants joined. The People argued that Campbell had become sufficiently familiar with defendants' voices so as to be able to identify them in the tape recordings, and that other circumstantial evidence sufficiently identified the speakers.

An Evidence Code section 402 hearing was held. Detective Campbell testified that, during the course of his investigation in this case, he had listened to the telephone calls that were intercepted and reviewed the transcripts of those calls, and he recognized the voice of each individual named in the transcripts.

Campbell recognized Morrison's voice from listening to numerous telephone calls consisting of those on the wiretap and, after Morrison's arrest, jail phone calls. He also listened to recordings of five to 10 jail visits for Morrison.

Campbell was able to recognize Silva's voice for the same reasons, and he was able to distinguish Silva's voice from the others in the intercepted telephone calls. He also was personally present during part of Silva's postarrest interview, and he personally seized some of Silva's clothing. Campbell was with Silva for no more than 10 minutes on that occasion. Campbell listened to dozens of postarrest calls for Silva. Jail inmates were limited to an hour per call, and Silva often used the whole hour. Thus, it amounted to hours and hours of phone calls. Campbell had heard the wiretapped calls before the arrest; after the arrest, he listened to those calls again.

One of the intercepted calls allegedly involved Terry Silva, Silva's mother; Campbell was able to recognize her voice from the intercepted calls, phone calls made at the time of her arrest, and, after she was released, numerous phone calls between her and Silva. In addition, Campbell spoke to her in person when he interviewed her following her arrest. The interview lasted approximately 30

minutes to an hour. With respect to the individual identified as Virginia "Ginger" Ellsworth, Campbell recognized her voice from phone calls captured during the wiretap between her and Silva, and, after her arrest, phone calls she made from the jail. She identified herself on at least one of those calls. Campbell was able to distinguish her voice from Fouse's voice.

As for Martinez, Campbell was able to identify his voice from the intercepted calls between him and Morrison, as well as from phone calls he made from the jail following his arrest. Although Martinez and Morrison did not identify themselves when talking to each other, a pin register gave information that allowed authorities to determine who was actually registered to the telephone number.

Campbell did not sit in on or listen to Martinez's or Morrison's interviews.[53] He did, however, hear a phone call made to Morrison. The caller, Keith Meyers, was tracked down through subscriber information. Campbell talked to Meyers in person and played the tape of the telephone call for him, and Meyers identified himself and Morrison. In addition, Campbell engaged in a little bit of small talk with Morrison after his arrest, while the male defendants were at a hospital to get blood collected in obedience to a search warrant. Also, Campbell had brief contact with Morrison and Martinez on August 12, 2003, before their arrests, when they were stopped by Turlock police officers. Campbell stood by while Morrison was talking to someone else, and he personally asked Morrison one question. On this occasion, Campbell listened to Morrison talk for a few minutes.

Campbell was able to identify Fouse's voice from intercepted phone calls, around a dozen jailhouse telephone calls, and from monitoring her interview the day she was arrested. At least three of the wiretapped calls contained Fouse's voice. All were on Silva's phone. On one occasion, she was with him at a Taco Bell when a call came in from his mother. While Silva was ordering food, Fouse got on the phone and talked to Terry Silva for a minute or two. During this call, Fouse identified herself by her nickname, "Shady." The other calls were on September 9, when Silva called her to be the driver, and later that evening, when she was on the phone, talking about all the police in Turlock.

The male defendants were in 12-man cells, each of which contained a telephone.[54] Prisoners were allowed to use the telephone whenever the jail had it turned on. Jail phone calls were identified primarily by location. Authorities could determine which cell the call originated in, look up that phone, and check the outgoing call and the telephone numbers of known family members. Silva would call his mother or his girlfriend, and would sometimes identify himself by first name. Sometimes he could be identified by the content of the conversation and the fact the phone number called was that of his mother. Martinez also would identify himself on phone calls by first name. With respect to jail visits, when defendants initially were booked, Campbell made a request to the jail's staff to tape every visit defendants received. In addition, the parties to the visits were logged in.

---

[53] At trial, Campbell testified that he reviewed a taped interview conducted with Martinez, and one conducted with Morrison, at the sheriff's department.

[54] Campbell believed the three men were all in the same cell. He did not know how many inmates actually were housed in the cell.

The trial court denied the motion to exclude the evidence. The court found there was a sufficient showing to allow Campbell to testify that the various voices sounded alike to him. It cautioned, however, that it must be made clear that he was not an expert witness, and that the prosecution also needed to establish how he was able to make his comparison of the voices and reach his conclusion. The court also determined that jurors would be instructed to decide whether the voices were the same. Based on what the court heard in the Evidence Code section 402 hearing, however, it found sufficient preliminary authentication to allow that issue to go to the jury, despite the single-voice identification. Consequently, a number of intercepted conversations were admitted, as described in the statement of facts, ante. In addition, Campbell testified that the people involved in the conversations sounded similar to voices with which he was familiar, and on what he based that opinion, and he was cross-examined on the subject. Before the tapes were played, jurors were instructed: "Ladies and gentlemen, the witness has testified that the voices sounded similar to him, but it will be ultimately your decision whether or not the voices that are heard on the tapes are belonging to the defendants and whether the ones that are identified as belonging to them are the same persons on the various recordings that you will hear."

Silva and Morrison now contend the trial court's ruling was erroneous and constituted a prejudicial violation of due process. They reiterate that the recordings were not authenticated, and that the voice identification procedure was impermissibly suggestive. We find no error.

B. Analysis

1. Authentication

A tape recording is considered a "writing" under the rules of evidence. (Evid. Code, § 250.) As such, it must be authenticated to be admissible. (Id., § 1401.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Id., § 1400.) In short, a recording "is authenticated by testimony or other evidence 'that it accurately depicts what it purports to show.' [Citation.]" (People v. Mayfield (1997) 14 Cal.4th 668, 747.) It need not necessarily be authenticated by the means set out in sections 1410-1421 of the Evidence Code (Evid. Code, § 1410; People v. Olguin (1994) 31 Cal.App.4th 1355, 1372); "[c]ircumstantial evidence, content and location are all valid means of authentication [citations]" (People v. Gibson (2001) 90 Cal.App.4th 371, 383).

The existence of authentication constitutes a preliminary fact. (Evid. Code, § 403, subd. (a)(3); Fakhoury v. Magner (1972) 25 Cal.App.3d 58, 65.) Accordingly, it is first determined by the trial court, but is then subject to redetermination by the jury. (Evid. Code, § 403, subds. (a)(3) & (c)(1); People v. Fonville (1973) 35 Cal.App.3d 693, 708-709.) When the existence of a preliminary fact is at issue, "the proffered evidence is inadmissible unless the trial court finds there is sufficient evidence to sustain a finding of the existence of the preliminary fact. [Citation.] That is, the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence. [Citation.]" (People v. Guerra (2006) 37 Cal.4th 1067, 1120, disapproved on other grounds in People v. Rundle (2008) 43 Cal.4th 76, 151.) "In other words … there [must] be sufficient evidence to enable a reasonable jury to conclude that it is more probable that the fact exists than that it does not. [Citations.]" (People v. Herrera

(2000) 83 Cal.App.4th 46, 61.) "A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion. [Citation.]" (People v. Guerra, supra, 37 Cal.4th at p. 1120.)

There was no abuse of discretion here. As this court has recognized, "[t]here are other ways of identifying a voice than by seeing the speaker …." (People v. Fonville, supra, 35 Cal.App.3d at p. 709.) "[T]estimony of a witness who recognizes a voice and uses this identification to name the speaker is properly admissible [citations], and any uncertainty of the recognition goes only to the weight of the testimony. [Citation.]" (People v. Sica (1952) 112 Cal.App.2d 574, 586-587.) In forming his opinion as to the various participants in the intercepted conversations, Campbell relied in part on self-identification and the content of the conversations, bolstered, where possible, by visual surveillance. He also was able to compare the unidentified voices in those conversations with defendants' voices in situations in which their identities were known, such as jail visits and personal contact, or at least substantially established, such as telephone calls from the jail to relatives. These were acceptable means of identification. (See People v. Gibson, supra, 90 Cal.App.4th at p. 383; People v. Fonville, supra, 35 Cal.App.3d at p. 709.) Since there was sufficient evidence to sustain a finding that the tape recordings of the intercepted conversations were what the prosecution claimed them to be, the trial court properly allowed authenticity and the issue of identity of the speakers to become questions of fact for the jury. (See McAllister v. George (1977) 73 Cal.App.3d 258, 262.)

2. Suggestiveness[55]

"A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification. [Citations.]" (People v. Contreras (1993) 17 Cal.App.4th 813, 819; Simmons v. United States (1968) 390 U.S. 377, 384; cf. Stovall v. Denno (1967) 388 U.S. 293, 301-302, overruled on other grounds in Griffith v. Kentucky (1987) 479 U.S. 314, 321-322.) In determining whether defendants' rights have been violated in this regard, "the court first determines whether the identification procedure was unduly suggestive and unnecessary. If so, the court must determine whether the identification itself was nevertheless reliable, under the totality of the circumstances, taking into account such factors as the witness's opportunity to view (or hear) the person, the degree of the witness's attention, the accuracy of any prior description of the person (or voice), the level of certainty of the identification, and the time between the incident and the confrontation. [Citation.]" (People v. Clark, supra, 3 Cal.4th at p. 135.) "'If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.]" (People v. Ochoa (1998) 19 Cal.4th 353, 412.)

Defendants have "the burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just speculation.' [Citation.]" (People v. Cook (2007) 40 Cal.4th 1334, 1355.) We review such a claim independently. (People v. Kennedy (2005) 36 Cal.4th 595, 608.)

"[A]n identification procedure is considered suggestive if it 'caused

---

[55] The California Supreme Court has assumed, without deciding, that voice identification procedures are judged by the same standards as visual identification procedures. (People v. Clark (1992) 3 Cal.4th 41, 135.) We do likewise.

defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (People v. Cook, supra, 40 Cal.4th at p. 1355.) Along these lines, "[n]umerous cases have condemned the use of a single photo identification procedure. [Citations.]" (People v. Contreras, supra, 17 Cal.App.4th at p. 820.) "A single-voice 'lineup,' like a one-person showup or corporeal lineup, may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered." (People v. Clark, supra, 3 Cal.4th at p. 136.)

We are not convinced that what occurred in the present case falls within the parameters of the foregoing authorities. In any event, neither the means by which Campbell gained familiarity with defendants' voices nor his comparison of the various voices was unduly suggestive and unnecessary. (See People v. Clark, supra, 3 Cal.4th at pp. 136-137.) Moreover, even "[w]hen an eyewitness has been subjected to undue suggestion, the factfinder must nonetheless be allowed to hear and evaluate his identification testimony unless the ""totality of the circumstances"" suggests "'a very substantial likelihood of irreparable misidentification."' [Citations.] No such likelihood appears here." (People v. Arias (1996) 13 Cal.4th 92, 168.) Accordingly, the trial court did not err by permitting jury consideration of Campbell's identification testimony. (Ibid.)[56]

(Lodged Doc. 1 at 81-88.)

        2.    Analysis

        a.    Authentication

To the extent that Respondent contends that Petitioner's claim is without merit as to Petitioner's claims of failure to properly authenticate the evidence, this Court agrees. Such allegations fail to set forth a violation of clearly established Supreme Court law:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. [Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006)].

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [see Williams v. Taylor, 529 U.S. 362, 375, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." [Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct.

---

[56] Defendants' reliance on People v. Vallez (1978) 80 Cal.App.3d 46 is misplaced. That case concerned a true voice lineup, in which the victims were played a tape recording of the defendant and five others speaking the same words, and from which they identified the defendant. (Id. at p. 54.) It is manifestly distinguishable from the circumstances before us.

1   649, 166 L. Ed. 2d 482 (2006)]. Under the strict standards of AEDPA, we are
2   therefore without power to issue the writ on the basis of [Petitioner's] additional
    claims.

3   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009).

4       In this case, Petitioner fails to allege the violation of any clearly established Supreme
5   Court authority for the admission of improperly authenticated evidence in violation of his
6   federal constitutional rights. Therefore, the claim must be rejected. See 28 U.S.C. § 2254(d).

7                           b.      Suggestiveness

8       The principles of due process prohibit the admission of eyewitness identifications
9   obtained after police have arranged identification procedures so impermissibly suggestive as
10  to give rise to a very substantial likelihood of irreparable misidentification. Perry v. New
11  Hampshire,      U.S.    , 132 S.Ct. 716, 720, 181 L. Ed. 2d 694 (2012); Simmons v. United
12  States, 390 U.S. 377, 384 (1968); Moore v. Illinois, 434 U.S. 220, 227 (1977). While
13  suggestiveness inquires usually involve the visual identification, the same principles and
14  reasoning apply to voice identifications. Accordingly, even though the following cases discuss
15  visual identification, they shall be considered and applied in the case of voice identification.

16      A two-part analysis is used to evaluate whether an in-court identification has been
17  irreparably tainted by an impermissibly suggestive pretrial identification procedure in violation
18  of due process. See United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984); Green v.
19  Loggins, 614 F.2d 219, 223 (9th Cir. 1980). The first step is to determine whether the pretrial
20  identification was unduly suggestive. Simmons, 390 U.S. at 384; Green, 614 F.2d at 223. This
21  may occur when a photographic identification procedure "emphasize[s] the focus upon a single
22  individual," thereby increasing the likelihood of misidentification. See United States v. Bagley,
23  772 F.2d 482, 493 (9th Cir. 1985). For example, the danger of misidentification "will be
24  increased if the police display to the witness . . . the pictures of several persons among which
25  the photograph of a single such individual recurs or is in some way emphasized." Simmons,
26  390 U.S. at 383; see Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (explaining that an
27  identification procedure may be impermissibly suggestive where a special focus upon a
28  suspect such that it appears to be suggested that a particular suspect is "the" person for a

witness to identify, or where a witness perceives pressure from police officers to "acquiesce" in identifying a particular individual such that the possibility is raised that the identification may have stemmed from suggestion and not from the witness's own recognition of the suspect); see also Foster v. California, 394 U.S. 440, 443 (1969) (An identification procedure is impermissibly suggestive if it "[i]n effect ... sa[ys] to the witness, 'This is the man.'" (citation omitted)). Whether an identification procedure was unduly suggestive is a fact specific determination, which may involve consideration of the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves. If the identification procedure was not unduly suggestive, the analysis ends.

If the identification procedure was unduly suggestive, the second step requires a determination of whether the totality of the circumstances surrounding the eyewitness's identification indicates that the identification was nonetheless reliable. Neil v. Biggers, 409 U.S. 188, 199 (1972); Simmons, 390 U.S. at 383; Love, 746 F.2d at 478. Factors considered in assessing reliability include: (1) the opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention (including any police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the identification. Biggers, 409 U.S. at 199-200; Manson v. Brathwaite, 432 U.S. at 114. Where "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Perry, 132 S.Ct. at 720.

Even assuming that the identification procedures were unduly suggestive, under the totality of the circumstances, Campbell's in-court identifications of Petitioner were nevertheless reliable. Biggers, 409 U.S. at 199-200. Here, Campbell heard significant amount of telephonic communication originating from Petitioner's phone. He listened to the recordings several times, including hearing many hour-long phone conversations Petitioner had once arrested.  Based on the amount of time Campbell spent listening to Petitioner and his co-defendants, it is reasonable to conclude that it would be possible to identify the voices over the phone. While Petitioner argues that it was a suggestive one-suspect show up, and therefore unduly

suggestive, Petitioner provides no other basis for claiming that the identification was unreasonable. Further, the court conditioned the testimony on admonishing the jury that Campbell was not an expert and allowed Petitioner to cross-examine Campbell regarding his identification. Peace officers commonly visually identify suspects without any question of suggestibility. The Court sees little distinction in this case. In sum, based on the totality of the circumstances, including Campbell's significant time listening to Petitioner's conversations, his identification of Petitioner favors reliability. Petitioner is not entitled to relief with regard to this claim.

**F.    Claim Six: Improper Assessment of Sentencing Enhancements**

In his sixth claim, Petitioner argues the trial court erred in imposing California Penal Code § 12022.53(d) enhancements on more than one count. (Pet. at 31-33.) Petitioner presented this claim to the state court on direct appeal, and the court denied the claim in a reasoned decision. (Lodged Doc. 1 at 154-61.) The California Supreme Court denied review of the claim. (Lodged Doc. 6.)

1.    State Court Review

The state court of appeal summarized the relevant facts and denied Petitioner's claim as follows:

> Acknowledging that section 654 does not apply to section 12022.53 enhancements (People v. Palacios (2007) 41 Cal.4th 720, 727-728 (Palacios), Silva nevertheless contends the trial court erred by imposing section 12022.53, subdivision (d) (hereafter subdivision (d)) enhancements as to both count 30 and count 31, the attempted murder and attempted robbery, respectively, of Marcos Renteria. Silva says that, because these were separate offenses that occurred at different times and places, an enhancement for personal discharge of a firearm causing great bodily injury, as prescribed by subdivision (d), was properly imposed in conjunction with the attempted murder, but only an enhancement for personal use of a firearm, as prescribed by section 12022.53, subdivision (b) (hereafter subdivision (b)), should have been imposed for the attempted robbery. Silva argues that Palacios does not apply because it involved enhancements imposed on separate counts occurring during a simultaneous shooting. As he argued in the trial court, albeit in the context of a claim section 654 should apply,[57] he and Martinez "were either attempting to kill [Renteria] or rob him, but they can't be attempting both," and, "The shots fired at Mr. Renteria were pursuant to the attempted murder and, therefore, great bodily injury was not caused during the attempted robbery."

---

[57] Palacios was decided after sentencing in this case.

Subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a),…personally and intentionally discharges a firearm and proximately causes great bodily injury … to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."[58] Subdivision (b) mandates a consecutive 10-year term for any person who, in the commission of a specified felony, personally uses a firearm. Subdivision (f) of section 12022.53 provides in pertinent part that "[o]nly one additional term of imprisonment under this section shall be imposed per person for *each crime*." (Italics added.)

In Palacios, supra, 41 Cal.4th 720, the defendant and his accomplice kidnapped and carjacked one Jones, whom they then shot and left for dead. The defendant was subsequently convicted of attempted premeditated murder, kidnapping for robbery, kidnapping for carjacking, carjacking, and robbery, and a firearm discharge allegation pursuant to subdivision (d) was found true as to each offense. The defendant was sentenced to three consecutive terms of life in prison with the possibility of parole for the attempted murder and two kidnapping convictions, and the trial court added a subdivision (d) enhancement of 25 years to life to each of those terms. (Palacios, supra, 41 Cal.4th at pp. 723-724.) On appeal, the defendant argued that section 654 barred imposition of multiple subdivision (d) enhancements, since he had fired a single shot at a single victim. (Palacios, at p. 725.) The Court of Appeal agreed, reasoning that, while the defendant should be punished for having discharged his gun, the fact that the kidnappings were technically ongoing at the time did not make him more culpable so as to justify imposing three times the punishment. (Ibid.)

The California Supreme Court granted review and reversed. The court found the legislative intent behind section 12022.53 to be clear: "'"The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime."' [Citations.]" (Palacios, supra, 41 Cal.4th at p. 725.) With respect to the factual scenario before it, the court stated: "Defendant's convictions for attempted murder, kidnapping for carjacking, and kidnapping for robbery are qualifying felonies [under section 12022.53, subdivision (a)]. [Citation.] When defendant shot Jones, attempting to kill him, the kidnapping offenses were still ongoing. '[T]he crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and [the defendant] has reached a place of temporary safety….' [Citation.] By finding the section 12022.53, subdivision (d) enhancement allegations to be true…, the jury necessarily determined that defendant fired the gun and caused great bodily injury during the commission of each of the three offenses. Thus, in this case, section 12022.53 mandates punishment for each of the subdivision (d) enhancements." (Palacios, at p. 726.)

The high court went on to determine that, in enacting section 12022.53, the Legislature created a sentencing scheme to which section 654 does not apply. (Palacios, supra, 41 Cal.4th at pp. 727-728.) It noted, however, that, while section 654 prohibits multiple punishment per act, the Legislature, in subdivision (f) of section 12022.53, chose to address the issue of multiple enhancements per crime. (Palacios, at p. 731.) "[T]he intent of section 12022.53, subdivision (f)

---

[58] Both attempted murder and attempted robbery constitute qualifying offenses under section 12022.53, subdivision (a). (§ 12022.53, subd. (a)(1), (4) & (18).)

was to punish the use of firearms linked to the commission of applicable crimes, not discrete acts…. 'The enactment of [subdivision (f)] shows that the Legislature specifically considered the issue of multiple enhancements and chose to limit the number imposed only "for each crime," not for each transaction or occurrence ….'" (Palacios, at pp. 731-73, fn. omitted.) In a passage that is particularly pertinent to the issue before us, the court stated: "Finally, defendant argues that the Legislature could not have intended a 'draconian' scheme whereby one injury could result in as many 25-years-to-life enhancements as there were qualifying offenses. He relies on the Court of Appeal's reasoning that the punishment should be commensurate with defendant's conduct rather than 'the fact the aggravated kidnappings were technically ongoing at the time he discharged the gun.' However, as we have discussed, *the applicability of section 12022.53 enhancements necessarily depends on what is 'technically ongoing at the time' a firearm is used.* The Legislature premised section 12022.53 enhancements on a defendant's firearm use during underlying crimes. The statute 'prescribes substantial sentence enhancements for *using a firearm* in the commission of certain listed felonies.' [Citation.] Although subdivision (d) incorporates an injury element, it still 'clearly serves' legislative goals in deterring the use of firearms in crimes. [Citation.] Defendant fired a gun and caused great bodily injury while he was committing three crimes. The sentence imposed by the trial court is required by the statutory language and in keeping with the legislative purpose." (Palacios, at p. 733, first italics added.)

Here, then, the question is whether the attempted robbery was technically ongoing at the time Silva discharged a firearm in his attempt to murder Renteria. If it was, then Silva fired a gun and caused great bodily injury while committing two crimes, and the imposition of a subdivision (d) enhancement as to both count 30 and count 31 was required by section 12022.53's language.

We conclude the attempted robbery was still in progress—hence, technically ongoing—at the time the gun was fired. "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission. [Citations.]" (People v. Medina (2007) 41 Cal.4th 685, 694.) Neither a completed theft nor a completed assault is required. (Ibid.) Instead, "[w]hen a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime [citation], and performs an act that 'go[es] beyond mere preparation …and…show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt." (People v. Toledo (2001) 26 Cal.4th 221, 230, fn. omitted.)

That the attempted robbery may have been committed for purposes of affixing liability to Silva for that crime long before he shot Renteria, such that the attempted murder and attempted robbery were two separate offenses (see People v. Sandoval, supra, 30 Cal.App.4th at p. 1299), does not mean, however, that Silva discharged his firearm and caused great bodily injury only in the commission of one offense for purposes of enhanced sentencing under section 12022.53. In this respect, "in the commission of," as used in subdivision (d), is not the same as "committed."

People v. Cooper (1991) 53 Cal.3d 1158 is instructive. In that case, the California Supreme Court was called upon to determine the duration of the "commission" of robbery for aiding and abetting liability. The court stated: "We have held that once all elements of a robbery are satisfied, the offense has been initially committed and the principal may be found guilty of robbery, as distinct from a mere attempt. [Citation.] This threshold of guilt-establishment is a fixed

point in time, but is not synonymous with 'commission' of a crime for our purposes. [P] For purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have ceased. The taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot. [Citation.] Thus, in determining the duration of a robbery's commission we must necessarily focus on the duration of the final element of the robbery, asportation. [P] Although, for purposes of establishing guilt, the asportation requirement is initially satisfied by evidence of slight movement [citation], asportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety." (Id. at pp. 1164-1165, fns. omitted.) In footnote 7 at page 1164 of the opinion, the court explained: "The logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability can be seen from the perspectives of both the victim and the accomplice. The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration). Rather, the offense does not end until all of the acts that constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially committed and aids the perpetrator in the continuing criminal acts is an accomplice under the concept of 'commission,' because he formed his intent to facilitate the commission of the rape during its commission."

People v. Keith (1975) 52 Cal.App.3d 947 is similar. There, a charge of first degree murder was submitted to the jury on a felony-murder theory. The prosecution's evidence showed that the victim was killed during the attempted flight of a group of robbers; the People's theory was that the defendant or one of his accomplices killed the victim in the course of a robbery or attempted robbery. (Id. at pp. 952-953.) Upon conviction for first degree murder and attempted robbery, the defendant argued that the then-recently recognized rule, "that a robbery is not complete while the robber only has scrambling possession of the loot and has not reached a place of temporary safety, does not apply to unsuccessful robberies that do not result in any loot and, hence, no possession whatever." (Id. at p. 953.) The Court of Appeal rejected the argument, finding "no doubt" that the rule applied to the facts of the case before it. (Ibid.)

The central element of the crime of robbery—and, by extension, the crime of attempted robbery—is the force or fear applied to the victim in order to deprive him or her of his or her property. (People v. Ramos (1982) 30 Cal.3d 553, 589, revd. on other grounds sub nom. California v. Ramos (1983) 463 U.S. 992.) In the present case, the intruders forced their way into Renteria's house with guns drawn. When he said they could have anything, one of them asked, "'Anything?'" and then both began to beat him. When he tried to rise, one put a gun to his head. They wrestled for it. At some point, one intruder's mask came off and Renteria saw that it was Martinez. When the other intruder—inferentially Silva—told Martinez to shoot him, Renteria attempted to flee. The intruders caught up to him and started beating him again. When he finally managed to get loose, he ran. They then shot him. Renteria estimated they were on the premises for about an hour before they left.

It is clear from the foregoing that, although none of Renteria's property was taken so far as he knew, the application to him of force, in order to deprive him of his property, was ongoing at the time he was shot. Thus, the attempted robbery, although complete for purposes of affixing criminal liability for that

1    offense, was still in progress at the time of the attempted murder. Accordingly,
2    Silva fired a gun and caused great bodily injury while he was simultaneously
     committing two crimes. As the jury necessarily determined, by its findings on the
3    subdivision (d) allegations, that he fired a gun and caused great bodily injury
     during the commission of each of the two offenses (Palacios, supra, 41 Cal.4th
4    at p. 726), the trial court was required to impose a subdivision (d) enhancement
     on both count 30 and count 31 (Palacios, at p. 733).

5    (Lodged Doc. 1 at 154-61.)

6              2.    Analysis

7           Initially, the undersigned notes that to the extent Petitioner is claiming that application

8    of the firearm enhancement violates section 12022.53, or any other state law, his claim is not

9    cognizable on federal habeas review. A writ of habeas corpus is available under 28 U.S.C. §

10   2254(a) only on the basis of some transgression of federal law binding on the state courts.

11   Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195,

12   1197 (9th Cir. 1983). It is unavailable for alleged error in the interpretation or application of

13   state law. Middleton, 768 F.2d at 1085; see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

14   ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on

15   state-law questions."). Habeas corpus cannot be utilized to try state issues de novo. Milton v.

16   Wainwright, 407 U.S. 371, 377 (1972). Thus, the undersigned defers to the state court's

17   interpretation of section 12022.53, in light of the California Supreme Court's holding in People

18   v. Palacios, 41 Cal. 4th 720, 726 (2007).

19          Petitioner argues that the multiple enhancements violate California Penal Code § 654

20   which precludes multiple punishment for a single act or indivisible course of conduct

21   punishable under more than one criminal statute. Federal courts must defer to the state courts'

22   interpretation of state sentencing laws. In Palacios, 41 Cal.4th at 723, the California Supreme

23   Court held the sentence enhancement provisions of § 12022.53 are not subject to the multiple

24   punishment prohibition of § 654. Accordingly, Petitioner's claim that his sentence violates §

25   654 is without merit.

26          Federal habeas relief for a state sentencing error "is limited, at most, to determining

27   whether the state court's finding was so arbitrary and capricious as to constitute an

28   independent due process violation." Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Christian v.

Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief.") Here, the trial court's imposition of a firearm enhancement, based on Petitioner's conduct during the attempted murder and attempted robbery, was not arbitrary, capricious, or fundamentally unfair. See Ramirez v. State of Arizona, 437 F.2d 119, 120 (9th Cir. 1971) ("Cumulation of sentences is a matter of state policy[,]" thus challenge to consecutive sentence does not raise a federal question.) This is especially true where the "cumulation" has no practical adverse effect, as in the case here where Petitioner is serving many life sentences. Furthermore, Petitioner has not made the necessary showing under AEDPA that the state court decision was either contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d). For these reasons, the Court defers to the state court's affirmance of Petitioner's sentence on the grounds stated in its in opinion.

Finally, the Court shall determine if the multiple enhancements violate the Double Jeopardy Clause. The Double Jeopardy Clause contains three distinct constitutional protections. See Plascencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006). "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishment for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted); see also Brown v. Ohio, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977).

In Plascencia, 467 F.3d at 1204, the Ninth Circuit analyzed whether a petitioner's sentence for murder in addition to a twenty-five years to life enhancement for using a firearm constituted double jeopardy. The Ninth Circuit explained that the United States Supreme Court in Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983):

> made clear that the protection against multiple punishments for the same offense did not necessarily preclude cumulative punishments in a single prosecution. The key to determining whether multiple charges and punishments violate double jeopardy is legislative intent. When the legislature intends to impose multiple punishments, double jeopardy is not invoked.

Plascencia, 467 F.3d at 1204. The Ninth Circuit continued by stating that the language of §

12022.53 is clear and that there is no question that the California legislature "simply determined that a criminal offender may receive additional punishment for any single crime committed with a firearm." Id. In Plascencia, the Ninth Circuit rejected a double jeopardy argument that is similar to what Petitioner raises in this case. See id. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

## V.    CONCLUSION

This Court finds that the state court's ruling was not contrary to, nor involved an unreasonable application of, clearly established federal law with regard to any of Petitioner's six claims. Moreover, the state court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented in that proceeding. 28 U.S.C. § 2254(d). Therefore, it is recommended that the petition be denied.

## VI.    RECOMMENDATION

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    March 12, 2013                          /s/ Michael J. Seng
                                        UNITED STATES MAGISTRATE JUDGE